## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| U.S. Commodity Futures Trading Commission, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - against - | ) | |
| | ) | |
| Michael Whitney, et al. | ) | |
| | ) | **Case No. 1:06-mc-00210 (RCL)** |
| Defendants. | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| | ) | |
| | ) | |

### MOTION OF THE MCGRAW-HILL COMPANIES, INC. FOR ENTRY OF A PROTECTIVE ORDER PROVIDING CONFIDENTIAL TREATMENT OF AND GOVERNING THE SCOPE OF PRODUCTION OF MCGRAW-HILL DOCUMENTS

Third party The McGraw-Hill Companies, Inc. ("McGraw-Hill") moves for entry of a protective order, in the proposed form attached hereto, to apply to the production of documents to be made by McGraw-Hill pursuant to the four subpoenas that are the subject of the captioned miscellaneous action pending before this Court. In support thereof McGraw-Hill would show the Court as follows:

1. The U.S. Commodity Futures Trading Commission (the "CFTC") has served McGraw-Hill with subpoenas in four separate actions requesting that McGraw-Hill produce certain documents protected from production by the reporter's privilege and containing confidential proprietary and trade secret information.

2. The CFTC filed a consolidated Motion to Compel in this Court, asking this Court to compel to produce all documents requested by the CFTC without entry of any sort of protective order.

3.    McGraw-Hill submits that under the jurisprudence of the reporter's privilege and trade secrets law, any records or documents that McGraw-Hill may produce in response to any of the subpoenas should be made subject to the protections provided in the proposed protective orders, submitted herewith.

4.    McGraw-Hill further submits that the scope of the production of records or documents that McGraw-Hill may be compelled to produce in response to the subpoenas should be limited in scope as set forth in the proposed protective orders.

For the reasons set forth above and in the accompanying memorandum of law and declaration of Carolyn K. Foley, McGraw-Hill respectfully requests that this Court enter protective orders binding the CFTC and all Defendants, in the forms submitted herewith as Appendices A, B, C and D.

McGraw-Hill respectfully requests that oral argument, in person, be heard on McGraw-Hill's cross-motion.

Dated: May 26, 2006          Respectfully submitted,
       New York, New York

                             s/ Richard L. Cys
                             Richard L. Cys
                             D.C. Bar No. 087536
                             DAVIS WRIGHT TREMAINE LLP
                             1500 K Street, N.W.
                             Suite 450
                             Washington, D.C. 20005-1272
                             (202) 508-6600 (phone)
                             (202) 508-6699 (fax)
                             *Counsel for Third Party The McGraw-Hill Companies, Inc.*

                             Of Counsel:
                             Victor A. Kovner (*pro hac vice* admission pending)
                             Carolyn K. Foley (*pro hac vice* admission pending)

Kevan D. Choset (*pro hac vice* admission pending)
DAVIS WRIGHT TREMAINE LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340
Email:  carolynfoley@dwt.com

Of Counsel:
William Farley, Esq.
Adam Schuman, Esq.
The McGraw-Hill Companies, Inc.
1221 Avenue of the Americas
New York, New York  10020

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of May, 2006, copies of the foregoing Motion

for Entry of a Protective Order and Memorandum of Points and Authorities in support of that

motion and in opposition to the CFTC's Motion to Compel, as well as all attachments and

exhibits thereto were served by first-class mail, postage prepaid, upon the following:

Anthony M. Mansfield, Esq. (MA Bar 630216)
Michael J. Otten, Esq. (VA Bar 42371)
Laura Gardy, Esq. (FL Bar 523909)
United States Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

Samuel F. Abernathy, Esq.
Menaker & Herrmann
10 East 40th Street
New York, NY 10016-0301
*Counsel for Michael Whitney*

Matthew L. Fornshell, Esq.
250 West Street
Columbus, OH 43215
*Counsel for Joseph Foley*

David R. Cordell, Esq.
Conner & Winters
4000 One Williams Center
Tulsa, OK 74172
*Counsel for Jeffrey Bradley*

Thomas M. Ladner, Esq.
Norman Wohlgemuth Chandler & Dowdell
401 South Boston Avenue
2900 Mid-Continent Tower
Tulsa, OK 74103-4023
*Counsel for Robert Martin*

Robert B. Christie, Esq.
Henderson & Lyman
175 West Jackson Blvd, Suite 240
Chicago, IL 60604
*Counsel for Andrew Richmond*

NYC 169936v1 3930059-27

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
------------------------------------------------- x
U.S. Commodity Futures Trading Commission,    :
                                              :
                    Plaintiff,                :      Case No. 1:06-mc-00210 (RCL)
                                              :
           - against -                        :      ORAL ARGUMENT REQUESTED
                                              :
Michael Whitney, et al.                       :
                                              :
                    Defendants.               :
------------------------------------------------- x
```

### MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE CFTC'S MOTION TO COMPEL THIRD PARTY TO PRODUCE DOCUMENTS IN RESPONSE TO SUBPOENAS *DUCES TECUM* AND IN SUPPORT OF McGRAW-HILL'S CROSS-MOTION FOR PROTECTIVE ORDER

### DAVIS WRIGHT TREMAINE LLP

**1633 Broadway
New York, New York 10019
(212) 489-8230**

**1500 K Street NW, Suite 450
Washington, D. C. 20005-1272
(202) 508-6600**

**Attorneys for Non-Party Respondent, The McGraw-Hill Companies, Inc.**

**Dated: May 26, 2006**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ....................................................................... 5

    The Publications..................................................................................... 5

    The Subpoenas ...................................................................................... 6

    The Underlying Case ............................................................................ 8

    Negotiations ........................................................................................ 10

ARGUMENT ........................................................................................ 11

    I.     THE CFTC'S MOTION TO COMPEL SHOULD BE DENIED ............................. 11

    II.    A PROTECTIVE ORDER SHOULD BE ENTERED TO ENSURE THAT THE
            CONFIDENTIAL, PRIVILEGED AND PROPRIETARY McGRAW-HILL
            DOCUMENTS THAT MAY BE PRODUCED ARE USED SOLELY FOR
            PURPOSES OF THE CASES FOR WHICH THEY ARE SOUGHT AND NOT
            OTHERWISE DISCLOSED OR PUBLISHED ........................................... 13

            A.     WHERE DOCUMENTS TO BE PRODUCED ARE COVERED BY
                    THE REPORTER'S PRIVILEGE, A PROTECTIVE ORDER IS
                    NECESSARY ....................................................................... 15

            B.     WHERE DOCUMENTS TO BE PRODUCED CONTAIN TRADE
                    SECRETS A PROTECTIVE ORDER IS NECESSARY............................. 16

            C.     THE CFTC'S ASSERTED REASONS FOR REFUSING TO ENTER A
                    PROTECTIVE ORDER ARE NOT LEGITIMATE ..................................... 21

                  1.     McGraw-Hill has Good Reason to Fear Extra-Judicial Disclosure
                          of Its Privileged Documents............................................... 21

                  2.     A Protective Order is the Only Way McGraw-Hill Can Protect Its
                          Privileged Information ...................................................... 22

                  3.     A Protective Order is Appropriately Issued under Rule 45 ................ 24

    III.   THE SCOPE OF THE SUBPOENAS SHOULD BE NARROWED......................... 24

            A.     The Reporter's Privilege Requires that Subpoenas be More Narrowly
                    Drawn................................................................................ 24

1.    The Subpoena Should Be Narrowed By Limiting the Scope
      Publications to Which the Individual Defendants Reported............... 25

2.    The Subpoenas Should Be Narrowed by Limiting the Scope
      Known or Suspected Incidents of False Trading (*i.e.*, by Hub and
      Date)......................................................................................................... 26

3.    Requests About How McGraw-Hill Used the Data Submitted by
      Defendants Do Not Go to the Heart of the Claims Asserted.............. 27

B.    The CFTC's Objections to Narrowing the Subpoena Betray a
      Misunderstanding of the Reporter's Privilege ................................................ 28

1.    The CFTC Has Not Issued These Subpoenas in Its Investigatory
      Capacity .................................................................................................. 28

2.    Most of the Uses to which the CFTC Professes to Intend to Put
      McGraw-Hill's Documents Do Not Go to the Heart of the Matter .... 29

3.    The CFTC Misconstrues the Exhaustion Requirement ...................... 31

C.    The Subpoenas Should be Narrowed Under Rule 45 in Order to Avoid
      Imposing Unfair and Undue Burden on McGraw-Hill ................................... 33

CONCLUSION.............................................................................................................. 41

# TABLE OF AUTHORITIES

## CASES

*In re Adobe Systems Inc. Security Litigation*, 141 F.R.D. 155 (N.D. Cal. 1992) ..........................20

*Alexander v. FBI*, 1998 WL 1049005 (D.D.C. May, 28 1998) ......................................................10

*Anderson, Greenwood & Co. v. Nibsco Supply, Inc.*,
   1996 WL 377205 (W.D.N.Y. 1996) ......................................................................................20

*Badman v. Stark*, 139 F.R.D. 601 (M.D.Pa. 1991) .......................................................................29

*CMedia, LLC v. Lifekey Healthcare, LLC*, 216 F.R.D. 387 (N.D. Tex. 2003).............................20

*Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44 (S.D.N.Y. 1996)...................................29

*Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975) ................................................................14

*Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) ........................................................29

*Democratic National Committee v. McCord*, 356 F. Supp. 1394 (D.D.C. 1973)..........................26

*E & J Gallo Winery v. Encana Energy Services, Inc.*,
   33 Media L. Rep. 1413 (S.D.N.Y. Jan 12, 2005)...................................................................9

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 131 F.R.D. 668 (S.D. Tex. 1990)....................20

*Fears v. Wilhelmina Model Agency, Inc.*,
   2004 WL 719185 (S.D.N.Y. April 1, 2004) .........................................................................29

*Fort James Corp. v. Sweetheart Cup Co., Inc.*,
   1998 WL 709813 (S.D.N.Y. Oct. 8, 1998) ...........................................................................33

*Foltz v. State Farm Mutual Automobile Insurance Co.*, 331 F.3d 1122 (9th Cir. 2003)...............20

*Gonzales v. National Broadcasting Co.*, 194 F.3d 29 (2d Cir. 1999)............................................28

*Grunseth v. Marriott Corp.*, 868 F. Supp. 333 (D.D.C. 1994) .....................................................10

*Hutira v. Islamic Republic of Iran*, 211 F. Supp.2d 115 (D.D.C. 2002) ......................................25

*In International Action Center v. U.S.*, 209 F.R.D. 1 (D.D.C. 2002) ...........................................12

*Lee v. Department of Justice*, 413 F.3d 53 (D.C. Cir. June 28, 2005)..........................................10

*Maughan v. N.L. Industries*, 524 F. Supp. 93 (D.D.C. 1981)......................................................26

*Miller v. Transamerica Press, Inc.*, 621 F.2d 721 (5th Cir. 1980) ...............................................14

*Nadler v. FDIC*, 92 F.3d 93 (2d Cir. 1996) ...................................................................19

*In re: Natural Gas Commodities Litigation,*
    No. 03 Civ. 6186, 2005 WL 3036505 (S.D.N.Y. November 14, 2005),
    *decision set aside in part by, In re: Natural Gas Commodities Litigation,*
    No. 03 Civ. 6186, 2006 WL 1044224 (S.D.N.Y. April 18, 2006)......................................9

*Night Hawk Ltd. v. Briarpatch Ltd., L.P.*, 2003 WL 23018833 (S.D.N.Y. Dec. 23, 2003) .........29

*In re Petroleum Products Antitrust Litigation*, 680 F.2d 5 (2d Cir. 1982)......................................9

*Revlon Inc. v. Pantry Pride, Inc.*, 1985 WL 2752 (S.D.N.Y. September 25, 1985).....................33

*Star Editorial, Inc. v. United States District Court for the Central District of California,*
    7 F.3d 856 (9th Cir. 1993) ........................................................................................14

*Tavoulareas v. Piro*, 93 F.R.D. 24 (D.C.D.C. 1981) ....................................................................11

*Tripp v. Department of Defense*, 284 F. Supp.2d 50 (D.D.C. 2003) .........................................25

*U.S. Commodity Futures Trading Com'n v. McGraw-Hill Companies, Inc.,*
    390 F. Supp.2d 27 (D.D.C.), *clarification denied by,*
    *U.S. Commodity Futures Trading Com'n v. McGraw-Hill Companies, Inc.,*
    403 F. Supp.2d 34 (D.D.C. 2005) .............................................................................3, 15

*United States v. Cortois*, 1981 U.S. Dist. LEXIS 12727 (S.D.N.Y. April 28, 1981) ...................20

*United States v. Hubbard*, 493 F. Supp. 202 (D.D.C. 1979) ........................................................26

*United States v. Louis Trauth Dairy, Inc.*, 1994 WL 876373 (S.D. Ohio 1994) ..........................20

*United States v. RMI Co*, 599 F.2d 1183 (3d Cir. 1979)..............................................................20

*United States v. Siegel, et al.*, 1997 U.S. Dist. LEXIS 188 (S.D.N.Y. Jan. 13, 1997)...................20

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) ............................................................................9

**STATUTES**

Fed.R.Civ.P. 45.................................................................................................................24

Fed.R.Civ.P. 45(c)(3)(A)(4)...............................................................................................34

18 U.S.C. § 1905...............................................................................................................19

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

------------------------------------------------------- x

U.S. Commodity Futures Trading Commission,    :

                            Plaintiff,    :    **Case No. 1:06-mc-00210 (RCL)**

          - against -    :    **ORAL ARGUMENT REQUESTED**

Michael Whitney, et al.    :

                Defendants.    :

------------------------------------------------------- x

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
THE CFTC'S MOTION TO COMPEL THIRD PARTY TO PRODUCE
DOCUMENTS IN RESPONSE TO SUBPOENAS *DUCES TECUM*
AND IN SUPPORT OF McGRAW-HILL'S CROSS-MOTION
FOR PROTECTIVE ORDER**

Respondent The McGraw-Hill Companies, Inc. ("McGraw-Hill") respectfully submits

this Memorandum of Points and Authorities in Opposition to the CFTC's Consolidated Motion

to Compel Third Party McGraw-Hill to Produce Documents in Response to Subpoenas Duces

Tecum, issued in four separate actions, and in support of McGraw-Hill's Cross-Motion for

Protective Orders, to issue in each case, that will impose appropriate confidentiality provisions

binding the parties to whom McGraw-Hill may be compelled to produce documents and that will

govern the scope of documents McGraw-Hill can be compelled to produce.

**PRELIMINARY STATEMENT**

McGraw-Hill has objected to the four subpoenas that are the subject of the instant

omnibus motion primarily because they seek to compel McGraw-Hill to produce a vast –

potentially limitless – quantity of its most confidential, privileged, proprietary and valuable

information without any restrictions on the potential use and subsequent dissemination of the

information.  The subpoenas seek, among other things, confidential and privileged

newsgathering materials McGraw-Hill collected from numerous energy companies (not just the

NYC 169768v1 3930059-27

former employers of the defendants named in the underlying cases) during the editorial process

by which McGraw-Hill created its daily and monthly assessments of natural gas prices.

Moreover, a significant portion of the documents sought contain highly valuable and confidential

trade secrets. In addition, the wide-ranging nature of the subpoenas renders compliance

impossible without highly burdensome searches of files and computer records which

McGraw-Hill has not maintained in systematic fashion in the ordinary course of its business.

As early as March 15 of this year, and in an effort to avoid motion practice, McGraw-Hill

had proposed a method by which it sought to comply with the subpoenas. (Exs. 10-13)[1] The

proposals (which were tailored to the facts of each case) were designed to provide the CFTC

with the information going to the heart of each of the underlying cases while at the same time

addressing McGraw-Hill's legitimate concerns. Accordingly, one of the key features of the

proposal was the entry of a protective order under which the CFTC would treat any documents

produced as confidential. The other feature of the proposal provided a method for narrowing the

subpoena to information concerning the heart of the matter: McGraw-Hill would provide the

CFTC with the data it had collected from the employers of the defendants and considered in

creating the indices, the CFTC would compare this data to the records of actual trades and

thereby identify the instances of false reporting. Not only would this allow the CFTC to achieve

one of its stated goals, determination of the extent or scope of the defendants' liability but it

would also enable the CFTC to narrow the scope of any additional documents that the CFTC

might believe it needs from McGraw-Hill. (A similar approach has already been adopted in a

civil litigation brought by a class of NYMEX traders against certain energy companies alleging

---

[1]    "Ex." refers to the exhibits attached to the May 26, 2006 declaration of Carolyn K. Foley
("Foley Dec.") submitted in opposition to the CFTC's motion to compel and in support of
McGraw-Hill's motion for a protective order.

that their false reporting to McGraw-Hill manipulated NYMEX prices *see*, *In re Natural Gas*, 03 Civ. No. 6186 (VM)(AJP) (S.D.N.Y.) (attached at Ex. 20.)

Nearly two months after McGraw-Hill made this proposal, the CFTC notified McGraw-Hill that it was rejecting McGraw-Hill's March 15 proposal (without offering any counter-proposals) and that it was going to file the instant motion unless McGraw-Hill agreed to produce the entire universe of documents requested by all of the subpoenas, *without any protective order*. Shortly before this motion was filed McGraw-Hill sent the CFTC a letter emphasizing McGraw-Hill's belief that its obligations to its sources to preserve the confidentiality of the information they had provided prevented McGraw-Hill from producing the requested information without, *at the very minimum*, entry of a protective order that would preserve the confidentiality of the information requested and prevent unlimited further dissemination of the documents (Ex. 15) The CFTC responded by filing the instant motion.

McGraw-Hill recognizes the public interest in the outcome of the underlying cases in which the subpoenas have issued, and McGraw-Hill has consistently sought to comply with the subpoenas in a manner consistent with the privileged, confidential and highly proprietary nature of the information sought. The CFTC's adamant refusal to agree to keep the documents confidential and, to use them only for the purposes of the specific cases for which they are sought, and to be more specific in its requests, however, has blocked McGraw-Hill's attempts to resolve this matter without judicial intervention. As this Court has recognized, the reporter's privilege applies to the requested documents. *U.S. Commodity Futures Trading Com'n v. McGraw-Hill Companies, Inc.*, 390 F. Supp.2d 27 (D.D.C. 2005) As a journalistic enterprise, McGraw-Hill simply cannot allow itself to be turned into an investigatory arm of the CFTC, with the CFTC free to roam through information and data that McGraw-Hill's journalistic sources

provided to McGraw-Hill on a confidential basis. Rather, McGraw-Hill respectfully submits, its documents should be made available to the CFTC only in those specific circumstances where the privilege is overcome – *i.e.*, where the documents requested are specifically directed at known or suspected incidents of false reporting on specific dates at specific hubs – and under appropriate commitments of confidentiality.

As this motion demonstrates, the CFTC's complete rejection of this principle, viewed by McGraw-Hill to be fundamental to the journalistic privilege, has created a gap between the CFTC and McGraw-Hill that has prevented them from reaching an understanding as to the appropriate scope of production and protections to be given to the documents produced. Indeed, had the CFTC even taken the step to respond to the March 15 proposal by limiting its subpoenas to what it now, for the first time, calls the three "core categories of documents" – "(i) the trade data the defendants submitted or caused to be submitted to Platts; (ii) the spreadsheets showing how Platts used the data to generate its index prices; and (iii) the instructions Platts provided to the defendants specifically, and the industry generally, about what information to report to Platts" (Moving Br. at 5)[2] – the need for this motion might have been avoided entirely or, at least, this motion might have been limited to the question of the propriety of the entry of a protective order.

For these reasons and the reasons set forth below, McGraw-Hill submits that the CFTC's motion to compel should be denied. (Point I, below) Instead, a protective order should issue to: (a) require that the documents sought from McGraw-Hill will be used solely for the purposes of the cases for which they are herein sought and not disclosed or disseminated for any other purpose (Point II, below) and, (b) narrow the scope of the subpoenas in order to limit the

---

[2]    "Moving Br." refers to the CFTC's May 8, 2006 Memorandum of Points and Authorities in Support of Consolidated Motion to Compel Third Party to Produce Documents.

documents to be produced to those specific instances where the reporter's privilege can be shown

to have been overcome (Point III(A), below) and to minimize the significant burden imposed on

McGraw-Hill by compliance with these and the additional, similar subpoenas that are likely to

issue or have already issued to McGraw-Hill.  (Point III(B), below).

**STATEMENT OF FACTS**

**The Publications**

McGraw-Hill, a leading educational and business publisher, owns and operates Platts, the

world's largest and most reliable source of news and information about the energy industry.

(Foster Aff. ¶ 1)[3]  Among Platts' various publications are *Inside FERC's Gas Market Report*

("*Inside FERC*") and *Gas Daily*, both of which provide news and analysis of current events,

market developments, and prices in the natural gas marketplace.  (Foster Aff. ¶ 2)[4]  During the

time frame at issue in each of the subpoenas that are the subject of this motion (see note 7,

below), and continuing to this day, *Inside FERC* and *Gas Daily* reported a price range and an

index price for a voluminous number of "hubs" or pricing points across the United States as part

of their extensive news coverage of the natural gas industry.  (Foster Aff. ¶ 2-4)  Then, as now,

*Inside FERC* published a price index for the monthly natural gas market, while *Gas Daily*

published a price index for the separate daily natural gas market. (Foster Aff. ¶ 2)[5]  Both the *Gas*

---

[3]      "Foster Aff." refers to the June 16, 2003 affidavit of Larry Foster, then Editorial Director
for Platts' U.S. Natural Gas publications, submitted in opposition to an enforcement action
brought by the CFTC in the Southern District of Texas (seeking, *inter alia*, trade submissions
made by CMS), attached as Exhibit 18 to the Foley Declaration. "Doolan Aff." Refers to the
December 6, 2004 affidavit of Kelly Doolan, then Chief Editor of *Inside FERC*, submitted in a
grand jury proceeding in the Southern District of Texas, attached as Exhibit 19 to the Foley
Declaration.

[4]      Examples of both publications are annexed as Exhibits 1 and 2 to the Foley Dec.

[5]      At the time Platts acquired *Gas Daily* in September 2001, *Gas Daily* also published a
monthly index for the natural gas price market.  Beginning in July 2002, however, Platts
discontinued the separate publication of *Gas Daily* monthly indices, thus the last monthly indices

*Daily* and the *Inside FERC* natural gas indices were, and continue to be, based on information obtained, on a confidential basis, by Platts' reporters from actual buyers and sellers in the marketplace. (Foster Aff. ¶ 4-7)  The price assessments are the product of an in-depth, focused editorial process that relies both on trade reports submitted by Platts' sources and on the editorial discretion of Platts' price reporters and editors. (Foster Aff. ¶¶ 5-6)[6]

**The Subpoenas**

The subpoenas that are the subject of this motion to compel issued in the context of four different cases brought by the CFTC against individual traders pending in Colorado (*CFTC v. Andrew Richmond*, Civil Action No. 05-m-668 (D. Colo.)) Ohio (*CFTC v. Joseph P. Foley*, Civil Action No. 2:05-cv-849 (S.D. Ohio)), Oklahoma (*CFTC v. Bradley and Martin*, Civil Action No. 4:05-cv-00062 (N.D. Okla.)) and Texas (*CFTC v. Michael Whitney*, Civil Action No. H-05-333 (S.D.Tex.)). [7]  The CFTC characterizes the subpoenas as seeking

---

published by *Gas Daily* were the indices for June 2002.  (Foley Dec. ¶ 2)

[6]     The CFTC claims that 90% of the time, the *Inside FERC* price indices are the volume-weighted average of the trade data submitted to Platts.  (Mov. Br. at 11) The CFTC relies on statements made by the United States Attorneys' Office working on criminal prosecutions of some individuals accused of submitting false trade data to Platts.  (*Id.*) The CFTC again fails to note that the U.S. Attorney's Office has reduced its assessment in this regard and now recognizes that the volume weighted average is "the starting point for an editorial process that determined index prices" and that the index price matches the volume weighted average "approximately three-fourths of the time." (Ex. 9 at ¶ 14)

[7]     • Richmond worked for Western Gas Resources, Inc. ("Western"), and the CFTC's subpoena to McGraw-Hill in the case against him covers a period from April 1, 2000 through February 28, 2001;

     • Foley worked for AEP Energy Services, Inc., a subsidiary of American Electric Power Company, Inc. ("AEP"), and the CFTC's subpoena to McGraw-Hill in the case against him covers a period from October 1, 2000 through October 31, 2002;

     • Bradley and Martin worked for CMS Field Services, Inc., a subsidiary of CMS Energy Corporation ("CMS"), and the CFTC's subpoena to McGraw-Hill in the case against them covers a period from December 1, 2000 through October 14, 2002;

> "three core categories of documents from McGraw-Hill:  (i) the
> trade data the defendants submitted or caused to be submitted to
> Platts; (ii) the spreadsheets showing how Platts used the data to
> generate its index prices; and (iii) the instructions Platts provided
> to the defendants specifically, and the industry generally about
> what information to report to Platts."[8]

(Mov. Br. at 5)  In fact, however, (and as discussed further in Point III(B), below) the subpoenas

seek much more than these three "core" categories of materials.  For example, the subpoenas

seek complaints McGraw-Hill may have received about the trade data submitted by any of the

former employers of the named defendants (Request 7) and they seek a segregated file (that does

not exist) of "rejected" submissions (Request 5).  The subpoenas do not just ask for the trade data

submitted by defendants' former employers, but rather seek "all documents ...from any

employee of [energy company]...that contain price, volume or delivery location of any natural

gas transaction"  (Request 1) and "all documents containing any information which references,

indicates or discusses any price or volume information concerning any natural gas

transaction...that was communicated to McGraw-Hill by any means of communication by any

employee of [energy company]..." (Request 3).  In addition, and instead of asking for the

second, relatively straight-forward "core" category of "spreadsheets showing how Platts used the

data to generate its index prices," the CFTC's subpoenas posed two different requests that seek

"all documents prepared or created by McGraw-Hill .. that reflect the price, volume or delivery

---

-      Whitney worked for Duke Energy Trading and Marketing, LLC ("Duke"), and the
  CFTC's subpoena to McGraw-Hill in the case against him covers a period from
  June 1, 2001 through August 31, 2002.

[8]    McGraw-Hill's published methodologies already provide the information sought by this
third category of "core" documents.  In addition, McGraw-Hill has already agreed that it can
produce the instructions that *Inside FERC* editors provided to the public about the types of
natural gas transactions for which market participants should submit.  Specifically, McGraw-Hill
will produce a copy of the reminder that was mailed during every month of the time period.
Because of the manner in which these instructions were sent (*via* email notices to "undisclosed
recipients"), McGraw-Hill is unable to identify the specific recipients of these email reminders.

location of any natural gas transaction [submitted by defendants' employers]" (Request 2) and

"all documents reflecting, referencing or implementing the formulas used to calculate index

prices…" (Request 4). In short, the CFTC's subpoenas utilize vague and overbroad language

which the CFTC utterly refused to negotiate with McGraw-Hill, until the CFTC made the instant

motion and determined to present its position to this Court as to the more reasonable three "core"

requests.

**The Underlying Case**

In the cases for which he subpoenas are issued, the defendants are charged with

submitting false trade data to Platts, among other index publishers, and thereby attempting to

manipulate published index prices. (A copy of the complaints in each of these actions is attached

to the Foley Dec. at Exhibits 3 through 6.) There are a few notable features of the cases that are

of particular relevance to the instant motion. *None* of the defendants, for example, is charged

with having actually succeeded in manipulating either a McGraw-Hill index or the price of

natural gas in general. And, in only one of the four cases – *CFTC v. Foley* – does the CFTC

allege that the defendant submitted false information to *Inside FERC*. (*See* Ex. 3 at ¶¶ 25, 28-31

and *see generally,* Exs. 3 through 6). The allegations in the other three cases all focus on false

submissions to *Gas Daily*. (Ex. 6 at ¶¶ 38-43; Ex. 5 at ¶¶ 30-35, 48-52; Ex. 4 at ¶¶ 27-32)

Indeed, counsel for the CFTC in both *CFTC v. Richmond* and *CFTC v. Whitney* have conceded

to McGraw-Hill that each of those cases was focused on false submissions to *Gas Daily*. (*See*

Otten Dec. at ¶ 8)[9] And while counsel for the CFTC in the case against Messrs. Bradley and

Martin has insisted that those defendants attempted to manipulate prices in both the daily and the

---

[9]    "Otten Dec." refers to the May 1, 2006 declaration of Michael J. Otten "Compa Dec."
refers to the May 1, 2006 declaration of Gregory Compa, and "Garcia Dec." refers to the April
29, 2006 Declaration of James A. Garcia, all of which were submitted in support of the CFTC's
Motion to Compel.

monthly market, the complaint nonetheless only alleges that the defendants made their false

submissions to *Gas Daily* (which, until July 2002, also published a monthly index, *see* note 5,

above).  (Ex. 6 at ¶¶ 38-43)

       Another fact not mentioned by the CFTC, but highly material to the outcome of this

motion, is the fact that the energy companies who employed Mr. Whitney (Duke), Messrs.

Bradley and Martin (CMS), and Mr. Foley (AEP) were themselves the subject of CFTC

investigations, during the course of which the CFTC moved against McGraw-Hill in the

Southern District of Texas to enforce compliance with an administrative subpoena seeking many

of the very same CMS, Duke and AEP documents which are now being sought by way of this

motion.  After that enforcement action was fully briefed, argued and pending *sub judice* before

Judge Hughes, however, the CFTC voluntarily moved to withdraw the motion.  Judge Hughes

responded to the CFTC's motion by dismissing the motion *with prejudice*.  (A copy of the

subpoena that was the subject of the Texas motion and the dismissal with prejudice are at Exs. 7

and 8 to the Foley Dec.)  The CFTC offers no explanation, and fails even to identify the issue to

this Court, of why this dismissal with prejudice should not bind the CFTC and prevent the

motions to compel herein presented, at least as to the subpoenas from *CFTC v. Whitney, CFTC v.*

*Bradley and Martin,* and *CFTC v. Foley*.[10]  Similarly, the CFTC has not disclosed that it has

---

[10]    By contrast, the CFTC continually cites to the decisions of this Court, *U.S. Commodity*
*Futures Trading Com'n v. McGraw-Hill Companies, Inc.*, 390 F. Supp.2d 27 (D.D.C. Oct. 4,
2005), and 403 F. Supp.2d 34 (D.D.C. Dec. 2, 2005), rendered in the course of the enforcement
of an administrative subpoena regarding a non-public investigation of a specific energy company
that is unrelated to any of the employers of the defendants in the actions here.  The CFTC argues
that this Court's prior decision is binding on McGraw-Hill with respect to the propriety of a
protective order imposing confidentiality obligations and narrowing the scope of the subpoena,
yet never mentions the dismissal *with prejudice* of this motion to compel in Texas, also in an
investigatory context, seeking some of the exact same CMS, Duke and AEP documents that the
CFTC seeks here.  (The energy company that was the subject of investigation in the earlier
proceedings before this Court was not among the companies under investigation in the Texas

closed its investigations of these former employers and settled its charges against them. (Exs. 21-24)

**Negotiations**

The subpoenas at issue here were served at various times in February 2006. The CFTC and McGraw-Hill agreed that McGraw-Hill's objections to all of the subpoenas would be provided on March 15. On March 15, McGraw-Hill served its objections to each of the subpoenas along with a detailed letter, specifically tailored to the facts of each case, proposing a method by which McGraw-Hill could provide the CFTC with the information going to the heart of its case. (A copy of each of these letters is attached as Exhibits 10 through 13 of the Foley Dec.) McGraw-Hill then initiated telephone conversations with the various counsel for the CFTC in the different actions, attempting to resolve McGraw-Hill's objections to the subpoenas and to devise a manner in which McGraw-Hill could produce documents. (Foley Dec. ¶ 17-18) Confidentiality of documents to be produced was stressed as a key component of McGraw-Hill's proposal. (*Id.*) On April 19, 2006, after a conversation between counsel for McGraw-Hill and some of the CFTC counsel, McGraw-Hill again wrote to the CFTC counsel attempting to modify its proposal to address some of the CFTC's concerns, inviting the CFTC to offer a counter-proposal that might address its concerns and noting that McGraw-Hill was still awaiting final response from the CFTC on the March 15 proposal. (Exs. 16, 17)

McGraw-Hill had also received subpoenas from at least two of the defendants named in these actions, and the line of litigants seeking documents or depositions from McGraw-Hill is getting longer. (Foley Dec. ¶¶ 8, 9, 11, 14) After receiving several requests for the depositions of a former McGraw-Hill employee, McGraw-Hill wrote to the CFTC and requested that the

proceeding.)

CFTC consider procedures by which the requests for deposition could be consolidated to minimize the burden placed on McGraw-Hill and its individual witnesses. (Ex. 14) To date, the CFTC has yet to respond to this request.

On Friday, May 5, the CFTC informed McGraw-Hill that the CFTC: (1) had rejected McGraw-Hill's March 15 proposal for providing the information called for by the subpoenas; (2) would make no counterproposal of any kind; (3) would not agree to narrow the scope of the subpoenas in any manner; (4) would not agree to any form of a protective order; and (5) intended to move immediately to compel production if McGraw-Hill did not agree to produce each and every document responsive to the subpoenas without any protective order. (Foley Dec. ¶ 20) By letter dated Monday, May 8, McGraw-Hill requested that the CFTC reconsider its position, in particular its refusal to agree to any form of a protective order. (Ex. 15) The CFTC responded by filing the instant motion.

## ARGUMENT

## I.    THE CFTC'S MOTION TO COMPEL SHOULD BE DENIED

For a quarter of a century, the D.C. Circuit has recognized that the First Amendment provides a qualified privilege protecting publishers and journalists from the compelled disclosure of confidential sources and confidential newsgathering information in civil proceedings. *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). All of the courts that have had occasion to address the question of whether the information that McGraw-Hill gathers on a confidential basis in the course of creating its natural gas price indices (*i.e.*, the "core" information sought by the CFTC) is protected from compelled disclosure by the reporter's privilege have answered that question in the affirmative. *See, e.g., U.S. Commodity Futures Trading Com'n v. McGraw-Hill Companies, Inc.*, 390 F. Supp.2d 27 (D.D.C. 2005); *In re: Natural Gas Commodities Litigation*, No. 03 Civ. 6186, 2005 WL 3036505 (S.D.N.Y. November 14, 2005), *decision set aside in non-relevant part*

by *In re: Natural Gas Commodities Litigation*, No. 03 Civ. 6186, 2006 WL 1044224 (S.D.N.Y. April 18, 2006); *E & J Gallo Winery v. Encana Energy Services, Inc.*, 33 Media L. Rep. 1413 (S.D.N.Y. Jan 12, 2005); *see also In re Petroleum Products Antitrust Litigation*, 680 F.2d 5 (2d Cir. 1982) (in which the Court found that a different McGraw-Hill publication's documents were protected by the reporter's privilege).

Thus, as the CFTC concedes, to succeed on its motion to compel, it must demonstrate: (1) that the requested information goes to the "heart of the matter" and (2) that the party requesting the information has exhausted "every reasonable alternative source of information." *Lee v. Department of Justice*, 413 F.3d 53, 57 (D.C. Cir. 2005), *citing Zerilli*, 656 F.2d at 713; *see also Hutira v. Islamic Republic of Iran*, 211 F. Supp.2d 115, 119 (D.D.C. 2002). And, as the courts in this Circuit have recognized, this showing is difficult to make and is designed to ensure that compelled disclosure from non-party journalists remains the exception and not the rule – especially in the context of civil litigation. *Id.* at 712; *see also, Lee,* 413 F.3d at 58 ("in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege").

The CFTC fundamentally misconstrues the showing it must make in this regard. Fatally, the CFTC equates a showing of relevance with a showing going to the heart of the matter. *See, e.g.*, Mov. Br. at 10 (arguing that the information sought is "relevant or likely to lead to the discovery of relevant evidence"); Mov. Br. at 12 ("unredacted spreadsheets will be relevant…"). The showing required to overcome the privilege, however, requires much more than mere relevance. While considering the relevance of information sought, "the interest in disclosure will be relatively weak unless the information goes to the heart of the matter, that is, unless it is *crucial* to the party's case." *International Action Center v. U.S.*, 207 F.R.D. 1, 4 (D.D.C. 2002) (emphasis added). Further, "more speculation that information might be useful will not suffice."

*Id.* Quite simply, relevant is not enough. Similarly, the CFTC's interpretation of the exhaustion requirement would all but render that part of the analysis meaningless. (*See* pp. 31-33, below) Thus, as shown below in support of McGraw-Hill's cross-motion for an order narrowing the scope of the subpoenas (Point III(a)), the CFTC has not and cannot show that the subpoenas, as currently drawn (a) request only information that goes to the heart of the cases for which they are sought or (b) that alternative sources have been exhausted. For this reason, the CFTC's motion to compel should be denied. *See, e.g., Alexander v. FBI*, 1998 WL 1049005 at *1 (D.D.C. May 28, 1998) (quashing "amazingly broad" subpoena served on non-party journalist where "there ha[d] been no demonstration that the information sought from [the journalist] goes to the 'heart' of plaintiffs' case"); *Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 335 (D.D.C. 1994) ("While the information sought would be relevant, and therefore admissible if obtained in other ways,… it certainly does not go to the heart of his claims and is not essential to establish liability").

Rather, in order to be enforceable in a manner consistent with the reporter's privilege, any production to be made by McGraw-Hill should be made pursuant to the terms of the protective order that would preserve the confidentiality of the documents, and be substantially more narrow in scope as set out in Points II and III below.

## II. A PROTECTIVE ORDER SHOULD BE ENTERED TO ENSURE THAT THE CONFIDENTIAL, PRIVILEGED AND PROPRIETARY McGRAW-HILL DOCUMENTS THAT MAY BE PRODUCED ARE USED SOLELY FOR PURPOSES OF THE CASES FOR WHICH THEY ARE SOUGHT AND NOT OTHERWISE DISCLOSED OR PUBLISHED

The CFTC's refusal to be bound by a protective order imposing confidentiality has essentially thwarted McGraw-Hill's ability to produce any documents in response to the subpoenas issued by the CFTC and/or the defendants in these cases.[11]  McGraw-Hill has, in

---

[11]     Defendants Bradley and Whitney have each issued subpoenas to McGraw-Hill. Defendant Bradley has agreed to treat any documents that McGraw-Hill produces according to

connection with these and the many other litigations and investigations throughout the country focusing on alleged attempts to manipulate the price of natural gas, expressed its willingness to provide documents for which the reporter's privilege could be overcome so long as the production was accompanied by appropriate assurances of confidentiality. (Foley Dec. ¶ 6) McGraw-Hill goes to great lengths to keep this information confidential both in order to preserve the trust of its journalistic sources and in order to remain competitive in the marketplace. (Foster Aff. ¶ 7; Doolan Aff. ¶¶ 21-22)  Plainly, such valued and confidential documents should be covered by a protective order limiting their dissemination to the smallest group possible. *See, e.g., Tavoulareas v. Piro*, 93 F.R.D. 24, 28-29 (D.C.D.C. 1981) (granting third-party Mobil a protective order "designed to preclude the free use or dissemination of any confidential Mobil documents disclosed during discovery except pursuant to certain judicially-imposed safeguards" and finding that "the protective order proposed by Mobil constitutes the best means of resolving the conflict between the legitimate need of [a party] for prompt, thorough disclosure and the genuine interest of Mobil in preserving the confidentiality of sensitive corporate documents").

The CFTC nonetheless has absolutely refused to provide McGraw-Hill with any form of a protective order and thus essentially asks this Court to require McGraw-Hill to relinquish control of some of its most important, privileged newsgathering materials, proprietary information and trade secrets – information that stands at the heart of its ability to create its well-

---

the terms of a protective order.  Because the CFTC would not agree to be bound, however, McGraw-Hill has not been able to produce documents to Mr. Bradley.  [After the CFTC brought the instant motion before this Court, defendant Bradley brought his own motion to compel against McGraw-Hill before the Oklahoma Court.  McGraw-Hill, a non-party, has thus been forced to assert its defense of these same principles simultaneously here and in the *CFTC v. Bradley & Martin* case.  In response to Mr. Bradley's motion, McGraw-Hill requested that the subpoena be narrowed.  In response to a motion made by the CFTC before the Oklahoma court to clarify or vacate McGraw-Hill's protective order with Messers. Bradley and Martin, McGraw-Hill cross-moved for a protective order against the CFTC.  The Judge in Oklahoma has set a hearing on these motions for May 31. (*See* Foley Dec. ¶¶ 2)

regarded daily and monthly price assessments – without any limitation on or control of their subsequent distribution or publication.

### A.   WHERE DOCUMENTS TO BE PRODUCED ARE COVERED BY THE REPORTER'S PRIVILEGE, A PROTECTIVE ORDER IS NECESSARY

Because Platts has no government mandate, no subpoena power, and no way to compel its energy company sources to provide *any* trade data, let alone accurate and complete data, Platts has always relied on its ability to obtain information through journalistic means honed over decades of reporting on its markets. (Foster Aff. ¶¶ 4-7)  Platts' effectiveness in collecting the breadth and depth of information needed to bring transparency to the markets it covers derives in large part from its reputation for integrity, objectivity and independence and from its ability to honor the assurances of confidentiality it makes to the sources of the information it reports. (Foster Aff. ¶ 7)  The ability to assure these sources of confidentiality was (and remains) crucial for Platts to obtain the broad range of price, volume and other market information on which its price assessments and other reporting are based.  (Foster Aff. ¶ 7)  Accordingly, during all time periods at issue in any of the cases, *Inside FERC*'s and *Gas Daily*'s published price assessments did not reveal the identities of the sources who provided the data from which the assessments were derived or any of the transactions reported.  Were McGraw-Hill to reveal their identities or the details of individual trades by disclosing its spreadsheets or the energy companies' submissions, there is a very real danger that it will lose its sources and ultimately its ability to publish the aggregate price assessments that are at the heart of its business.  (Foster Aff. ¶ 7)  Given the importance of confidentiality, *Inside FERC* employees are required annually to sign a code of ethics that expressly forbids divulging confidential source information, which includes but is not limited to the names of confidential sources, unless expressly authorized by the Editorial Vice President of Information and Trading Services.  (Doolan Aff. ¶ 10)  McGraw-Hill

here merely seeks comparable assurances from the CFTC and the defendants in these cases limiting disclosure of the confidential documents to permissible ends.

In recognition of the public interest in protecting the free flow of information to Platts that makes the assessments possible, the information that Platts collects from its sources to publish its indices is protected from compelled production by the reporter's privilege as recognized under the First Amendment. *CFTC v. The McGraw-Hill Companies, Inc.*, 390 F. Supp.2d at 32. While the reporter's privilege may be overcome in certain circumstances, the principles underlying the privilege dictate that any compelled disclosure of the documents covered by the privilege be as limited as possible. The natural corollary of this principle is that the confidential nature of the privileged documents that a journalist is compelled to produce should be protected through entry of a protective order. Indeed, in a civil case in which a court found the reporter's privilege had been overcome and the confidential sources would have to be revealed, the Fifth Circuit did just that. *See Miller v. Transamerica Press, Inc.,* 621 F.2d 721, 727 (5th Cir. 1980) (upholding district court's ruling that party need produce information protected by the reporter's privilege, but directed the district court to "protect the informant by restricting the information about the informant's identity to counsel and requiring that it be used strictly for the litigation"); *see also, e.g., Star Editorial, Inc. v. United States District Court for the Central District of California*, 7 F.3d 856, 861 (9th Cir. 1993) (noting that district court "recognized the importance of protecting confidentiality to prevent the risk of job loss to the informants and tailored its order to protect the sources by restricting disclosure to counsel and only for the purposes of [the] litigation."). The same approach should apply here.

### B.    WHERE DOCUMENTS TO BE PRODUCED CONTAIN TRADE SECRETS, A PROTECTIVE ORDER IS NECESSARY

Separate and apart from McGraw-Hill's journalistic concerns, the information the CFTC

would require McGraw-Hill to produce – particularly the spreadsheets used in the process of

creating the price indices – also reveals significant proprietary and trade secret information.

*Inside FERC* and *Gas Daily* cover natural gas prices in the monthly market based on information

obtained firsthand from actual buyers and sellers in the marketplace.  (Foster Aff. ¶ 4)  In a

typical month, *Inside FERC* and *Gas Daily* consider thousands of transactions.  (Doolan Aff.

¶ 11)  REDACTED: REFERRING TO MATERIAL FILED UNDER SEAL

*Id.*, ¶¶ 5, 12.[12]  The monthly internal spreadsheets used by *Inside FERC*

reveal details of the data collected from all of their sources under promises of confidentiality.

*Id.*, ¶¶ 8, 12.  It has taken *Inside FERC* years to develop sources who were willing to report their

trades, and their ability to retain those sources – and acquire new ones – depends upon their

ability to protect the confidentiality of their sources and the information they have provided in

the past. *Id.*, ¶ 7.  At no time have *Inside FERC*'s or *Gas Daily*'s published price assessments

revealed the identities of any of their sources or the details of any individual transactions

reported to them. *Id.*, ¶ 7.  In short, these spreadsheets contain information that McGraw-Hill

treats as highly confidential and that lies at the heart of both its journalistic and business efforts.

REDACTED: REFERRING TO MATERIAL FILED UNDER SEAL

---

[12]     A different system is used to compile the daily data.  For the dates at issue in this case, that system did not keep track of the sources of the data entered.  So it is impossible at this time to trace the daily data to any of the defendants in the underlying cases.

REDACTED: REFERRING TO MATERIAL
FILED UNDER SEAL

*Id.*, ¶ 14)  Because of its value and sensitivity, *Inside FERC* goes to great lengths to maintain the security of this information. *Id.*, ¶ 23.  The spreadsheets are maintained on a secure server, accessible by only a limited number of authorized users.  *Id.* Even within *Inside FERC*'s newsroom, access to these spreadsheets is limited to editorial managers.  *Id.*  The spreadsheets themselves have substantial commercial value within the publishing and gas industries and have never been publicly disclosed.  *Id.*, ¶ 16.

The value, importance and sensitivity of these internal spreadsheets, as well as the raw source data collected from McGraw-Hill's energy company sources, is highly significant to the continued vitality and success of *Inside FERC* and *Gas Daily*.  Public disclosure and misuse of this information could cause substantial harm to *Inside FERC*'s and *Gas Daily*'s business, especially if this information fell into the hands of competitors of these publications or other parties interested in replicating their work.  (Foster Aff. ¶¶ 7)  Because the documents sought by the CFTC reveal the internal mechanisms developed by McGraw-Hill's publications over several years – editorial operations and considerations that lie at the heart of their indices, namely their ability to quickly and efficiently assimilate and process large amounts of information in the short period of time available for creating the indices (Foster Aff. ¶ 7-8) –  this information is properly classified as proprietary and commercially sensitive and as concerning or relating to trade

secrets, processes, operations, style of work, confidential statistical data and confidential

business transactions as those terms are used in the Trade Secrets Act, 18 U.S.C. Section 1905.

*Nadler v. FDIC*, 92 F.3d 93 (2d Cir. 1996) (in which the court found that, under the Trade

Secrets Act, the FDIC did not have to disclose confidential financial information that two

individuals had submitted to a bank).

      Where, as here, the information called for by a third party subpoena involves trade

secrets, issuance of a protective order is not only appropriate, but crucial. "In instances where a

subpoena requires disclosure of a trade secret or other confidential or commercially sensitive

information it 'should be quashed unless the party serving the subpoena shows a substantial need

and the court can devise an appropriate accommodation to protect the interests of the' party

opposing such potentially harmful disclosure." *Anderson, Greenwood & Co. v. Nibsco Supply,*

*Inc.*, 1996 WL 377205, *2 (W.D.N.Y. 1996)  Here, such an "appropriate accommodation" would

be a simple requirement of confidentiality.  As a general matter, trade secrets and confidential

business information are properly subject to a protective order upon a particularized showing by

the party seeking the order.  A protective order is the appropriate remedy where public disclosure

of proprietary or confidential information "would put a company at a competitive disadvantage."

*In re Adobe Systems Inc. Sec. Litig.*, 141 F.R.D. 155, 158 (N.D. Cal. 1992). *See also CMedia,*

*LLC v. Lifekey Healthcare, LLC*, 216 F.R.D. 387, 391 (N.D. Tex. 2003); *Exxon Chemical*

*Patents, Inc. v. Lubrizol Corp.*, 131 F.R.D. 668, 671 (S.D. Tex. 1990); *Foltz v. State Farm Mut.*

*Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003).

      The very real risk posed by the public disclosure of this information is precisely the type

of harm that courts have consistently held justifies the issuance of a protective order.  *See United*

*States v. Louis Trauth Dairy, Inc.*, 1994 WL 876373, *4-5 (S.D. Ohio 1994); *United States v.*

*Cortois*, 1981 U.S. Dist. LEXIS 12727 (S.D.N.Y. April 28, 1981); *United States v. RMI Co*, 599

F.2d 1183, 1184 (3d Cir. 1979); *United States v. Siegel, et al.*, 1997 U.S. Dist. LEXIS 188

(S.D.N.Y. Jan. 13, 1997).  As observed in *In re Adobe Systems, Inc.*, the "good cause" that

necessitates a protective order can be demonstrated, as McGraw-Hill does here, by showing that

"the protected information includes proprietary and technical information, financial information

and business strategy or marketing information, which, if revealed to a competitor, would put a

company at a competitive disadvantage."  141 F.R.D. at 158.

      Certainly, here, McGraw-Hill would be put at an extreme competitive disadvantage if the

requested documents were revealed to its competitors.  McGraw-Hill relies on the confidentiality

of the data submitted to it and its internal data in order to compete in the marketplace.  (Doolan

Aff. ¶ 21-22)  The public disclosure of the tools McGraw-Hill uses during the editorial process

of creating its indexes would significantly diminish, if not eliminate, their value to McGraw-Hill.

(*Id.* ¶ 5)    REDACTED: REFERRING TO MATERIAL
                      FILED UNDER SEAL

\* \* \*

      Accordingly, McGraw-Hill respectfully requests entry of a protective order that requires

the CFTC and the defendants who wish to be provided with a copy of the documents that

McGraw-Hill produces in this case keep the information confidential and use it only for the

purposes of the actions for which it is sought herein.[13]  Entry of such a protective order will go a

---

[13]    As with the protective order to which the defendants in the *CFTC v. Bradley and Martin*
have already agreed, and the protective order to which McGraw-Hill has proposed that the
Oklahoma court bind the CFTC, McGraw-Hill is not proposing here the entry of a protective
order that will change the CFTC's obligations with respect to any documents already in its
possession.

long way toward alleviating the majority of McGraw-Hill's concerns and facilitating production of McGraw-Hill documents that go to the heart of the cases from which the present subpoenas issued.

## C.   THE CFTC'S ASSERTED REASONS FOR REFUSING TO ENTER A PROTECTIVE ORDER ARE NOT LEGITIMATE

While McGraw-Hill recognizes that the needs of the CFTC and defendants in litigating their cases can, in appropriate circumstances, compel McGraw-Hill to produce to them its privileged newsgathering material, proprietary data and trade secrets confidential, McGraw-Hill submits that such a production should not result in the disclosure of those documents to the world.  A protective order restricting the dissemination of these documents to the parties in the present cases would fairly balance the competing interests and accommodate the needs of the parties and of McGraw-Hill.

### 1.   McGraw-Hill has Good Reason to Fear Extra-Judicial Disclosure of Its Privileged Documents

There are very real and immediate reasons for McGraw-Hill to fear indiscriminate or uncontrolled production and use of its documents without the requested protective order. McGraw-Hill is currently facing numerous requests for documents from private and governmental litigants all of whom stand on very different grounds when it comes to the question of whether McGraw-Hill's reporter's privilege had been overcome for purposes of their cases.  (Foley Dec. ¶¶ 5-6, 8-12, 14)  The protective order is necessary to avoid instances of inadvertent waivers or back-door attempts to obtain documents that would not otherwise be available to certain litigants.[14]  The very existence of the multitude of investigations, litigations

---

[14]     There are numerous civil litigants who seek documents similar to those sought by the CFTC.  (Foley Dec. ¶ 5-6, 8-12, 14)  The CFTC is almost certain to receive a request from these litigants for any information that McGraw-Hill is compelled to produce in this case.  Without entry of a protective order, nothing would stop the distribution of McGraw-Hill's documents to

and other proceedings in which a party may want to use McGraw-Hill documents underscores the need for a protective order. Without entry of an appropriate protective order, the danger exists that McGraw-Hill's privileged and confidential documents will be shared indiscriminately between litigants, without regard to whether the documents go to the heart of the matters at issue in any given case and are otherwise unavailable. Just because McGraw-Hill may be compelled to produce certain confidential documents in one case should not mean that it should be forced to surrender control of limitations on the general circulation of the documents.

### 2.    A Protective Order is the Only Way McGraw-Hill Can Protect Its Privileged Information

The need for a protective order is even stronger in this case than it was in the earlier case before this Court which the CFTC will undoubtedly cite as a reason that no protective order is necessary. [15] In that prior situation, the CFTC had argued that "the proposed order… was duplicative of statutory and regulatory protections already afforded to McGraw-Hill." *CFTC v. The McGraw-Hill Companies, Inc.,* Case 1:05-mc-00235-RCL (D.D.C. Oct. 31, 2005), Docket

---

and among all of these litigants despite the fact that determination of whether the reporter's privilege has been overcome is a fact-specific determination that must be made on a case-by-case basis.

[15]    Despite the CFTC's claims otherwise, McGraw-Hill submits that this Court's 2005 decision in a case regarding another energy company did not decide the questions at issue here. In that case, *U.S. Commodity Futures Trading Com'n v. McGraw-Hill Companies, Inc.,* 403 F. Supp.2d 34, 38 (D.D.C. Dec. 2, 2005), the court, in denying McGraw-Hill's motion for reconsideration, stated, "McGraw-Hill offers no explanation for its failure to seek, in the original action, a protective order" *denying clarification of U.S. Commodity Futures Trading Com'n v. McGraw-Hill Companies, Inc.,* 390 F. Supp.2d 27 (D.D.C. 2005). Here, as this Court suggested, McGraw-Hill is seeking a protective order as an initial matter. Further, the Court indicated that because McGraw-Hill did not seek "specific revision of the subpoena's language," the Court could not "better… deliberate in light of each party's position as to all the issues under review." *CFTC v. McGraw-Hill,* 403 F. Supp.2d. at 38. Again, here McGraw-Hill proposes just such a specific revision. Finally, if the CFTC believes that this Court's prior decision, which answered different questions regarding a different energy company, should be binding, then certainly so too should be the decision of the District Court for the Southern District of Texas, which dismissed, with prejudice, the CFTC's motion to compel many of the very same documents at issue here. (Ex. 8)

No. 17. That case was a confidential investigatory proceeding; this one is a civil action – presumably commenced after the conclusion of an investigatory proceeding. Thus, the "statutory and regulatory protections" the CFTC referred to previously do not apply in the present case, making it all the more important that McGraw-Hill's confidential documents are protected by court order.

To McGraw-Hill's surprise and frustration, the CFTC takes the position that the regulations that require notice be given to McGraw-Hill before any of its confidential documents are disclosed to a third party do not apply when the disclosure is made in the context of a litigation in which the CFTC is a party. (Foley Dec. ¶ 16) Thus, while its regulations would require the CFTC to give McGraw-Hill notice and the opportunity to object in the event a subpoena served on the CFTC by third party or a FOIA request submitted by a member of the public, the CFTC apparently does not view itself as obligated to provide the same notice and opportunity to object where the documents are produced to defendants in the context of an action the CFTC itself brings. This glaring hole in the CFTC's regulations further underscores the importance of the entry of a protective order governing each production of documents that the McGraw-Hill may make to the CFTC.[16]

---

[16]    On March 6, 2006, the CFTC notified McGraw-Hill that it intended to release to defendants Bradley and Martin privileged and confidential documents that McGraw-Hill had produced to the CFTC pursuant to this Court's October 4, 2005 order (390 F. Supp.2d 27). (Foley Dec. ¶ 16)  McGraw-Hill and Bradley and Martin negotiated a protective order under which Bradley and Martin would agree to keep McGraw-Hill's documents confidential. While McGraw-Hill attempted to craft a protective order to which the CFTC would stipulate and which would govern the use of these documents in that action, the CFTC refused (Foley Dec. ¶ 16) While McGraw-Hill and defendants were negotiating the terms of a protective order, defendants requested that the protective order be expanded to include documents that might be produced by McGraw-Hill directly to the defendants pursuant to the subpoena issued by Mr. Bradely (Foley Dec. ¶ 16)  McGraw-Hill agreed, and thus expanded the definition of "McGraw-Hill Documents" to which the protective order applied to include "any documents that McGraw-Hill may produce in response to any third party subpoenas that it may be served with by any party to

### 3.    A Protective Order is Appropriately Issued under Rule 45

The subpoenas at issue here have been presented to McGraw-Hill under the authority of

Fed. R. Civ. P. 45, the same authority that any other civil litigant would rely on to subpoena

documents.  Importantly, then, these subpoenas do not issue under the authority of the CFTC's

investigatory powers, but under Fed. R. Civ. P. 45 and can be governed by the standards applied

to such subpoenas [17]  Accordingly, McGraw-Hill should receive at least the rights and

protections under Rule 45 to which any other non-party recipient of a subpoena is entitled.

## III.    THE SCOPE OF THE SUBPOENAS SHOULD BE NARROWED

Whether reviewed under the more exacting standard by which subpoenas that seek

privileged information are reviewed, or under the standard applicable to any third party subpoena

issued under Fed. R. Civ. P. 45, it is clear that the subpoenas, both individually and, most

certainly when taken as a whole, are drawn far too broadly, without adequate concern for the

burdens they impose on non-party McGraw-Hill.

### A.    The Reporter's Privilege Requires that Subpoenas be More Narrowly Drawn

The CFTC incorrectly characterizes McGraw-Hill's proposed method of complying with

the subpoenas as an "unacceptable" attempt "to determine what documents are adequate for the

Commission's enforcement purposes" and accuses McGraw-Hill of trying "to set up hurdles for

the Commission to overcome before the government gets all the documents it needs to prove a

---

the captioned action."  Thus, defendants Bradley and Martin are currently the only parties to
these four cases who have entered a protective order guaranteeing confidential treatment of
McGraw-Hill documents.

[17]    According to the Advisory Committee's notes that accompany Rule 45, "[t]his rule…
does not apply to the enforcement of subpoenas issued by administrative officers and
commissions pursuant to statutory authority."  Fed. R. Civ. P § 45 (Advisory Committee Notes,
1937 adoption)  By issuing its subpoena under Rule 45, the CFTC has implicitly acknowledged
that the investigative portion of its cases is over and it is now acting as a civil plaintiff.

false reporting or manipulation claim." (Mov. Br. at p. 4)  That the CFTC would level such accusations betrays once again its fundamental misunderstanding, or disregard, of the reporter's privilege.  The "hurdles" about which the CFTC complains were not erected by McGraw-Hill, but rather inhere in the reporter's privilege.  The proposal McGraw-Hill made was designed to assist the CFTC in making its way through the hurdles.  What is ultimately "unacceptable" here is the CFTC's refusal to: (1) recognize and correct the glaringly obvious instances in which the subpoenas reach for documents that fall far beyond what can be considered as concerning the "heart of the matter" of the cases for which they are issued; and, (2) use the materials it has already obtained from alternative sources to narrow the scope of its subpoena.

**1.      The Subpoena Should Be Narrowed By Limiting the Scope to the Publications to Which the Individual Defendants Reported**

The complaints against both Whitney and Richmond only concern allegedly false reporting by those defendants to *Gas Daily*.  Yet the subpoenas issued in both of those cases seek discovery of *all* submissions made by Duke (Whitney's former employer) and Western Gas Resources, Inc. (Richmond's former employer) *both* to *Gas Daily* and *Inside FERC*.  (Exs. 4 and 5 to Mansfield Declaration)  (Even the CFTC attorney in charge of both of those actions has conceded to counsel for McGraw-Hill that the allegations in those cases are about false submissions to *Gas Daily*.  (Otten Dec. at ¶ 8))  Thus, for these two actions requests for submissions and other requests relating to *Inside FERC* stand beyond the heart of the matter and are thus overly broad.

The complaint against Bradley and Martin is similarly focused only on *Gas Daily*, although counsel for the CFTC in that case insists upon discovery of all submissions made by CMS (defendants' former employer) to *Inside FERC* as well, even though he has no reason to believe that these defendants submitted any trades, never mind false trades, to *Inside FERC*.

(Indeed, review of McGraw-Hill's records of submissions by CMS to *Inside FERC* during the time period indicate that the vast majority of submissions were made by a person named Melissa Richardson, not Mr. Bradley or Mr. Martin. [Foley Dec. ¶ 15]) Thus, unless the CFTC has reason to believe that Ms. Richardson was submitting trades on behalf of Mr. Bradley or Mr. Martin, those submissions should be eliminated from the CFTC's request as clearly not going to the heart of the matter at issue.

### 2. The Subpoenas Should Be Narrowed by Limiting the Scope to the Known or Suspected Incidents of False Trading (*i.e.*, by Hub and Date)

The face of the complaint filed against Mr. Bradley and Mr. Martin also provides a clear basis for narrowing that subpoena. The allegation against Mr. Martin is that he conspired with Mr. Bradley to submit false information about trades at one particular pricing point (known as Northern TOK) to Tom Haywood at *Gas Daily* on July 30, 2002. (Ex. 6 at ¶ 46; *see also* Garcia Dec. at ¶ 3) Accordingly, in seeking discovery directed at the heart of this conspiracy, the request can be limited to submissions made to *Gas Daily* on or around that day and to the corresponding spreadsheets for *Gas Daily* and, if the submission concerned a monthly trade, then to the relevant monthly index. (Since July 2002 was the month that *Gas Daily* ceased publishing its monthly indices [Foley Dec. ¶ 2], there might be reason for this month and the few subsequent months in the relevant period to check the *Inside FERC* records.)

Likewise, the complaint alleges that Mr. Bradley wrongly reported to *Gas Daily*: approximately 261 transactions that never took place; approximately 158 trades in which the prices or volumes of the trades actually entered into were misrepresented; and approximately 310 daily transactions that were not of the type of transactions that were supposed to be reported to *Gas Daily*. (Ex. 6 at ¶¶ 40-41) In addition, the complaint alleges that Mr. Bradley made inaccurate transaction reports on 119 days during the time period. (*Id.* ¶ 42) Clearly, the CFTC

has identified the false reports at issue in its case against Bradley and can narrow its subpoena based on the date of the false reports and the hubs involved. Thus, anything not limited to the identified instances of false reporting cannot be said to go to the heart of the complaint against Messrs. Bradley and Martin.

Presumably, the CFTC has similar information about the dates and hubs as to which false reports were made in the other three cases and can similarly limit those subpoenas. If not, however, McGraw-Hill's proposal (as even the CFTC admits to understanding it [Mov. Br. at 8-9]) would provide the CFTC with sufficient information to enable the CFTC to determine the incidents of false reporting, thereby enabling the CFTC to both determine the scope of the defendants' liability and narrow the subpoena.

### 3.   Requests About How McGraw-Hill Used the Data Submitted by Defendants Do Not Go to the Heart of the Claims Asserted

The other obvious way to narrow the requests to McGraw-Hill arises, in general, from the fact that the CFTC does not claim that any of the defendants in any of the underlying actions actually succeeded in manipulating the price of an index. Accordingly, the requests designed to discover documents concerning how McGraw-Hill may have used the reports made by defendants cannot be said to go to the heart of the matters at issue in the complaint.[18]

\*   \*   \*

In sum, McGraw-Hill respectfully submits that the subpoenas at issue should be

---

[18]    If the privilege is held to be overcome as to spreadsheets – which it should not be because how McGraw-Hill used the submitted prices is not at issue in these cases – McGraw-Hill respectfully submits that the names of sources other than the former employers of the defendants in each of the cases should be redacted. The uses to which the CFTC proposes to put the information associated with all of these other energy companies to be found on the spreadsheets (*see* Mov. Br. at 11-14) can be accomplished without knowing the name of the energy company. For example, in order to show that defendants' employer had market power (Mov. Br. at 13), the CFTC need only know the total volume traded at a particular hub, not which companies were trading.

narrowed, at the very least, so as to request information that only concerns the publications, the hubs and the dates on which the CFTC has reason to believe false reports were made. Without such specificity, the subpoenas are clearly overbroad. *See Alexander v. FBI*, 1998 WL 1049005 at *1 (quashing subpoena because it contains "requests that are clearly overbroad")

### B.    The CFTC's Objections to Narrowing the Subpoena Betray a Misunderstanding of the Reporter's Privilege

In support of its motion to compel, the CFTC offers several reasons why it rejected McGraw-Hill's protocol for complying with the subpoenas. As shown below, each one of the reasons proffered, however, fundamentally misconstrues the reporter's privilege.

### 1.    The CFTC Has Not Issued These Subpoenas in Its Investigatory Capacity

The CFTC currently stands well beyond the investigatory stages of its proceedings against the energy companies and their employers who allegedly submitted false price reports to Platts. In fact, the CFTC has already settled the charges against the four energy companies that were the employers of the individual defendants in the present cases. (Ex. 21-24) The CFTC can no longer rely on its investigatory mandate for the issuance of broad administrative subpoenas. Rather, actual civil cases are now before this Court, involving actual defendants whom the CFTC alleges committed specific bad acts. The CFTC should therefore be required to craft a document request to non-party McGraw-Hill that is limited to the specific incidents of wrongdoing at issue. Indeed, to the extent that the CFTC's prior proceeding in Texas to force McGraw-Hill to comply with a subpoena that sought, *inter alia*, the submissions and spreadsheets regarding the former employers of Mr. Whitney (Duke), of Mr. Foley (AEP) and of Messrs Bradley and Martin (CMS) has now been dismissed with prejudice, the CFTC cannot contend that it requires the same documents, and certainly not the same breadth of documents, previously sought in connection with its investigation. (*See* Exs. 7 and 8) The CFTC is no

longer before this Court in its investigatory role, but in its enforcement role. At this stage the CFTC, like other civil litigants, is appropriately bound to meet the standards required by the reporter's privilege in order to obtain information from Platts.

**2.      Most of the Uses to which the CFTC Professes to Intend to Put McGraw-Hill's Documents Do Not Go to the Heart of the Matter**

In trying to show why it rejects McGraw-Hill's proposed narrowing of the CFTC's subpoenas, the CFTC conjures several intended uses of the documents that clearly fall outside of the matters that can be said to go to the heart of the matters raised in the underlying actions. For example, the CFTC claims to need to examine "all of the reports defendants submitted" in order to be able to rebut the potential defense that a given defendant "did not understand" what information should be reported to Platts. (Mov. Br. at 10) Under the CFTC's theory, it needs to examine *all* price reports in order to determine if the defendant ever "submitted accurate information." According to the CFTC, such examination would "debunk" this hypothetical "I didn't understand" defense. Not only is such a potential need for review of all trade submissions highly speculative, but any evidence it would uncover would be inconclusive, at best. The fact that a defendant submitted the correct information on one day and incorrect information on another day could just as easily support the "I didn't understand" defense. Moreover, there are numerous other ways to "debunk" such a defense – not the least of which is through testimony of what the defendants' colleagues understood was called for, as well as the methodologies published by McGraw-Hill and the monthly email reminders sent by McGraw-Hill, both of which indicate what was called for.

Another potential use for the documents articulated by the CFTC appears directly designed to attack McGraw-Hill's editorial discretion. The CFTC claims to need all of the spreadsheets McGraw-Hill used in the editorial process of creating its indices in order to refute

McGraw-Hill's testimony about how it uses the spreadsheets. As McGraw-Hill has explained, the information contained in the spreadsheets does not capture all of the information considered in determining the indices. Rather, there is also a subjective component to the determination which relies on the reporter's editorial discretion – *i.e.*, his knowledge of the market and market conditions. (Doolan ¶¶ 18-19) Notwithstanding this editorial component of the determination, the CFTC believes it can show that the indices were "simply the aggregation of price and volume data" and not the product of "editorial discretion." To this showing, the CFTC argues it needs as many spreadsheets as it can lay its hands on. (Mov. Br. at 11)

Not only does this purported need for McGraw-Hill's documents fall far short of the heart of the matter it actually borders on the punitive and improper. Because McGraw-Hill can not authenticate the spreadsheets for the uses to which the CFTC wishes to put them, the CFTC apparently intends to punish McGraw-Hill by seizing as many of the spreadsheets as it can and attempting to debunk McGraw-Hill's understanding of its own proprietary documents. Moreover, the evidence would indicate that far from debunking McGraw-Hill, the proposed detailed examination of the spreadsheets is as likely to support McGraw-Hill's position as it is to support the CFTC. In fact, although the CFTC relies on calculations performed by the U.S. Attorney's office which purported to show that McGraw-Hill's index price matched the volume weighted average "over 90% of the time," the U.S. Attorney's office now apparently believes that such a correlation exists only "three/fourths of the time." (Ex. 9)

In another example of the CFTC's overreaching, it argues that the spreadsheets need to be produced in unredacted form to rebut the defense grounded on the possibility of false submissions by other sources. First of all, since determination of the index prices is a matter of editorial discretion, an index price cannot be "recreated" with any certainty simply by "backing

out" what appear to be false trades by one source. Second, if the CFTC were truly serious about collecting sufficient information to identify and account for false trades by all sources, discovery in any given case would be potentially limitless. Indeed, to actually rebut such a defense, the CFTC would have to be able to identify all false trades by any source who traded at one of the same hubs that one of the defendants traded. Given that Platts has hundreds of sources and that there are dozens of hubs, such an undertaking would be overwhelming. The record does not show that, as of this date, any party has undertaken such a project. Until the CFTC certifies that it has determined all false trades by all sources, the purported need for an unredacted spreadsheet simply does not arise.[19]

### 3.     The CFTC Misconstrues the Exhaustion Requirement

The CFTC contends that it has exhausted alternative sources because it has gathered everything available from alternative sources but still suspects that it does not have everything. (Mov. Br. at 15) This argument turns the requirement of exhaustion on its head. First of all, the CFTC's argument is supported by nothing more than the simplest and most conclusory attorney declarations wholly lacking in detail. (*See* Compa, Garcia and Other Declarations) Ultimately, the CFTC's position is that: (1) it has looked for evidence of false submissions from all available alternative sources; (2) it has found enough evidence to bring the underlying actions; but (3) it believes that there *may* be more evidence and it therefore seeks unfettered review of McGraw-Hill's files.

---

[19]     The CFTC's claimed need for the *Gas Daily* spreadsheets despite the fact that no sources are noted thereon underscores the absurdity of the CFTC's position. (Mov. Br. at 14) There is no way at this point for anyone to trace the data considered for a *Gas Daily* spreadsheet during the time period to *any* given source. Indeed, even if some numbers could be matched up from the very few daily submissions McGraw-Hill still has, or from energy company records, there would still be no way to conclude for certain that the matching numbers meant that the defendants' submissions were considered. (Foley Dec. ¶ 26)

If the exhaustion requirement is to have any meaning, however, the CFTC should be required to *use* the information it has gained from the alternative sources to *limit* the scope of what it seeks from McGraw-Hill. Such limitation can be accomplished in any number of ways. Most obviously, the exhaustion requirement could be met here were the CFTC to limit its requests to dates and hubs where testimony or documents indicate false reports may have been made. Alternatively, exhaustion might be met through identifying dates or hubs for which data appears to be missing. However, by issuing subpoenas that seek "*all* documents" within the entire time frames at issue in the underlying suits, the CFTC has clearly not used any information gathered from alternative sources to narrow its request.

The purpose of the exhaustion requirement is not just to make the journalist the source of last resort, but to ensure that requests to journalists are specific and that the parties approach the journalist with knowledge of what they are looking for. In other words, the exhaustion requirement might obviate the need for resort to journalist at all. (To the extent the CFTC is concerned that it is missing the universe of data submitted to *Inside FERC*, McGraw-Hill's March 15 proposal suggested a means of narrowly accomplishing that result. *See* Exs. 10-13[20] Accordingly, because of the exhaustion requirement, subpoenas that seek peripheral or cumulative information or that are not specific as to the particular information needed – again like the subpoenas here – are routinely quashed. *See, e.g., Grunseth v. Marriott Corp.*, 868 F.Supp. 333, 335 (D.D.C. 1994) (quashing a motion to compel because Plaintiff had not "demonstrated, other than in conclusory language, that he has exhausted all other reasonable

---

[20]     "McGraw-Hill will provide the CFTC with a list of the trade data associated with AEP as considered in the determination of the natural gas index prices published in *Inside FERC Gas Market Report* . . . "for those dates and pricing points as to which the CFTC certifies that discrepancies are found, McGraw-Hill will undertake a reasonable search of its records for the document(s) that reflect the data submitted by AEP for the affected pricing point on the identified data and will produce any such document still in its possession."

sources for obtaining the information"); *Zerilli v. Smith*, 656 F.2d 705, 715 (C.A.D.C. 1981)

(denying motion to compel and finding that requesting parties cannot "escape their obligation to

exhaust alternative sources simply because they feared that [doing so] would be time-consuming,

costly, and unproductive").

As this Court has noted, the reporter's privilege is intended to protect the press in general

and the newsgathering process as a whole, rather than a single journalist or the source of a

particular story. *Hutira*, 211 F. Supp.2d at 121. This point is highly relevant here, where the

outcome of this proceeding bears on four pending subpoenas and may also impact subpoenas to

come in the future and therefore McGraw-Hill's newsgathering process generally. As the very

existence of the multiple subpoenas indicates, McGraw-Hill currently finds itself facing the

precise harms that the privilege is supposed to prevent:

> [Without the reporter's privilege, it] would likely become standard
> operating procedure for those litigating against an entity that had
> been the subject of press attention to sift through press files in
> search of information supporting their claims. The resulting
> wholesale exposure of press files to litigant scrutiny would burden
> the press with heavy costs of subpoena compliance, and could
> otherwise impair its ability to perform its duties – particularly if
> potential sources were deterred from speaking to the press or
> insisted on remaining anonymous, because of the likelihood that
> they would be sucked into litigation. Incentives would also arise
> for press entities to clean out files containing potentially valuable
> information lest they incur substantial costs in the event of future
> subpoenas. And permitting litigants unrestricted, court-enforced
> access to journalistic resources would risk the symbolic harm of
> making journalists appear to be an investigative arm of the judicial
> system, the government, or private parties.

*Gonzales v. National Broadcasting Co.*, 194 F.3d 29, 35 (2d Cir. 1999). The reporter's privilege

thus requires, at the very least, that the subpoenas be narrowed as proposed by McGraw-Hill.

### C.    The Subpoenas Should be Narrowed Under Rule 45 in Order to Avoid Imposing Unfair and Undue Burden on McGraw-Hill

McGraw-Hill submits that, under any standard, the CFTC's requests run amiss. For

example, the CFTC has directed several requests to documents which request information from sources who have no relationship to the defendants or their former employers. (*E.g.*, Requests 3 and 7) – an area of inquiry which this Court previously found overbroad in the context of an investigatory subpoena. *See CFTC v. The McGraw-Hill Companies, Inc.*, 390 F. Supp.2d at 36 ("having to cull its files for data submitted by other energy companies would impose undue burden on McGraw-Hill.") – highly burdensome and intrusive requests unlikely to reveal anything of real meaning or use to the CFTC. Likewise, the CFTC aims at internal communications or documents or drafts of documents shared among and between McGraw-Hill personnel that may happen to mention energy companies who employed the defendants (Requests 2, 4, 5).

Thus, even setting aside the reporter's privilege, enforcement of the CFTC's subpoena should be denied on the ground that it is unduly burdensome. Fed. R. Civ. P. 45(c)(3)(A)(4) provides that "[o]n timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it . . . subjects a person to undue burden." Whether a subpoena imposes an "undue burden" is a "case specific inquiry" that "turns on such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 53 (S.D.N.Y. 1996) (citation omitted); *see also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("Concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs."); *Badman v. Stark*, 139 F.R.D. 601, 605 (M.D.Pa. 1991) ("The Federal Rules of Civil Procedure were not intended to burden a non-party with a duty to suffer excessive or unusual expenses in order to comply with a subpoena duces tecum."); *Night Hawk Ltd. v.*

*Briarpatch Ltd., L.P.*, 2003 WL 23018833 at * 8 (S.D.N.Y. Dec. 23, 2003). The general rule, however, is that where discovery is sought from a non-party, "the Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on the non-party." *Fears v. Wilhelmina Model Agency, Inc.*, 2004 WL 719185 at *1 (S.D.N.Y. April 1, 2004); *see also Concord Boat Corp.*, 169 F.R.D. at 49 ("the status of a witness as a non-party to the underlying litigation entitles the witness to consideration regarding expense and inconvenience") (citation omitted).

Here, the probative value of the great majority of the information sought does not outweigh the burden imposed on McGraw-Hill by the subpoenas. *Inside FERC*'s employees have already committed enormous amounts of time to responding to requests for information from the CFTC and other government agencies and litigants. (Foster Aff. ¶ 10-11). Addressing these requests has required *Inside FERC* staff members, including senior editors, to divert their attention from their day-to-day responsibilities in order to review documents and otherwise handle the ongoing requests. (Foster Aff. ¶ 12). As outlined below, if these four subpoenas are enforced, the extraordinary interference with McGraw-Hill's business will be significantly extended and magnified.[21]

**Request No. 1**[22] seeks: "all documents received by McGraw-Hill… by any employee or agent of [energy company]… that contains price, volume or delivery location of any natural gas transaction." The burden imposed by this request inheres in the fact that McGraw-Hill does not keep "all documents" containing trade data in one place, organized by company submitting the

---

[21]    With minor differences not relevant to this motion, all four subpoenas set forth the same document requests. McGraw-Hill has already provided the CFTC the documents called for by Requests. 6, 8 and 9.

[22]    The full text of the 10 requests common to all four subpoenas is included in an appendix at the end of this memorandum.

information. Thus finding all such documents could require extensive searches of many employee email accounts and paper files. To the extent the privilege is found to be overcome as to this request, a reasonable search for such documents would entail review of the limited *Gas Daily* files[23] that remain in McGraw-Hill's possession for such submissions and the email files of the *Inside FERC* editor for submissions that appear to have been made by the energy companies at issue.

**Request No. 2** seeks "all documents prepared or created by McGraw-Hill *at any time* that reflect the price, volume, or delivery location of any natural gas transaction entered into during the relevant period that was communicated to McGraw-Hill by any and all means of communication by any employee or agent of [energy company] ..." (emphasis added) The scope of this request is truly vast. It would require production of any document, of any kind, having any tangential relationship to the creation of an index price, as well as the master spreadsheets which reflect all the data considered in connection with the derivation of an index price. Moreover, McGraw-Hill does not keep a file of all such documents and without limiting this request by reference to a McGraw-Hill employee, it would be extremely burdensome and difficult to locate copies of all such communications. The production would also be highly repetitive of Requests 1 and 4 and extremely intrusive on McGraw-Hill's editorial process. To the extent that the "core information" that this request seeks is the information submitted by an energy company that employed one of the defendants that were considered in the creation of an

---

23      During the time frame at issue in this case, the *Gas Daily* reporters and editors were not in the custom of retaining price reports received from energy traders. Before Platts acquired *Gas Daily* in September 2001, that publication routinely discarded the information submitted by the energy company traders. After the acquisition, Platts informed *Gas Daily* reporters of Platts' preference for retaining the reports made by energy company traders. Nonetheless, we understand that, at least during a transition period that lasted well into 2002, *Gas Daily* reporters largely continued their previous practices of discarding the daily trade reports.

index price, and the privilege is deemed overcome as to such information, Request 1 covers the required information.

**Request No. 3** seeks "all documents containing any information which references, indicates or discusses any price or volume information concerning any natural gas transaction entered into during the relevant period that was communicated to McGraw Hill by… any employee or agent of [energy company]." McGraw-Hill does not keep files of all documents that reference trade data submissions made by energy companies – let alone organize them by energy company. To the extent this request is meant to encompass complaints received about such submissions, internal discussions about submissions from any energy company or defendant or to identify submissions that were thought to be inaccurate or that were rejected, McGraw-Hill's files are not kept in a fashion that would render search and recovery of such documents feasible. To require McGraw-Hill to do an exhaustive search to collect all such documents would be exceedingly burdensome, if not impossible. If it is decided that the privilege is overcome as to information related to this topic, the answer to the question of whether any data submitted by any energy company or defendant was excluded can be determined by reference to the documents that would be produced pursuant to Request Nos. 1 and 4.

**Request No. 4** seeks "all documents reflecting, referencing or implementing the formulas used to calculate index prices for each day of the relevant period for each natural gas delivery point at which any employee or agent of [energy company]… submitted price and volume information…" McGraw-Hill has repeatedly explained that it is not accurate to say that the index prices for each natural gas delivery point or hub is calculated by way of a specific formula. Ultimately, the determination is a subjective one depending both on statistical calculations and the editors' knowledge of the market. Moreover, McGraw-Hill has already produced its

methodologies which detail the process by which the indices are created. If the point of this request, however, is to get at the data considered in coming up with a specific index price (and the privilege were held to be overcome as to specific hubs on specific dates), spreadsheets containing the data *considered* in determining the *Inside FERC* indices for each of the hubs throughout the period in question can be produced. Since those spreadsheets also contain the data submitted on a confidential basis by numerous other sources of information and since the identity of those sources is not relevant to the claims in this suit, the names of the sources other than the energy company who employed the given defendant should be redacted. In addition, to the extent that the spreadsheets reflect statistical calculations that can be performed by the parties themselves, McGraw-Hill requests that the calculations performed by the Platts editors who ultimately determined the index prices also be redacted.

With regard to the "calculation" of the daily *Gas Daily* indices, until November 4, 2002, the system used to create the *Gas Daily* indices was not set up in such a way to keep track of the source of each item of data considered in creating the indices. In other words, for all daily indices published before November 2002, *Gas Daily* simply does not have records that would enable McGraw-Hill, the CFTC, defendants – or anyone else – to retroactively match the data considered in connection with the creation of the *Gas Daily* indices with the source that provided it. So with regard to the *Gas Daily* indices, McGraw-Hill is unable to identify which documents, if any, in its possession might be responsive to this request and therefore has nothing to produce.

**Request No. 5** seeks "All documents containing or describing any price and volume data about natural gas transactions that was communicated to McGraw-Hill during the relevant period by any employee or agent of [energy company] … that McGraw-Hill rejected, or otherwise decided not to include, in a calculation of a price index." McGraw-Hill does not keep a file of all

rejected data and to require a non-party to do a comprehensive search of its paper and computer files for such a vague request and without even identifying the employees whose files should be searched clearly imposes more of a burden than appropriately placed on a third party. Again, to the extent that this request is designed to identify false trade submissions by energy companies who employed defendants and the privilege is found to have been overcome, such identification can be accomplished through the documents McGraw-Hill proposes to produce (should the privilege be overcome) pursuant to Requests 1 and 4.

**Request No. 7** seeks documents which "reference any complaints received from any person, or any conversation that related to the communication of false, inaccurate or otherwise in incorrect price and volume information or attempted price manipulation by any employee or agent of [energy company]." McGraw-Hill does not, however, keep files which reflect the requested information, whether organized by energy company or otherwise. Accordingly, it would be exceedingly burdensome to require McGraw-Hill to search its files for all documents that refer to complaints about inaccurate transaction information submitted by any given energy company. To the extent the privilege is found to have been overcome in this regard, the documents McGraw-Hill proposes to produce (should the privilege be overcome) pursuant to Requests 1 and 4 should provide the information the CFTC seeks in this regard.

**Request No. 10** seeks instructions McGraw-Hill provided to the public about the types of natural gas transactions for which market participants should submit information. As McGraw-Hill indicated, it will perform a reasonable search for and produce a representative sampling (one per month) of the reporting instructions, if any, that were regularly sent out by email during the time period by reporters and editors for *Inside FERC* and were intended to be used by those reporting trade data to *Inside FERC*. Because of the manner in which these email

notices were sent, however, McGraw-Hill is unable to identify the specific recipients of these email reminders and thus ultimately unable to identify what exactly may or may not have been sent to any given energy company or defendant.

*　　*　　*

As presently worded, these four subpoenas to non-party McGraw-Hill are egregiously burdensome and intrusive and seek to engage in a fishing expedition through McGraw-Hill files rather than request, in a targeted fashion, specific information or documents needed. The burden imposed by enforcement of such a subpoena would be extreme. Accordingly, even without the First Amendment privilege, it would be clear that the subpoenas should be quashed as overbroad and unduly burdensome. *See Concord Boat Corp.,* 169 F.R.D. at 53 (quashing subpoena on non-party Merrill Lynch where compliance "would subject numerous Merrill Lynch employees and managers in several branch offices to countless hours of research, analysis, and compilation"); *Alexander,* 1998 WL 1049005 at *2 (quashing subpoena where even those document requests "not covered by the journalist[ic] privilege . . . are extraordinarily over broad").

## CONCLUSION

For the reasons set forth above, McGraw-Hill respectfully requests that this Court deny the CFTC's motion to compel and grant McGraw-Hill's motion for a protective order that narrows the subpoenas at issue and that requires that the documents that McGraw-Hill produces be subject to the terms of a protective order in the form attached to the motion and to grant such other and further relief as this Court may deem appropriate.

Dated: May 26, 2006
        New York, New York

Respectfully submitted,

s/  Richard L. Cys
Richard L. Cys
D.C. Bar No. 087536
DAVIS WRIGHT TREMAINE LLP
1500 K Street, N.W.
Suite 450
Washington, D.C. 20005-1272
(202) 508-6600 (phone)
(202) 508-6699 (fax)
*Counsel for Third Party The McGraw-Hill Companies, Inc.*

Of Counsel:
Victor A. Kovner (*pro hac vice* admission pending)
Carolyn K. Foley (*pro hac vice* admission pending)
Kevan D. Choset (*pro hac vice* admission pending)
DAVIS WRIGHT TREMAINE LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340
Email:  carolynfoley@dwt.com

Of Counsel:
William Farley, Esq.
Adam Schuman, Esq.
The McGraw-Hill Companies, Inc.
1221 Avenue of the Americas
New York, New York  10020

# Appendix

## Document Requests Common to All Four CFTC Subpoenas

**Document Request Number 1:**

All documents received by McGraw-Hill during the relevant period from any employee or agent of [Energy Company], including but not limited to [Defendant and other individuals], that contains price, volume or delivery location of any natural gas transactions.

**Document Request Number 2:**

All documents prepared or created by McGraw-Hill at any time that reflect the price, volume, or delivery location of any natural gas transaction entered into during the relevant period that was communicated to McGraw-Hill by any and all means of communication by any employee or agent of [Energy Company], including but not limited to [Defendant and other individuals].

**Document Request Number 3:**

All documents containing any information which references, indicates or discusses any price or volume information concerning any natural gas transaction entered into during the relevant period that was communicated to McGraw-Hill by any means of communication by any employee or agent of [Energy Company], including but not limited to [Defendant and other individuals].

**Document Request Number 4:**

All documents reflecting, referencing or implementing the formulas used to calculate index prices for each day of the relevant period for each natural gas delivery point at which any employee or agent of [Energy Company], including but not limited to [Defendant and other individuals] submitted price and volume information on each day of the Relevant Time Period.

**Document Request Number 5:**

All documents containing or describing any price and volume data about natural gas transactions that was communicated to McGraw-Hill during the relevant period by any employee or agent of [Energy Company], including but not limited to [Defendant and other individuals] that McGraw-Hill rejected, or otherwise decided not to include, in a calculation of a price index.

**Document Request Number 6:**

All documents reflecting published natural gas prices during the relevant period, including but not limited to, electronic mail, web pages, and newsletters in chronological date order, during the Relevant Time Period.

**Document Request Number 7:**

All documents reflecting any complaints received from any person, or any conversation that relates to the communication of false, inaccurate or otherwise incorrect price and volume information or attempted price manipulation by any employee or agent of [Energy Company], including but not limited to [Defendant and other individuals].

**Document Request Number 8:**

All documents concerning McGraw-Hill's methodology for calculating McGraw-Hill's daily published natural gas index prices during the relevant period.

**Document Request Number 9:**

All documents concerning McGraw-Hill's methodology for calculating McGraw-Hill's first of the month (or monthly) published index prices for natural gas during the relevant period.

**Document Request Number 10:**

All documents concerning reporting of information about natural gas transactions McGraw-Hill provided to any employee or agent of [Energy Company], including but not limited to [Defendant and other individuals], including, without limitation, instructions about the types of natural gas transactions for which [Energy Company]/they should submit information.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

----------------------------------------------------- x

U.S. Commodity Futures Trading Commission,    :

              Plaintiff,    :     **Case No. 1:06-mc-00210 (RCL)**

        - against -    :

Michael Whitney, et al.    :

           Defendants.    :

----------------------------------------------------- x

### NOTICE OF FILING UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Third Party The McGraw-Hill Companies, Inc. ("McGraw-Hill"), by and through undersigned counsel, herewith file the following document under seal:

MEMORANDUM OF POINTS AND AUTHORITIES (UNREDACTED)

This document is subject to the pending Order Sealing the Unredacted Memorandum of Points and Authorities in the above-captioned case. A copy of that proposed Order is attached hereto.

Dated this 26th day of May, 2006, New York, New York.

Respectfully submitted,

s/ Richard L. Cys_____
Richard L. Cys
D.C. Bar No. 087536
DAVIS WRIGHT TREMAINE LLP
1500 K Street, N.W.
Suite 450
Washington, D.C. 20005-1272
(202) 508-6600 (phone)
(202) 508-6699 (fax)
*Counsel for Third Party The McGraw-Hill Companies, Inc.*

1

Of Counsel:
Victor A. Kovner (*pro hac vice* admission pending)
Carolyn K. Foley (*pro hac vice* admission pending)
Kevan D. Choset (*pro hac vice* admission pending)
DAVIS WRIGHT TREMAINE LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340
Email:  carolynfoley@dwt.com

Of Counsel:
William Farley, Esq.
Adam Schuman, Esq.
The McGraw-Hill Companies, Inc.
1221 Avenue of the Americas
New York, New York  10020