# EXHIBIT 4

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2005 APR 12 PM 12: 34

GREGORY C. LANGHAM
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

BY_____DEP. CLK

Civil Action No.: __05 - M - 668 (oes)__

UNITED STATES COMMODITY
FUTURES TRADING COMMISSION,

          Plaintiff,

v.

ANDREW KENNEDY RICHMOND,

          Defendant.

---

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT

---

The United States Commodity Futures Trading Commission ("Commission"), by its

attorneys, alleges as follows:

### I. Summary

1.    As more fully set forth below, defendant Andrew Richmond has engaged in acts

and practices which constitute violations of the Commodity Exchange Act, as amended, (the

"Act") 7 U.S.C. §§ 1 et seq. (2002).

2.    More specifically, during the period beginning in approximately April 2000 and

ending in approximately February 2001 (the "relevant period"), defendant violated Sections 6(c),

6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2), by knowingly delivering, or causing

to be delivered, for transmission through the mails or interstate commerce by telegraph,

telephone, wireless, or other means of communication false or misleading or knowingly

inaccurate reports concerning market information or conditions that affect or tend to affect the market price of natural gas, and by attempting to manipulate the market price of natural gas.

3.    Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. §13a-1, the Commission brings this action to enjoin such acts and practices, and to compel compliance with the provisions of the Act.  In addition, the Commission seeks civil monetary penalties and such other ancillary relief as the Court deems necessary or appropriate under the circumstances.

4.    Unless restrained and enjoined by this Court, there is a reasonable and substantial likelihood that defendant will continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as more fully described below.

## II.  Jurisdiction and Venue

5.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person and to enforce compliance with the Act whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

6.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), in that defendant is found in, inhabits and transacts business in this District and the acts and practices in question have occurred, are occurring, or are about to occur in this District.

## III.  The Parties

7.    Plaintiff is an independent federal regulatory agency charged with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et seq.*, and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.*

8.      Defendant currently resides in Superior, Colorado. During the relevant period, defendant was employed by Western Gas Resources, Inc. ("Western") in Denver, Colorado as the director of marketing for the Rocky Mountain, Mid-continent and Texas region. Defendant is currently employed by Shamrock Energy, a privately held corporation based in Shreveport, Louisiana, and reports for work in the Denver, Colorado offices of Optigas, Shamrock Energy's parent corporation.

### IV. Facts

#### A.      The Natural Gas Market and Natural Gas Price Indexes

9.      During the relevant period, natural gas was a commodity that was typically transported in interstate commerce through a network of pipelines across the United States.

10.     During the relevant period, Western sought to buy and sell natural gas for profit. To that end, its traders entered into transactions calling for the actual physical delivery of natural gas ("physical trades").

11.     Physical trades were typically priced with either a fixed price set at the time of the transaction or with reference to an index to be set at a later date.

12.     During the relevant period, natural gas traders and companies reported natural gas market information to companies that calculated natural gas price indexes ("indexes").

13.     The market information the traders and companies reported to the indexes typically included price and volume information for natural gas transactions entered into for delivery at a specific natural gas pricing/delivery location ("transaction information").

3

14.    During the relevant period, participants in the natural gas markets widely used indexes for various purposes including pricing and settlement of index trades. Moreover, natural gas traders also referred to indexes for price discovery and for assessing price risks.

15.    *Gas Daily* is an index widely used by the natural gas industry and its participants during the relevant period. *Gas Daily* is issued by Platts, a division of the McGraw-Hill Companies, and puts out a monthly and daily index for various natural gas pricing/delivery locations.

16.    During the relevant period, *Gas Daily* gathered from market participants, including Western's traders, transaction information concerning physical, fixed-price natural gas transactions and calculated a volume weighted average price index for natural gas pricing/delivery locations.

17.    The transaction information Western's traders reported to *Gas Daily* was market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce.

**B.    Reporting and Trading Activities in Western's Rocky Mountain, Mid-continent and Texas Region**

18.    In his position as Western's director of marketing for the Rocky Mountain, Mid-continent and Texas region, defendant supervised the natural gas traders who traded within his region of responsibility.

19.    The natural gas traders that defendant supervised within his region of responsibility were divided into three groups ("desks"): the Rocky Mountain desk; the Mid-continent desk; and the Texas desk. The traders also referred to the Texas desk as the southern region.

4

20.    Defendant encouraged and/or required the traders he supervised to report transaction information to *Gas Daily*. Typically, the traders reported transaction information to *Gas Daily* over the telephone.

21.    As a result of defendant encouraging and/or requiring the traders he supervised to report transaction information to *Gas Daily*, the traders reported transaction information to *Gas Daily* frequently, with at least one trader reporting transaction information on nearly every trading day throughout the relevant period.

22.    During most months of the relevant period, the Texas desk traders entered into spread trades.

23.    A spread trade involves related transactions at more than one separate pricing/delivery location wherein the difference between the price at each location is known as the "spread." Frequently, a spread trade remains in place for one month but its profitability is often judged on a daily basis by referencing the *Gas Daily* index.

24.    A potential financial benefit to entering into a spread trade is that a company can make a profit by purchasing natural gas at one pricing/delivery location, transporting it to a second pricing/delivery location, and selling it at a higher price at the second location. If the spread is greater than the cost of transporting the natural gas from one location to the other, the company can make a profit by capitalizing on price differences, that is, by transporting natural gas to locations where it can be sold at a higher price.

25.    If a market participant could manipulate the price of natural gas at one or more of the pricing/delivery locations for which they had entered into a spread trade, the potential profit

derived from the spread trade could be greater than it would have been had market forces alone been at work.

26.    During the relevant period, defendant's Texas desk traders regularly entered into spread trades during most months within the relevant period.

**C.    Defendant Pressured Traders to Submit False Reports to *Gas Daily* in an Attempt to Manipulate the Index Price of Natural Gas**

27.    During the relevant period, defendant routinely pressured at least two of the traders he supervised to knowingly deliver false or misleading or knowingly inaccurate reports of transaction information to *Gas Daily* regarding natural gas pricing/delivery locations at which they had entered into spread trades. Defendant applied this pressure on the traders each time they entered into a spread trade.

28.    Because a single spread trade was typically in place for up to one month, defendant often applied pressure on the traders on more than one occasion throughout the month for each spread trade that was in place.

29.    Each time defendant pressured the traders to deliver the false or misleading or knowingly inaccurate reports of transaction information to *Gas Daily*, he did so with the intent to manipulate the price of natural gas at one or more pricing/delivery locations for which they had entered into a spread trade. The traders knew that defendant intended their false or misleading or knowingly inaccurate reports to manipulate the price of natural gas at pricing/delivery locations for which they had entered into a spread trade.

30.    Each time defendant pressured the traders to knowingly deliver false or misleading or knowingly inaccurate reports of transaction information to *Gas Daily*, at least two

of the traders succumbed to defendant's pressure and knowingly delivered false or misleading or knowingly inaccurate reports of transaction information to *Gas Daily*.

31.    When defendant caused the traders to knowingly deliver false or misleading or knowingly inaccurate reports in an attempt to manipulate the price of natural gas at one or more pricing/delivery locations, defendant's intent was to manipulate the spread(s) so that the spread(s) would be wider or narrower than had market forces alone been at work.

32.    When defendant attempted to manipulate the spread(s) so that the spread(s) would be wider or narrower than had market forces alone been at work, defendant did so with the intent to increase the income Western derived from the spread trade(s).

33.    If defendant's attempted manipulation of the price of natural gas had been successful, it could have affected the price of natural gas, a commodity in interstate commerce, and the price of natural gas futures and options contracts traded on the New York Mercantile Exchange ("NYMEX").

### V. Violations of the Commodity Exchange Act

34.    The allegations contained in paragraphs 1 through 33 above are re-alleged and incorporated by reference into each Count alleged below.

35.    Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), makes it unlawful for any person "[K]nowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce. . . ."

36.    Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), also makes it unlawful for any person to "[M]anipulate or attempt to manipulate the price of any commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, including any contract market."

37.    Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), "Any person who commits, or who willfully aids, abets, counsels, . . . or procures the commission of a violation of this Act, . . . or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done . . . may be held responsible for such violation as a principal."

38.    Sections 6(c) and 6(d) of the Act, 7 U.S.C. §§ 9 and 13b, together authorize the Commission to serve a complaint and provide for the imposition of, among other things, fines and penalties if the Commission "has reason to believe that any person . . . has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any contract market . . . or otherwise is violating or has violated any of the provisions of [the] Act."

### Count I – False Reporting

39.    Defendant violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), when he delivered, or caused to be delivered, for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports of natural gas transaction information to *Gas Daily*.

40.    Delivery of false or misleading or knowingly inaccurate reports of transaction information to *Gas Daily* amounts to the delivery of market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce.

41.    Each occasion upon which defendant delivered, or caused to be delivered, for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate transaction information concerning natural gas transactions is alleged herein as a separate and distinct violation of section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2).

42.    Based on defendant's conduct described above, defendant willfully aided, abetted, counseled or procured the commission of a violation of the Act by the traders he supervised, or acted in combination or concert with them in a violation of the Act, or willfully caused them to violate the Act, and is therefore also liable for such violations pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

43.    Each occasion upon which Richmond willfully caused aided, abetted, counseled, and or procured a violation of the Act and/or worked in combination and concert with the traders in a violation of the Act is alleged herein as a separate and distinct violation.

### Count II – Attempted Manipulation

44.    Defendant violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) when he attempted to manipulate the price of natural gas, a commodity in interstate commerce. Defendant had the specific intent to manipulate the price of natural gas when he pressured the traders to deliver or cause to be delivered to *Gas Daily* through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or

9

misleading or knowingly inaccurate reports of natural gas transactions in an attempt to manipulate the price of natural gas.

45.    Each occasion upon which defendant attempted to manipulate the price of natural gas at each individual pricing/delivery location is alleged herein as a separate and distinct violation of Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

46.    Based on defendant's conduct described above, defendant willfully aided, abetted, counseled or procured the commission of a violation of the Act by the traders, or acted in combination or concert with them in a violation of the Act, or willfully caused them to violate the Act, and is therefore also liable for such violations pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a).

47.    Each occasion upon which defendant willfully caused aided, abetted, counseled, and or procured a violation of the Act and/or worked in combination and concert with the traders in a violation of the Act is alleged herein as a separate and distinct violation.

### VI. Relief Requested

WHEREFORE, Plaintiff respectfully requests that this Court enter an order of permanent injunction:

A.    Restraining and enjoining defendant and any of his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him who receive actual notice of such order by personal service or otherwise, from directly or indirectly violating Sections 6(c), 6(d), 9(a)(2) and 13(a) of the Act, 7 U.S.C. §§ 9, 13b, 13(a)(2) and 13c(a);

B.    Directing defendant to pay civil monetary penalties, to be assessed by the Court against the defendant, in amounts not to exceed $110,000 for each violation of the Act occurring before October 23, 2000 and $120,000 for each violation occurring on or after October 23, 2000, or triple the monetary gain to him for each violation of the Act, as described herein;

C.    Directing defendant to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act or Regulations, as described herein, and interest thereon from the date of such violations;

D.    Directing defendant to make full restitution, pursuant to such procedure as the Court may order, of funds received by him as a result of acts and practices which constituted violations of the Act and Regulations, as described, and interest thereon from the date of such violations; and,

E.    Providing for such other and further remedial and ancillary relief as this Court may deem necessary and appropriate.

**Respectfully Submitted**

Dated: _04/11/05_

**UNITED STATES COMMODITY FUTURES TRADING COMMISSION**

By: _Michael Otten_

Kathleen M. Banar, Chief Trial Attorney
Michael J. Otten, Senior Trial Attorney
Judy T. Lee, Trial Attorney
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW, Three Lafayette Center
Washington, D.C. 20581
phone:  (202) 418-5000/5388
fax:  (202) 418-5523

11

# EXHIBIT 5

United States Courts
Southern District of Texas
FILED

FEB 0 1 2005

Michael N. Milby, Clerk

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
#### Houston Division

|  |  |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| MICHAEL WHITNEY, | ) ) |
| Defendant. | ) ) ) |

**Complaint for Injunctive and Other Equitable Relief and Civil Monetary Penalties Under the Commodity Exchange Act**

Docket No.: **H 05 - 333**

The United States Commodity Futures Trading Commission ("Commission"), by its

attorneys, alleges as follows:

### I. Summary

1.      As more fully set forth below, Defendant Michael Whitney has engaged in acts

and practices which constitute violations of the Commodity Exchange Act, as amended, (the

"Act") 7 U.S.C. §§ 1 *et seq.* (2002).

2.      From approximately June 2001 through approximately August 2002 (the

"relevant period"), Defendant was a natural gas trader and marketing representative at Duke

Energy Trading and Marketing, LLC ("DETM") in Houston, Texas.

3.      As part of his duties, Defendant provided, either directly or through other

employees of DETM, market information concerning natural gas, physical trades to reporting

firms, including but not limited to, *Gas Daily* and Enerdata.

4.      Reporting firms, such as *Gas Daily* and Enerdata, provide price indexes for the

natural gas industry and compile the price indexes using price and volume information taken

from actual fixed price, physical natural gas trades executed by energy companies.  The price

indexes are widely used by natural gas participants to price and settle natural gas transactions and for price discovery and price risk assessment.

5.    During the relevant period, Defendant knowingly submitted, or caused to have submitted, to the reporting firms, among other things, fixed price, physical natural gas trades he had executed on behalf of DETM but with the prices and/or volumes altered.

6.    By such conduct, Defendant knowingly delivered, or caused to be delivered, false, misleading or knowingly inaccurate reports concerning market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce, in violation of section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2).

7.    Defendant engaged in such conduct with the intent to affect the prices set forth in the indexes. Accordingly, through his submission of false or misleading or knowingly inaccurate reports concerning natural gas transactions, Defendant attempted to manipulate the price of natural gas, in violation of sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

8.    Accordingly, pursuant to section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action against Defendant to enjoin such acts and practices, and to compel Defendant's compliance with the Act. In addition, the Commission seeks restitution, disgorgement of any ill-gotten gains obtained by Defendant through his unlawful acts, civil monetary penalties and other such ancillary relief as this Court may deem necessary or just under the circumstances.

## II. Jurisdiction and Venue

9.    This Court has jurisdiction over this action pursuant to section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of

any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action against such person to enjoin such practice or to enforce compliance with the Act.

      10.    Venue properly lies with this Court pursuant to section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), in that the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

      11.    Unless restrained and enjoined by this Court, Defendant is likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

### III. The Parties

      12..·    The Commission is the independent federal regulatory agency charged with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1. *et seq.*

      13.    Defendant Michael Whitney ("Whitney" or "Defendant") currently resides in New York, New York. During the relevant period, Defendant was an employee of DETM, an affiliate of Duke Energy Corporation ("Duke"), located in Houston, Texas.

### IV. Facts

**A.**    <u>**Whitney Was A Trader For DETM and Reported Market Information**</u>

      14.    During the relevant period, Whitney was employed by DETM as a trader and marketing representative.

      15.    During the relevant period, DETM marketed natural gas, electricity and other energy-related products to a wide range of customers across North America. Specifically, the

3

Houston offices of DETM conducted natural gas marketing operations at eastern power and gas

trading hubs for the Eastern region of the United States.

16.     Natural gas was, and is, a commodity that travels in interstate commerce through a

network of pipelines across the United States.

17.     During the relevant period, DETM sought to buy and sell natural gas for profit.

To that end, its traders and marketing representatives entered into transactions calling for the

actual physical delivery of natural gas ("physical trades"). Physical trades typically were priced

with either a fixed price set at the time of the transaction or with reference to an index to be

published at a later date.

18.     As a trader and marketing representative for DETM, Whitney traded and marketed

natural gas. In trading and marketing natural gas, Whitney entered into physical trades.

19.     During the relevant period, as part of his duties for DETM, Whitney also reported,

or caused to be reported, natural gas trade information, including price and volume data to reporting

firms that compiled natural gas price indexes for the industry, including but not limited to, *Gas

Daily* and Enerdata, Ltd.

### B.     Natural Gas Market Participants' Use of Indexes

20.     During the relevant period, reporting firms, such as *Gas Daily* and Enerdata,

calculated the indexes using natural gas transaction information, including volume, price, and

delivery point/pricing location ("hub"). The indexes obtained and collected the transaction

information used to calculate the indexes from reports submitted by market participants,

including Defendant.

4

21.    The reporting firms, including *Gas Daily* and Enerdata, sought from natural gas traders specific market information, *i.e.*, price and volume data, derived from fixed price, physical, natural gas trades the traders actually executed.

22.    Natural gas traders submitted price and volume data to reporting firms for use in compiling the indexes.

23.    Natural gas traders, including Defendant, generally knew that the reporting firms compiled their indexes using price and volume data from fixed price, physical natural gas transactions actually executed by the traders.

24.    After collecting the reports submitted by market participants of their price and volume information for natural gas transactions entered into at each hub, the reporting firms calculated a volume-weighted average to determine and publish the index prices.

25.    During the relevant period, *Gas Daily,* issued by Platts, a division of the McGraw-Hill Companies, was a daily index that provided natural gas market information and price indexes for natural gas hubs throughout the United States and Canada.

26.    During the relevant period, Enerdata, Ltd. ("Enerdata") issued a number of natural gas trade reports concerning natural gas market information and price indexes for natural gas hubs throughout the United States and Canada, including *The Natural Gas Lookout, Weekly Price Update, Priceline Daily, Canadian Gas Price Reporter,* and *Canadian Natural Gas Market Report*

27.    During the relevant period, participants in the natural gas markets used the natural gas indexes to price and settle commodity transactions; that is, the indexes were used to calculate the values of trades that were executed off of the index price.

5

28.    Natural gas futures traders referred to the published index prices for price discovery and for assessing price risks.

29.    Information concerning prices and volumes of natural gas trades reported by natural gas traders, including Defendant, to reporting firms, such as *Gas Daily* and Enerdata, is and was market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce.

### C.    Whitney Knowingly Submitted False, Misleading, or Knowingly Inaccurate Trade Information to Reporting Firms

30.    During the relevant period, Whitney regularly submitted reports of natural gas transaction information directly to at least two natural gas reporting firms, including but not limited to, *Gas Daily* and Enerdata.

31.    Whitney also provided reports of natural gas transaction information to other DETM employees who then submitted those reports of natural gas transaction information to natural gas reporting firms, including but not limited to, *Gas Daily* and Enerdata.  When Whitney provided the reports to the other DETM employees, he knew the other employees would submit the reports to the reporting firms.

32.    The reports of natural gas transaction information that Defendant personally submitted, or caused other DETM employees to submit, to reporting firms, typically included price, volume, and hub.

33.    Whitney knew that the reporting firms, including *Gas Daily* and Enerdata, sought to compile their indexes using price and volume data derived from fixed price, physical, natural gas trades.

34.    On a regular basis during the relevant period, Defendant knowingly submitted, or knowingly caused to be submitted, reports concerning trades executed on behalf of DETM to at

6

least two reporting firms, *Gas Daily* and Enerdata. Defendant's reported trades included false or misleading or knowingly inaccurate prices and/or volumes for certain trades. Specifically, Whitney reported, among other things, trades entered into by DETM but with the prices altered and/or the volumes inflated or deflated—such that trades potentially were weighed more or less heavily in the compilation of the index than they ordinarily would have been.

35.    On each occasion that Defendant knowingly submitted, or caused to be submitted, reports of natural gas transactions that included false or misleading or knowingly inaccurate prices and/or volumes, Defendant did so in an attempt to manipulate the price of natural gas, which, if successful, could have affected the price of natural gas futures and options contracts traded on the New York Mercantile Exchange ("NYMEX").

### D.    Defendant Attempted to Manipulate the Price of Natural Gas at the Emerson Hub

36.    On July 31, 2002, Whitney knowingly submitted false or misleading or knowingly inaccurate reports concerning certain natural gas trades, executed on behalf of DETM, to Enerdata in an attempt to manipulate the price of natural gas at the Emerson Hub.

37.    The Emerson hub is on the Trans-Canada pipeline and is located on the Canada-Minnesota border. Gas flowing into the United States at the Emerson hub supplies much of the upper-Midwest with natural gas.

38.    On or about July 31, 2002, Defendant purchased natural gas from a trader at DETM's affiliate in Calgary ("Calgary trader"). The natural gas was to be delivered on August 1, 2002 at the Emerson hub.

39.    Later that same day, Defendant reported his transaction information regarding the Emerson hub over the telephone to a representative of Enerdata. Defendant submitted price and

volume information for transactions that day so that the information from his transactions could be used to calculate the index price for natural gas at the Emerson hub.

40.    Prior to July 31, 2002, Defendant had provided reports of transaction information to Enerdata for the Emerson hub and knew that Enerdata used the reports of transaction information to calculate an index price for the Emerson hub.  As such, on July 31, 2002, Defendant expected and knew that the transaction information he submitted to Enerdata would likely be used to calculate the volume weighted index price for natural gas at the Emerson hub.

41.    During the telephone call with Enerdata on July 31, 2002, Defendant knowingly submitted false or misleading or knowingly inaccurate price and volume reports regarding his transaction(s) at the Emerson hub.  More specifically, Defendant submitted a report with price and/or volume information that was higher than that of the actual transaction he entered into with the Calgary trader.  Defendant knowingly submitted this report in an attempt to manipulate the price of natural gas at the Emerson hub.

42.    On July 31, 2002, the Calgary affiliate also submitted to a representative of Enerdata reports of natural gas transaction information for the Emerson hub, including information concerning the transaction executed with the Defendant.  Those reports of transaction information were accurate.

43.    Upon receiving the conflicting reports submitted by Defendant and the Calgary affiliate, Enerdata called Defendant on July 31, 2002 to find out why the reports differed.

44.    Despite being challenged by Enerdata, Defendant falsely maintained that his report was accurate.  Exacerbating his wrongdoing, Defendant then proceeded to suggest that the Calgary affiliate and/or trader had provided Enerdata with inaccurate price and volume information, claiming that the Calgary affiliate had "something they're trying to put on."

45      After being challenged by Enerdata, Defendant made three telephone calls that same day to the Calgary trader to discuss their Emerson reports to Enerdata because Defendant believed that he and the Calgary trader "need[ed] to be on the same page" regarding the reports. In one of those conversations, Defendant attempted to convince the Calgary trader to report price and volume data that would benefit the Calgary trader's position.

46.      During a telephone discussion with the Calgary trader, Defendant attributed the inconsistent reports to Enerdata to a "miscommunication" between Defendant and Enerdata. Defendant made this statement to the Calgary trader despite the fact that earlier in the day, Defendant told Enerdata that the inconsistency was due to the Calgary trader and/or the Calgary affiliate reporting inaccurate numbers and attempting to manipulate the market.

47.    If the attempted manipulation of the price of natural gas had been successful, it could have affected the price of natural gas futures and options contracts traded on the NYMEX.

**E.      Defendant Attempted to Manipulate the Price of Natural Gas at the ANR, ML-7 Hub**

48.      During the relevant period, Defendant submitted, or caused to be submitted, reports of transaction information to *Gas Daily*. The reports included volume, price, and hub.

49.      Defendant reported this information by entering his transaction information onto a Microsoft Excel spreadsheet located on a shared computer drive at DETM. Once Defendant and the other traders entered the necessary information, the spreadsheet was transmitted via electronic mail to *Gas Daily*.

50.      Between February 5, 2002 and February 7, 2002, Defendant purchased approximately 335,000 mmBtu of natural gas from the Wisconsin Public Service Commission ("WPSC"). The natural gas was to be delivered on the ANR pipeline to the ML7 hub. On each

of those three days, Defendant reported price, volume and hub information for those transactions
to *Gas Daily*.

51.    On each of those three days, Defendant knowingly submitted false or misleading
or knowingly inaccurate price and volume information to *Gas Daily* regarding his transactions at
the ANR, ML7 hub.  Defendant did so in an attempt to manipulate the price of natural gas at that
hub.

52.    On February 7, 2002, a representative from *Gas Daily* called Defendant to
challenge the price Defendant reported that day for his ML7 transaction(s) because Defendant's
reported price was significantly higher than any other price reported.  The *Gas Daily*
representative informed Defendant that his reported price was so much higher than other prices
reported that the market was "highly upset" because Defendant's report was causing a "spike in
the market."

53.    Despite Defendant's report being challenged, Defendant falsely maintained that
his report was accurate, stating the "[O]nly thing I report is what I trade . . . I'm not trying to
game the system."  Defendant attempted to further cover his false reporting by maintaining that
he only reports what he actually traded and blamed other companies for not reporting accurately.

54.    If the attempted manipulation of the price of natural gas had been successful, it
could have affected the price of natural gas futures and options contracts traded on the NYMEX.

## V. Violations of the Commodity Exchange Act

### Count I:  Delivery of False or Misleading or Knowingly Inaccurate Information

55.    The allegations contained in paragraphs 1 through 54 above are re-alleged and
incorporated by reference herein.

56.    Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), provides, in pertinent part, that it is unlawful for any person "[K]nowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ."

57.    Defendant violated section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), when he knowingly delivered or caused to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning natural gas transactions to industry reporting firms that calculated and reported the index price of natural gas.

58.    Submission of market information concerning price and volumes of natural gas trades to reporting firms, like *Gas Daily* and Enerdata, affects or tends to affect the price of natural gas, a commodity in interstate commerce.

59.    Each occasion upon which Defendant knowingly delivered or caused to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication, a false or misleading or knowingly inaccurate price and/or volume concerning a natural gas transaction, including but not limited to those specifically alleged herein, is alleged herein as a separate and distinct violation of section 9(a)(2) of the Act, 7 U.S. C. § 13(a)(2).

### Count II: Attempted Manipulation of Natural Gas Price Indexes

60.    The allegations contained in paragraphs 1 through 59 above are re-alleged and incorporated by reference herein.

11

61.     Sections 6(c) and 6(d) of the Act, 7 U.S.C. §§ 9 and 13b, together authorize the Commission to serve a complaint and provide for the imposition of, among other things, fines and penalties if the Commission "has reason to believe that any person . . . has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any contract market . . . or otherwise is violating or has violated any of the provisions of [the] Act."

62.     Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), provides, in pertinent part, that it is unlawful for any person to "[M]anipulate or attempt to manipulate the price of any commodity in interstate commerce . . . ."

63.     Defendant violated sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2), when, with the intent to manipulate the price of natural gas, he knowingly delivered or caused to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning natural gas transactions to the reporting firms that calculated and reported the index price of natural gas.

64.     Each occasion upon which Defendant knowingly delivered a false or misleading or knowingly inaccurate report in an attempt to manipulate the price of natural gas, including but not limited to those occasions specifically alleged herein, is alleged herein as a separate and distinct violation of sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

## VI.  Relief Requested

65.     WHEREFORE, Plaintiff Commission respectfully requests that this Court enter an order of permanent injunction:

A. Restraining and enjoining Defendant and any of his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him who

receive actual notice of such order by personal service or otherwise, from directly or indirectly violating sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2);

B. Directing Defendant to pay civil monetary penalties, to be assessed by the Court against the Defendant, in amounts not to exceed $110,000 for each violation of the Act occurring before October 23, 2000 and $120,000 for each violation occurring on or after October 23, 2000, or triple the monetary gain to him for each violation of the Act, as described herein;

C. Directing Defendant to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act or Regulations, as described herein, and interest thereon from the date of such violations;

D. Directing Defendant, pursuant to such procedure as the Court may order, to make full restitution of funds received by him as a result of acts and practices which constituted violations of the Act and Regulations, as described and interest thereon from the date of such violations; and,

E. Providing for such other and further remedial and ancillary relief as this Court may deem necessary and appropriate.

Dated: _7/31/05_

Respectfully submitted,

**U.S. COMMODITY FUTURES
TRADING COMMISSION**

By:_____

Michael J. Otten, Attorney in Charge
Senior Trial Attorney
*motten@cftc.gov*
Michael Solinsky, Of Counsel
Chief Trial Attorney
*msolinsky@cftc.gov*
U.S. Commodity Futures Trading
     Commission
Division of Enforcement
1155 21st Street, N.W.
Washington, DC 20581
202-418-5000 (Phone)
202-418-5523 (Facsimile)

13

JS 44 (Rev. 11/04)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
U.S. Commodity Futures Trading Commission

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Michael J. Otten/Michael Solinsky, CFTC, Division of Enforcement, 1155 21st Street, NW, Washington, DC 20581

### DEFENDANTS
Michael Whitney

County of Residence of First Listed Defendant    New York, NY
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

United States Courts
Southern District of Texas
FILED
FEB 0 1 2005
Michael N. Milby, Clerk

H 05 - 333

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

### V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
7 U.S.C.s, 13b, 13(a)(2)
Brief description of cause:
Knowing submission of false natural gas reports and attempted manipulation

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____
DOCKET NUMBER _____

DATE 1/27/05
SIGNATURE OF ATTORNEY OF RECORD    Michael Otten

### FOR OFFICE USE ONLY
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# EXHIBIT 6

# FILED

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

FEB 0 1 2005

Phil Lombardi, Clerk
U.S. DISTRICT COURT

|  |  |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT** |

U.S. COMMODITY FUTURES
TRADING COMMISSION,

　　　　　　　　　Plaintiff,

　　v.

JEFFREY A. BRADLEY and
ROBERT L. MARTIN,

　　　　　　　　　Defendants.

**COMPLAINT FOR INJUNCTIVE AND
OTHER EQUITABLE RELIEF AND
CIVIL MONETARY PENALTIES
UNDER THE COMMODITY
EXCHANGE ACT**

**05CV62**  SEH  — FHM

Docket No.

The United States Commodity Futures Trading Commission ("Commission"), by its attorneys, alleges as follows:

## I. Summary

1.　As alleged below, from at least January 2001 through at least October 2002 ("the relevant period"), Defendants Jeffrey A. Bradley and Robert L. Martin (collectively "Defendants") have engaged in acts and practices which constitute violations of the Commodity Exchange Act, as amended, (the "Act") 7 U.S.C. §§ 1 *et seq.* (2002).

2.　During the relevant period, Defendant Bradley was a manager of marketing for CMS Field Services, Inc. ("Field Services"), a subsidiary of CMS Energy Corporation, operating out of Tulsa, Oklahoma, and traded natural gas for Field Services. Defendant Martin was a director of gas supply and in that capacity managed contracts under which producers supplied natural gas to Field Services.

*fees wv*
*S/I*
*forms*

3.       During the relevant period, Defendant Bradley routinely provided market information concerning natural gas physical trades entered into by Field Services to natural gas reporting firms, including but not limited to *Gas Daily, Btu Daily, Natural Gas Intelligence* ("*NGI*"), and *Natural Gas Week*.

4.       Reporting firms, such as *Gas Daily*, provide price indexes for the natural gas industry and compile price indexes using price and volume information taken from actual fixed price, physical gas trades executed by energy companies.  The price indexes are widely used by natural gas market participants to price and settle natural gas transactions and for price discovery and risk assessment.

5.       Defendant Bradley routinely bought and sold natural gas at index-based prices. Defendant Martin managed natural gas contracts that settled against such indexes.

6.       On numerous occasions during the relevant period, Bradley knowingly submitted false, misleading or knowingly inaccurate transaction information regarding hundreds of natural gas transactions to multiple natural gas reporting firms, including but not limited to *Gas Daily, Btu Daily, NGI* and *Natural Gas Week*, by reporting fictitious trades as if they were *bona fide* transactions entered into on behalf of Field Services, by altering the prices and volumes for trades actually entered into on behalf of Field Services, or by reporting non-fixed price trades as if they were fixed price trades.

7.       By such conduct, Defendant Bradley knowingly delivered, or caused to be delivered, false, misleading or knowingly inaccurate reports concerning information that affects or tends to affect the price of natural gas, a commodity in interstate commerce, in violation of Section 9(a)(2) of the Act, 7 U.S.C. §13(a)(2).

2

8.      Defendant Bradley engaged in such conduct with the intent to affect the prices set forth in the indexes and thereby, attempted to manipulate the price of natural gas, in violation of Sections 6(c), 6(d), and 9(a)(2), 7 U.S.C. §§ 9, 13b, and 13(a)(2).

9.      On at least one occasion during the relevant period, Bradley and Martin coordinated and conspired to provide, and did provide, false, misleading or knowingly inaccurate information to reporting firms concerning purported Field Services natural gas transactions on the pipeline point know as Northern Natural TOK ("NNTOK"). By such conduct, Defendants submitted, or caused to be submitted, false, misleading or knowingly inaccurate market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce, in violation of Section 9(a)(2), 7 U.S.C. §13(a)(2).

10.     Defendants submitted the false, misleading or knowingly inaccurate trade information in an attempt to manipulate the price of natural gas in order to benefit contracts managed by Martin for Field Services, in violation of Sections 6(c), 6(d), and 9(a)(2), 7 U.S.C. §§ 9, 13b, and 13(a)(2).

11.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. §13a-1, the Commission brings this action against the Defendants to enjoin such acts and practices, and to compel Defendants' compliance with the Act. In addition, the Commission seeks civil monetary penalties and other such ancillary relief, as this Court may deem necessary or just under the circumstances.

## II.      Jurisdiction and Venue

12.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is

3

about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder.

13.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), in that Defendants transacted business in this District, and the acts and practices in violation of the Act and the Regulations have occurred, are occurring, or are about to occur within this District.

14.    Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

### III.    The Parties

15.    Plaintiff Commission is the independent federal regulatory agency charged with responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1. *et seq.*

16.    Defendant Bradley resides in Bixby, Oklahoma. During the relevant period, Bradley was employed as Manager of Marketing for Field Services.

17.    Defendant Martin resides in Tulsa, Oklahoma. During the relevant period, Martin was employed by Field Services as Director of Gas Supply.

### IV.    Facts

### A.    Defendants Traded and/or Managed Natural Gas for Field Services and Reported, or Caused to be Reported, Market Information

18.    During the relevant period, Bradley was a manager and trader for Field Services, working out of the Tulsa, Oklahoma facility, and held the title of Manager of Marketing. Martin

4

managed natural gas contracts for Field Services, also located at the Tulsa facility, and was the Director of Gas Supply.

19.    During the relevant period, the business of Field Services was to gather and process natural gas.[1] Field Services also engaged in wholesale energy trading.

20.    Natural gas was, and is, a commodity that traveled in interstate commerce through a network of pipelines across the United States.

21.    During the relevant period, CMS Field Services sought to buy and sell natural gas for profit. To that end, its traders/marketing representatives entered into transactions calling for the actual physical delivery of natural gas ("physical trades"). Physical trades typically were priced with either a fixed price set at the time of the transaction or with reference to an index to be published at a later date.

22.    As a trader for Field Services, Bradley traded and marketed natural gas. In trading and marketing natural gas, Bradley entered into physical trades, some of which were priced according to the indexes. As Director of Gas Supply, Martin was responsible for purchasing natural gas from well-head producers for use in Field Services' processing plant. The contracts for such natural gas purchases commonly settled against index-based prices.

23.    During the relevant period, Bradley also submitted, or caused to have submitted, reports concerning natural gas transactions to numerous natural gas reporting firms that compiled natural gas price indexes for the industry, including, *Gas Daily, Btu Daily* and *NGI*. During the relevant period, on at least one occasion, Martin conspired and coordinated with Bradley, and caused reports to be submitted to natural gas reporting firms, including *Gas Daily, Btu Daily, NGI* and *Natural Gas Week*.

---

[1] On July 2, 2003, CMS announced that it had completed the sale of its CMS Field Services subsidiary to Cantera Natural Gas, Incorporated.

**B.**   **Natural Gas Market Participants' Use of Indexes**

24.     During the relevant period, reporting firms, such as *Gas Daily, Inside FERC* and *NGI,* calculated the indexes using natural gas transaction information, including volume, price, and delivery point/pricing location ("hub"). The reporting firms obtained and collected the transaction information used to calculate the indexes from reports submitted by market participants, including Defendant Bradley.

25.     The reporting firms, including *Gas Daily, Btu Daily* and *NGI,* sought from natural gas traders specific market information, *i.e.,* price and volume data, derived from fixed price, physical, natural gas trades the traders actually executed.

26.     Natural gas traders submitted price and volume data to reporting firms for use in compiling the indexes.

27.     Natural gas traders and marketers, including Defendants, generally knew that the reporting firms compiled their indexes using price and volume data from fixed price, physical natural gas transactions actually executed by the traders.

28.     After collecting the reports submitted by market participants of their price and volume information for natural gas transactions entered into at each hub, the reporting firms calculated a volume-weighted average to determine and issue the index prices.

29.     During the relevant period, *Gas Daily,* issued by Platts, a division of the McGraw-Hill Companies, provided a daily index that provided natural gas market information and price indexes for natural gas hubs throughout the United States and Canada. *Gas Daily* also provided a monthly index during the relevant period. The *Inside FERC Gas Market Report* ("*Inside FERC*"), likewise issued by Platts, also provided a monthly index for various natural gas delivery points. The *Gas Daily* and *Inside FERC* monthly index surveys were consolidated in July 2002.

6

30.    *Btu Daily, NGI* and *Natural Gas Week* also provided natural gas transaction data during the relevant period and were widely used by participants in the energy industry.

31.    Monthly indexes are calculated on a month-ahead basis. They are derived from prices and volumes of natural gas transactions scheduled for delivery throughout the coming month. Thus, for example, monthly index prices for August are typically based on price and volume data collected from market participants during the last five business days of July. This period is known as "bidweek."

32.    Daily indexes are calculated on a day-ahead basis. They are derived from prices and volumes of natural gas transactions scheduled for delivery on the following day. Thus, for example, the daily index prices for Wednesday are based on price and volume data submitted by market participants on Tuesday.

33.    During the relevant period, participants in the natural gas markets used the natural gas indexes to price and settle commodity transactions; that is, the indexes were used to calculate the values of trades that were executed at the index price.

34.    Natural gas futures traders referred to the index prices published by the trade publications for price discovery and for assessing price risks.

35.    Information concerning prices and volumes of natural gas trades reported by natural gas traders, including Defendant Bradley, to reporting firms, such as *Gas Daily* and *Natural Gas Intelligence*, is and was market information that affects or tends to affect the price of natural gas, a commodity in interstate commerce.

## C.    Field Services' Reporting to Energy Industry Publications

36.    During the relevant period Bradley submitted, on behalf of Field Services, numerous reports of natural gas transaction information, including price and volume data, to

7

several natural gas reporting firms, including *Gas Daily*, *Btu Daily*, *NGI* and *Natural Gas Week*. These submissions were sent via facsimile to various locations, including the Houston-area offices of *Gas Daily* and *NGI*.

37.    For instance, on July 31, 2002, Bradley submitted, through an administrative assistant, monthly reports of natural gas transaction information, including price and volume data, for natural gas transactions for delivery in the month of August 2002 to *Gas Daily*, *Btu Daily*, *NGI* and *Natural Gas Week*. On August 30, 2002, Bradley submitted monthly reports of natural gas transaction information, including price and volume data, for natural gas transactions for delivery in the month of September 2002 to *Gas Daily*, *Btu Daily* and *NGI* and *Natural Gas Week*. Bradley also submitted monthly data for at least nine months during 2001. Each monthly submission included multiple transaction reports.

38.    During the relevant period, Bradley also submitted, through an administrative assistant, daily reports of natural gas transaction information, including price and volume data, via facsimile to *Gas Daily*, *Btu Daily* and *Natural Gas Week*. For instance, on 119 days during the period of February 25, 2002 through October 14, 2002, Bradley submitted daily reports of natural gas transaction information, including daily price and volume data, for various pipelines each day to *Gas Daily*, *Btu Daily* and, beginning in July 2002, *Natural Gas Week*.

39.    On numerous occasions during the relevant period, Bradley knowingly submitted, or caused to be submitted, false, misleading or knowingly inaccurate transaction information regarding hundreds of natural gas transactions. In those reports, he provided false or misleading or knowingly inaccurate prices and/or volumes for certain trades. Specifically, Bradley reported, among other things, fictitious trades as if they were *bona fide* transactions entered into on behalf of Field Services or actual trades entered into by Field Services, but with the prices of those

8

transactions altered and/or the volumes significantly inflated or deflated—such that trades potentially were weighed more heavily in the compilation of the index. Bradley also reported index-based trades as through they were fixed price trades.

40.    During the relevant period, Bradley submitted to the reporting firms natural gas transaction information for at least 848 daily transactions and represented that the transaction information represented *bona fide* transactions entered into by Field Services. Of those 848 submitted daily transactions, approximately 261 were not actual transactions entered into by Field Services, *i.e.*, Bradley had reported fictitious trades.

41.    In addition, approximately 158 of those 848 submitted daily transactions included altered prices and volumes for trades actually entered into on behalf of Field Services, while approximately 310 of the 848 submitted daily transactions were based on non-fixed price transactions actually entered into by Field Services.

42.    Bradley submitted or caused to be submitted these false, misleading or knowingly inaccurate transaction reports on at least 119 days during the relevant period. Each daily submission included multiple transaction reports.

43.    On each occasion that Bradley knowingly submitted, or caused to be submitted, reports of natural gas transactions that included false or misleading or knowingly inaccurate prices and/or volumes, Bradley did so in an attempt to manipulate the price of natural gas, which, if successful, could have affected the price of natural gas futures and options contracts traded on the New York Mercantile Exchange ("NYMEX").

### D.    Defendants' Coordinated Attempt to Manipulate Natural Gas Prices

44.    On at least one occasion during the relevant period, Bradley and Martin coordinated and conspired to provide, and did provide, false, misleading or knowingly inaccurate

information to reporting firms concerning purported Field Services natural gas transactions on

the pipeline point know as NNTOK in an attempt to manipulate the price of natural gas, a

commodity in interstate commerce.

45.    On July 30, 2002, Bradley received a telephone call from Tom Haywood, an

employee of *Gas Daily* responsible for collecting transaction information from energy industry

market participants. In that telephone call, Haywood asked Bradley for Field Services'

transaction information for NNTOK.

46.    Bradley then contacted Martin by telephone and they conspired about how

Bradley should report to *Gas Daily* in order to benefit natural gas contracts being managed by

Martin:

> **Bradley**: Bob? Hey *Inside FERC* guys are asking me, if I have any
> indication of Northern TOK prices, to list them. You got an
> agenda?
>
> **Martin**: I don't know. Should we give them anything?
>
> **Bradley**: It's up to you, if you already changed your pricing around
> where you don't have to mess with it, or—
>
> **Martin**: No, we're still TOK-tied on a zillion contracts.
>
> **Bradley**: Well, let's make up some numbers and turn them in, then.

47.    Bradley and Martin then determined an advantageous index price for NNTOK

that was advantageous to the Field Services' contacts Martin managed:

> **Bradley**: You want them low, though.
>
> **Martin**: Oh, yeah.
> . . . .
> **Bradley**: How far behind Demarc would you put [the NNTOK
> price]?
> . . . .
> **Martin**: Thirteen cents back of Demarc is what I'd say.

48.    Thereafter, as agreed upon with Martin, Bradley submitted the fictitious transaction information consistent with the agreed upon desired price for the NNTOK index to, among others, *Gas Daily*.

49.    Bradley and Martin fabricated the transaction information alleged above for the specific purpose of manipulating the index price for natural gas at NNTOK.

## V. Violations of the Commodity Exchange Act

### Count I: Delivery of False or Misleading or Knowingly Inaccurate Information

50.    The allegations contained in paragraphs 1 through 49 above are re-alleged and incorporated by reference herein.

51.    Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), provides, in pertinent part, that it is unlawful for any person "[k]nowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ."

52.    Defendants violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), when they knowingly delivered or caused to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning natural gas transactions to industry reporting firms that calculated and reported the index price of natural gas.

53.    Information concerning prices and volumes of natural gas trades affects or tends to affect the price of natural gas, a commodity in interstate commerce.

11

54.     On at least one occasion, Defendant Martin aided, abetted, counseled, or acted in combination or in concert with Bradley in Bradley's violations of Section 9(a)(2) and is liable for Bradley's violations as a principal, pursuant to Section 13(a) of the Act.

55.     Each occasion upon which Defendants knowingly delivered or caused to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate information concerning natural gas transactions, including but not limited to those specifically alleged herein, is alleged herein as a separate and distinct violation of section 9(a)(2) of the Act, 7 U.S. C. § 13(a)(2).

## Count II:  Attempted Manipulation of Natural Gas Price Indexes

56.     The allegations contained in paragraphs 1 through 55 above are re-alleged and incorporated by reference herein.

57.     Sections 6(c) and 6(d) of the Act, 7 U.S.C. §§ 9 and 13b, together authorize the Commission to serve a complaint and provide for the imposition of, among other things, "fines and penalties if the Commission has reason to believe that any person . . . has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any contract market . . . or otherwise is violating or has violated any of the provisions of [the] Act. "  Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), provides, in pertinent part, that it is unlawful for any person to "[m]anipulate or attempt to manipulate the price of any commodity in interstate commerce . . . ."

58.     Defendants violated Sections 6(c), 6(d), and 9(a)(2), 7 U.S.C. §§ 9, 13b, and 13(a)(2), when, with the intent to manipulate the price of natural gas, they knowingly delivered or caused to be delivered for transmission through the mails or interstate commerce by telegraph,

telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning natural gas transactions to the reporting firms that calculated and reported the index price of natural gas.

59.     On at least one occasion, Defendant Martin aided, abetted, counseled, or acted in combination or in concert with Bradley in Bradley's violations of Sections 6(c), 6(d) and 9(a)(2) and is liable for Bradley's violations as a principal, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a).

60.     Each occasion upon which Defendants knowingly delivered a false or misleading or knowingly inaccurate report in an attempt to manipulate the price of natural gas, including but not limited to those occasions specifically alleged herein, is alleged herein as a separate and distinct violation of Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S. C. §§ 9, 13b and 13(a)(2).

## VI. Relief Requested

WHEREFORE, Plaintiff respectfully requests that this Court enter an order:

A.     Providing for a permanent injunction restraining and enjoining Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him who receive actual notice of such order by personal service or otherwise, from directly or indirectly violating Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2);

B.     Directing Defendants to pay civil monetary penalties, to be assessed by the Court against the Defendants, in amounts not to exceed the higher of $120,000 or triple the monetary gain to them for each violation of the Act, as described herein; and,

C.     Directing Defendants to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act or Regulations, as described herein, and interest thereon from the date of such violations;

D.    Directing Defendants, pursuant to such procedure as the Court may order, to make full restitution of funds received by them as a result of acts and practices which constituted violations of the Act and Regulations, as described and interest thereon from the date of such violations; and,

E.    Providing for such other and further remedial and ancillary relief as this Court may deem necessary and appropriate.

Dated: January 31, 2005

Respectfully submitted,

James A. Garcia
(D.C. Bar No. 458085)
Michael Solinsky
(D.C. Bar No. 433754)
Trial Attorneys
**United States Commodity Futures
    Trading Commission**
Division of Enforcement
1155 21st Street, N.W.
Washington, DC 20581
202-418-5000 (Phone)
202-418-5523 (Facsimile)

KEVIN C. LEITCH
(Oklahoma Bar No. 5366)
Assistant United States Attorney
Northern District of Oklahoma
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119-1029
918-382-2710 (Phone)
918-560-7939 (Facsimile)

Of Counsel

# EXHIBIT 7



**U.S. COMMODITY FUTURES TRADING COMMISSION**
140 Broadway
New York, New York 10005
Telephone: (646) 746-9733
Facsimile: (646) 746-9940

Division of
Enforcement

## *SUBPOENA*
### *Duces Tecum*

**TO:**    **The McGraw-Hill Companies**
**c/o William P. Farley, Esq.**
**Associate General Counsel**
**1221 Avenue of The Americas**
**New York, NY 10020**

**YOU ARE COMMANDED** to produce to the Commodity Futures Trading Commission
("Commission"), all books, papers, documents, and other tangible things specified in the
attached Schedule A at or before noon on the 14th day of February, 2003. Those materials are
to be produced at the Commission's Eastern Regional Office, Division of Enforcement, 140
Broadway, New York, NY 10005, in the matter of:

<u>**Certain Trading by Energy and Power Marketing Firms**</u>

**In producing documents, you need not appear in person on the above return date if you
comply by mail according to the instruction enclosed herewith.**

**FAILURE TO COMPLY WITH THIS SUBPOENA MAY RESULT IN THE
COMMENCEMENT OF A LEGAL ACTION IN THE UNITED STATES DISTRICT
COURT TO COMPEL COMPLIANCE WITH THE REQUIREMENTS HEREOF.**

Issued February 7, 2003, at New York, New York by:

Joseph Rosenberg
Trial Attorney
Division of Enforcement
Commodity Futures Trading Commission

CFTC Form 10 (6-83)

## RETURN ON SERVICE

In the case of a natural person:

[ ]    handing it to the person named herein.

[ ]    leaving it at the person's office with the person in charge, namely:

[ ]    leaving it at the person's office in a conspicuous place, to wit:

[ ]    leaving it at the person's usual place of abode, namely:

[ ]    mailing by certified or registered mail to the following address:

[ ]    another method by which actual notice is given, to wit:

In the case of service upon other than a natural person:

[ ]    handing it to a registered agent for service or other officer, director or agent in charge of such office, namely
(name & title):

[ ]    mailing by certified or registered mail to such agent or representative, namely
(name, title & address):

[X]    another method by which actual notice is given, to wit:
Delivery via Federal Express Next Day Service:

      The McGraw-Hill Companies
      c/o William P. Farley, Esq.
      Associate General Counsel
      1221 Avenue of The Americas
      New York, NY 10020

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I served this subpoena in accordance with the method noted above.*

2/7/07
*Date*

*Signature*

2

# SCHEDULE A

## NOTICE CONCERNING DOCUMENT DESTRUCTION

Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to (1) influence, delay, or prevent the testimony of any person in an official proceeding; (2) cause or induce any person to (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding; (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or object, in an official proceeding; or (D) be absent from an official proceeding to which such person has been summoned by legal process; or (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings; shall be fined under this title or imprisoned not more than ten years, or both. 18 U.S.C. § 1512(b).

## DEFINITIONS AND INSTRUCTIONS

The following definitions and instructions are expressly incorporated into each specific demand for production as if fully stated therein:

A.    "Commission" refers to the United States Commodity Futures Trading Commission.

B.    "Documents" is synonymous in meaning and equal in scope to the usage of that term in Federal Rule of Civil Procedure 34(a). Accordingly, "document," for purposes of this subpoena, means any memorialization, whether typed, written, recorded, printed or otherwise reproduced by any process or by hand, and includes, but is not limited to: agreements, contracts, correspondence, facsimile or E-mail transmissions, telephone logs and records, memoranda, diaries, graphs, formulas, models, mathematical and statistical data, reports, notebooks, manuals, charts, plans, journals, ledgers, financial statements, information stored on or generated by computer disks, hard drives, tapes or other electronic data storage systems, bank records, brochures, electronically recorded information such as audiotape or videotape recordings, microfilm or microfiche, summaries, analyses, commentaries, minutes or other records of interviews, meetings, conferences, conversations or discussions as well as all drafts of the foregoing and any copies bearing marks or notations not found on the original.

3

C.    The definition of "documents" used in this subpoena includes information stored in or accessible through, computer or other information retrieval system. In determining where responsive documents in this form might be located, you are required to search all equipment or media that may contain "documents" as defined herein, whether maintained by your company or by a third party, including but not limited to:

i.    Laptops, notebooks, hand-helds, Personal Digital Assistants (PDAs), portable electronic mail or document devices, and other portable computers, personal computers, workstations, minicomputers, or mainframes, whether used by single or multiple users, or as servers or storage facilities, and any home computers used for work-related purposes; and

ii.    Backup and archival disks, tapes, and documents, and other forms of offline storage, whether maintained by your company or by a third party, either on or off your company's premises.

D.    Unless otherwise specifically provided herein, you may provide responsive documents in machine-readable form. Machine-readable data should be provided in a form that does not require specialized or proprietary hardware or software, unless agreed to in advance and in writing by the Commission. Your company's personnel responsible for managing and supporting your company's computing equipment should contact your company's custodian and/or counsel before compiling and formatting machine-readable data for production in response to this subpoena. **The production of electronic documents in machine-readable form will require advance coordination with the Commission.**

E.    "Including" or "includes" are used in the broadest sense of the term and specification of a particular matter included in a request is not meant to exclude any other documents that might be responsive to a specific request.

F.    "Relating to" means analyze, appraise, assess, characterize, comment on, concern, consider, constitute, contain, deliberate, delineate, describe, discuss, evaluate, evidence, explicate, pertain to, recommend, record, refer to, reflect, report on, set forth, show or study.

G.    "Subpoena Period" shall refer to the period commencing on January 1, 1999 and continuing to the present.

H.    "The McGraw-Hill Companies" (hereinafter "McGraw-Hill") means McGraw-Hill Corporation and any and all of its affiliates, subsidiaries, directors, divisions, groups, offices, branches, departments, employees, consultants, agents, representatives, accountants, predecessors or successors, wherever they may be situated, and all other persons who have an interest in McGraw-Hill, its

subsidiaries, affiliates, divisions, joint ventures, including, but not limited to McGraw-Hill or any other legal entity in which McGraw-Hill has an interest.

I. "Energy Companies" means American Electric Company, Aquila, Inc., Avista Corporation (including but not limited to Avista Energy, Inc.), BP Amoco, Calpine Corporation (Including but not limited to Calpine Energy Services, Inc.), Equitable Resources, Inc., CMS Energy Corporation, Duke Energy, Inc., Dynegy Inc., El Paso Electric, Encana Corporation (including but not limited to Encana Energy Services, Inc.), Merchant Energy Group of the Americas, Inc. (including but not limited to Transalta Energy Marketing, (US) Inc.), Mirant, NRG Energy, Inc., Oneok, Inc.,(including but not limited to ONEOK Energy Marketing and Trading Company), Powerex, Public Service Company of Colorado, Reliant, Sempra Energy (including but not limited to Sempra Energy Trading, Corp.), Xcel Energy, Inc., West Coast LLC, and The Williams Companies, Inc. For each, this includes all affiliates, subsidiaries, directors, divisions, groups, offices, branches, departments, employees, consultants, agents, representatives, accountants, predecessors or successors, wherever they may be situated, and all other persons who have an interest in the companies, their subsidiaries, affiliates, divisions, joint ventures, including, or any other legal entity in which the companies have an interest.

J. "Person" means any natural person, and includes individuals, partnerships, corporations, trusts, any business, legal, or governmental entities, associations or political subdivisions.

K. Use of either the singular or plural should not be deemed a limitation and the use of the singular should be construed, where applicable, the plural and vice versa.

L. The conjunctive form "and" and the disjunctive form "or" are mutually interchangeable and are meant to encompass each other.

M. This subpoena applies to all documents which were generated, created, prepared, sent, dated, in effect, in existence or used during the Subpoena Period (unless otherwise specified), as well as all responsive documents which record or relate to matters occurring within the Subpoena Period, which are in the possession, custody or control of the witness, without regard to the physical location of such documents, including but not limited to documents held by any agent of the witness such as the witness's attorney, accountant, financial advisor, or employee.

N. With respect to any and all documents requested herein that are claimed to have been destroyed or otherwise are no longer within the witness's possession, custody or control, furnish a list with the following information in affidavit form:

  i.    the nature, source and date of the document;

    ii.    a description of the document's subject matter;

    iii.    the name and address of each recipient of the original or a copy of the document, together with the date or approximate date when each recipient received the document;

    iv.    all names and addresses of all other persons to whom the contents of the document have been disclosed, the date such disclosure took place, and the means of such disclosure;

    v.    the date the document was destroyed;

    vi.    the person who ordered or authorized such destruction;

    vii.    the reason for the document's destruction, and the policy and authority for the same; and

    viii.    the custodian of the document on the date of destruction.

O.    With respect to any and all documents requested herein that are being withheld on the ground of privilege, furnish a list specifying the following information:

    i.    the nature, source and date of the document;

    ii.    a description of the document's subject matter;

    iii.    the name and address of each recipient of the original or a copy of the document, together with the date or approximate date when each recipient received the document;

    iv.    the names and addresses of all other persons to whom the contents of the document have been disclosed, the date such disclosure took place, and the means of such disclosure; and

    v.    the nature of the privilege or rule of law relied upon, including the identity of the person or persons asserting the privilege or rule as well as the legal basis for asserting that privilege or rule, or other reason for non-production.

P.    The authorized representative of your company responsible for complying with this subpoena should submit with the subpoenaed documents a sworn statement which:

    i.    States the name and position of each person assisting in the search and production of the documents;

ii.     Describes all locations searched;

iii.    Identifies the documents produced by number;

iv.     Certifies that the documents produced fully comply with the demands of this subpoena, and that your company has withheld no documents, except on grounds of privilege in accordance with Paragraph O, above, and:

v.      Certifies that the documents produced meet each of the requirements of Federal Rule of Evidence 902(11).

Q.      The obligations created by this subpoena are continuing, and you shall supplement your production if you locate additional responsive documents in your possession, custody or control. You shall produce the specified materials to the Commission as they are kept in the usual course of business or shall organize and label them to correspond with the categories in this subpoena.

R.      Documents shall be produced as they are kept in the usual course of business.

S.      Consecutively number, i.e. bates stamp, by page all documents in your submission and indicate the total number of documents in your submission.

T.      In your cover letter, please indicate by bates number the numbered item, category or lettered sub-item or sub-category in response to which the document is being produced.

U.      If any documents responsive to this subpoena have been previously supplied to the Commission by you, you may comply with this subpoena by identifying in writing the document(s) previously provided.

V.      Legible, true, correct, and complete photocopies may be submitted in lieu of original documents, provided that the originals are retained in their current state and are available for inspection if requested by Commission staff and provided further that submission of a copy shall constitute a waiver of any claim as to the authenticity of the copy should it be necessary to introduce such copy into evidence in any Commission proceeding or court of law.

W.      A complete copy of each document should be submitted even though only a portion of the document is responsive. The document shall not be edited, redacted, cut, or expunged and shall include all covering letters and memoranda, transmittal slips, appendices, tables or other attachments and all other documents referred to in the document or attachments.

X.      If you have any questions regarding terms used in this subpoena, the scope of this subpoena or the production of a particular document or group of

7

documents you may contact, or have your attorney contact, John R. Velasquez, Jr. (646) 746-9763, or Joseph Rosenberg (646) 746-9765.

Y.   No agreement purporting to modify, limit or otherwise vary this subpoena shall be valid and binding on the Division of Enforcement or Commission unless confirmed or acknowledged in writing (or made of record in court) by a duly authorized representative thereof.

## DOCUMENTS TO BE PRODUCED
## BY THE McGRAW-HILL COMPANIES
## PURSUANT TO FEBRUARY 7, 2003 SUBPOENA

1.  All documents relating to Michele Markey, a former McGraw-Hill employee, concerning price and volume information reporting to energy industry trade publications.

2.  All documents relating to Michele Markey, a former McGraw-Hill employee, concerning communications regarding the gathering and the verification of price and volume information provided to energy industry trade publications.

3.  All documents relating to David Behrman, a former McGraw-Hill employee, concerning price and volume information reporting to energy industry trade publications.

4.  All documents relating to David Behrman, a former McGraw-Hill employee, concerning communications regarding the gathering and the verification of price and volume information provided to energy industry trade publications.

5.  Provide a list of McGraw-Hill publications that post price and volume information for all delivery points.

6.  All documents identifying all current and former McGraw-Hill employees responsible for gathering, editing, verifying, and publishing price and volume information for the energy industry trade publications of McGraw-Hill.

7.  All documents including, but not limited to, company issued statements, policy, procedures manuals, and literature for or used by or in the orientation and training of current and former McGraw-Hill employees involved in the gathering, reporting, and verification of price and volume information.

8.  All documents containing any information, which references, indicates or discusses any false, inaccurate or otherwise incorrect price and volume information to McGraw-Hill.

9.  All documents relating to submissions by the Energy Companies received by or used by McGraw-Hill to gather, calculate and publish price and volume information.

10. All documents reflecting, discussing and implementing the formulas used to calculate index prices for each delivery point on each day of the subpoena period.

11  All documents containing or describing any price and volume data that were rejected from, or otherwise not included in, a calculation of a price index.

12.  All documents relating to any internal audit or investigation conducted by, or on behalf of, McGraw-Hill or its Board of Directors or any other agent or employee of McGraw-Hill concerning the transmission and receipt of price and volume information.

13.  All documents reflecting published prices, including but not limited to, electronic mail, web pages and newsletters in chronological date order, starting from the beginning of the subpoena period.

14.  All documents reflecting any requests or demands from any persons to McGraw-Hill, including but not limited to, subpoenas, discovery demands or informal requests for voluntary disclosures concerning false, inaccurate or otherwise incorrect reporting of price and volume information or manipulation.

15.  All documents produced pursuant to any requests or demands to McGraw-Hill, including subpoenas, discovery demands or informal requests for voluntary disclosures from any person concerning false, inaccurate or otherwise incorrect reporting of price and volume information or manipulation to McGraw-Hill.

16.  All documents reflecting any complaints received from any person or any conversation concerning false, inaccurate or otherwise incorrect price and volume information or manipulation.

# EXHIBIT 8

UNITED STATES DISTRICT COURT                    SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | § § § § | |
| Applicant, | § | |
| versus | § § | MISCELLANEOUS H-03-187 |
| | § | |
| THE MCGRAW-HILL COMPANIES, INC., | § § | |
| Respondent. | § | |

# Dismissal Order

On the government's motion, this case is dismissed with prejudice.(34)

Signed March ___30___, 2006, at Houston, Texas.

Lynn N. Hughes
United States District Judge

# EXHIBIT 9

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § | |
| | § | CRIMINAL NO. **H-04-514-SS** |
| **v.** | § | |
| | § | **Conspiracy; 18 U.S.C. § 371** |
| **MICHELLE M. VALENCIA,** | § | **False Reporting; 7 U.S.C. § 13(a)(2)** |
| | § | **Wire Fraud; 18 U.S.C. § 1343** |
| **Defendant.** | § | |

## SECOND SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times material to this Superseding Indictment:

### Natural Gas

1.      Natural gas, a combustible mixture of methane and other hydrocarbon gases, was one of the most widely used sources of energy in the United States.  It was used to heat and cool homes and buildings, cook food and generate electricity.

2.      Natural gas was extracted from underground, processed and then transported to consumers  through a vast interconnected network of pipelines that spanned North America.  Natural gas produced in one region was interchangeable

1

with natural gas produced in all other regions, and was quickly and efficiently transported along the pipeline network to areas of high natural gas demand. The only significant distinction between natural gas produced in different regions of the United States was the cost of transporting it from one location to another.

3.    Contracts for future delivery of natural gas were traded on the New York Mercantile Exchange ("NYMEX"), a physical commodity futures exchange. Natural gas was therefore a commodity as defined in Title 7, United States Code, Section 1a(4).

## Physical trades

4.    The most basic type of natural gas trade was a "physical" trade. A physical trade called for the actual delivery of gas to the buyer. When traders entered into a physical trade, they agreed upon the price, the volume of gas, the period it was to be delivered and the delivery location.

5.    A "baseload" trade was a common type of physical trade. A typical baseload trade called for the delivery of natural gas each day for an entire month. Most baseload trades were negotiated during a period at the end of the preceding month called "bidweek".

## Fixed price

6.    There were several ways to set the price of a physical trade. One way

2

was for traders to agree upon a specific dollar amount at the time of the trade. Such a price was called a "fixed" price. Fixed price baseload trades were common for natural gas delivered in some areas of the country, including Southern California.

### Index price

7.    Traders could also agree to buy and sell natural gas at a price that was unknown at the time of the trade but would be determined later. For example, traders commonly agreed to buy or sell natural gas at a price to be published some date in the future by a privately-owned newsletter. Such a price was called an "index price". Some index prices were published the first day of every month, while others were published every day.

8.    Index prices also affected many other types of natural gas transactions in addition to physical trades, including the following:

- "Swaps", that is, financial transactions in which two natural gas traders agreed to buy the exact same amount of gas from each other at the same time but at different prices. In a typical natural gas swap, one trader agreed to pay an index price, and the other trader agreed to pay a fixed price, the price of a NYMEX futures contract, or some other index price.

- Long-term supply contracts through which electric utilities, natural gas utilities and industrial companies bought natural gas at prices tied to index prices.

- "Option" contracts that gave traders the right to buy natural gas at index prices.

- Royalty payments received by owners of natural gas mineral rights, including the United States government and the states of Texas and New Mexico.

- "Tariffs" charged by natural gas pipelines.

- Natural gas futures contracts

9.    Index prices also were used as an indication of the market price of natural gas. For example, producers of natural gas were often willing to sell it at index prices. More generally, index prices affected the allocation of resources in the national economy by helping consumers estimate the cost of their future use of natural gas and by helping companies that invested in exploration and production, transportation and storage of natural gas estimate the value of their assets.

### *Inside FERC* and *NGI*

10.    *Inside FERC Gas Market Report* (*"Inside FERC"*) and *Natural Gas Intelligence* (*"NGI"*) were two newsletters that published natural gas index prices. *Inside FERC* was published by Platts, a division of The McGraw-Hill Companies, Inc., which was a large media conglomerate. *NGI* was published by a small company called Intelligence Press, Inc.

11.    *Inside FERC* and *NGI* determined and published index prices at the beginning of every month for natural gas delivered at dozens of different "hubs" throughout the United States. These hubs were locations on major interstate natural

gas pipelines. *Inside FERC's* and *NGI's* monthly index prices were supposed to be representative of the fixed prices at which companies had bought and sold natural gas for delivery at these locations.

### How Index prices were Determined

12.    *Inside FERC* and *NGI* determined their monthly index prices through surveys of natural gas traders. *Inside FERC* gave written instructions to traders who participated in the surveys. The instructions, sent by email at the end of each month, directed traders to report a specific type of natural gas trade to *Inside FERC*: "Only report FIXED-PRICED, BASELOAD DEALS negotiated during bidweek". These exact words were part of *Inside FERC's* written instructions to traders from at least November 1999 through August 2002, covering the entire period of this Second Superseding Indictment. The instructions directed traders to report the delivery points, prices, volumes and dates of each such trade. *Inside FERC* supplied traders with an Excel form on which to make the reports. In addition, *Inside FERC* invited traders to call the publication's chief editor, Kelley Doolan, with any questions, and many traders did call.

13.    Traders participated in the surveys by e-mailing lists of trades to the publications, often on the form provided by *Inside FERC*. When *Inside FERC* and *NGI* received reports from traders, editors transferred the reported data into master

5

Excel work sheets that listed trades reported by all sources. On occasion editors excluded some reported trades from the master Excel work sheets, or reduced the volumes. The work sheets contained formulas that automatically performed various statistical calculations on the trades listed for a given location, including the volume-weighted average price.

14.    *Inside FERC* editors used the volume-weighted average prices appearing on its master Excel work sheets as the starting point for an editorial process that determined index prices. Approximately three-fourths of the time, that editorial judgment led *Inside FERC* to select an index price that was exactly the same as the volume-weighted average price shown on *Inside FERC's* work sheets rounded to the nearest penny.

15.    *NGI's* usual practice was to publish the weighted average price of reported trades as the index price.

### Dynegy

16.    Dynegy, Inc. ("Dynegy") was a publicly traded Illinois corporation with its headquarters in Houston, Texas. Dynegy owned Dynegy Marketing and Trade, a natural gas marketer that maintained a large natural gas trading operation. Dynegy was also a part owner of a business called West Coast LLC which operated electricity generating facilities in California. Dynegy sold natural gas to West Coast LLC.

### The Defendant

6

17.    Defendant MICHELLE M. VALENCIA was employed by Dynegy Marketing and Trade in Houston, Texas, as a senior natural gas trader on Dynegy 's "West Desk". Defendant VALENCIA's job at Dynegy was to earn profits by buying and selling natural gas and by entering into "swaps".

18.    Between December 30, 1999, and January 31, 2002, defendant VALENCIA emailed over twenty reports to *Inside FERC* and *NGI*, and also caused other Dynegy employees to email reports.

19.    Index prices published by *Inside FERC* and *NGI* affected the amount of profit defendant VALENCIA earned on her trades at Dynegy.   When defendant VALENCIA reported false information to *Inside FERC* and *NGI* she affected and tended to affect index prices and, thereby, the price of natural gas.

## COUNT ONE
(Conspiracy -- 18 U.S.C. § 371)

### A.    INTRODUCTION

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

### B.    THE CONSPIRACY AND ITS OBJECTS

2.    From in or about July, 2000, through on or about September 30, 2000, in the Houston Division of the Southern District of Texas, and elsewhere, the

7

defendant,

## MICHELLE M. VALENCIA,

did knowingly combine, conspire, confederate and agree with Greg Singleton, not a

defendant herein, and others known and unknown to the grand jury to commit the

following offense against the United States:

> To knowingly deliver and cause to be delivered for transmission
> through interstate commerce by telephone and other means of
> communication material false and misleading and knowingly
> inaccurate reports concerning market information that affected
> and tended to affect the price of natural gas, a commodity in
> interstate commerce, in violation of Title 7, United States Code,
> Section 13(a)(2).

## C.    THE MANNER AND MEANS OF THE CONSPIRACY

3.    It was a part of the conspiracy that defendant MICHELLE M.

VALENCIA would and did discuss with Greg Singleton natural gas trades they

intended to report and not to report to index publications.

4.    It was a further part of the conspiracy that defendant MICHELLE M.

VALENCIA and Greg Singleton would and did agree to report a natural gas trade

between El Paso and Dynegy that was not real.

5.    It was a further part of the conspiracy that defendant MICHELLE M.

VALENCIA and Greg Singleton would and did agree not to report a natural gas trade

between El Paso and Dynegy that was real.

6.    It was a further part of the conspiracy that defendant MICHELLE M.

VALENCIA and Greg Singleton would and did cause employees of El Paso and Dynegy to report fictitious natural gas trades to *NGI* and *Inside FERC*.

7.     It was a further part of the conspiracy that defendant MICHELLE M. VALENCIA and Greg Singleton would and did lower and cause to be lowered the volume weighted average price of Southern California baseload natural gas trades listed on *Inside FERC's* and *NGI's* August 2000 and September 2000 work sheets.

## D.    OVERT ACTS

8.     In furtherance of the conspiracy, and to effect the objects thereof, the defendants performed and caused to be performed, among others, the following overt acts:

(1)     On or about July 28, 2000, defendant MICHELLE M. VALENCIA and Greg Singleton agreed in a telephone conversation with each other not to report a natural gas trade between El Paso and Dynegy that was real.

(2)     On or about July 31, 2000, Greg Singleton sent a report to *NGI* listing trades by El Paso that were not real.

(3)     On or about July 31, 2000, defendant MICHELLE M. VALENCIA sent a report to *Inside FERC* listing trades by West Coast LLC that were not real.

(4)     On or about July 31, 2000, defendant MICHELLE M. VALENCIA caused a Dynegy employee to send a report to *Inside FERC* listing trades by Dynegy that were not real.

9

(5)    On or about August 30, 2000, defendant MICHELLE M. VALENCIA and Greg Singleton agreed in a telephone conversation with each other to report a trade of natural gas between El Paso and Dynegy that was not real.

(6)    On or about August 31, 2000, Greg Singleton caused an El Paso employee to include a fictitious trade on a report sent to *Inside FERC*.

(7)    On or about August 31, 2000, Greg Singleton caused an El Paso employee to include a fictitious trade on a report sent to *NGI*.

(8)    On or about August 31, 2000, defendant MICHELLE M. VALENCIA caused a Dynegy employee to send a report to *NGI* and *Inside FERC* listing trades by West Coast LLC that were not real.

(9)    On or about August 31, 2000, defendant MICHELLE M. VALENCIA caused a Dynegy employee to send a report to *Inside FERC* listing trades by Dynegy that were not real.

In violation of Title 18, United States Code, Section 371.

### COUNT TWO
(False Reporting -- 7 U.S.C. § 13(a)(2))

## A.    INTRODUCTION

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

10

**B.**   **FALSE REPORTING**

2.     On or about July 31, 2000, in the Houston Division of the Southern District of Texas, the defendant,

### MICHELLE M. VALENCIA,

aided and abetted by Greg Singleton, not a defendant herein, and by others known and unknown to the grand jury, did knowingly deliver and cause to be delivered for transmission through interstate commerce by telephone and other means of communication material false and misleading and knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas, a commodity in interstate commerce, that is, an email sent from El Paso in Houston, Texas, to *NGI*, in Oregon, that did not accurately describe El Paso's real trades of natural gas.

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code Section 2.

### COUNT THREE
(False Reporting -- 7 U.S.C. § 13(a)(2))

**A.**   **INTRODUCTION**

1.     The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

**B.**   **FALSE REPORTING**

11

2.    On or about July 31, 2000, in the Houston Division of the Southern District of Texas, the defendant,

## MICHELLE M. VALENCIA,

aided and abetted by others known and unknown to the grand jury, did knowingly deliver and cause to be delivered for transmission through interstate commerce by telephone and other means of communication material false and misleading and knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas, a commodity in interstate commerce, that is, an email sent from West Coast LLC in Houston, Texas, to *Inside FERC*, in Washington, D.C., that did not accurately describe West Coast LLC's real trades of natural gas.

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code Section 2.

## COUNT FOUR
### (False Reporting -- 7 U.S.C. § 13(a)(2))

A.    **INTRODUCTION**

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

B.    **FALSE REPORTING**

2.    On or about July 31, 2000, in the Houston Division of the Southern District of Texas, the defendant,

## MICHELLE M. VALENCIA,

aided and abetted by Greg Singleton and by others known and unknown to the grand jury, did knowingly deliver and cause to be delivered for transmission through interstate commerce by telephone and other means of communication material false and misleading and knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas, a commodity in interstate commerce, that is, an email sent from Dynegy in Houston, Texas, to *Inside FERC*, in Washington, D.C., that did not accurately describe Dynegy's real trades of natural gas.

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code Section 2.

### COUNT FIVE
(False Reporting -- 7 U.S.C. § 13(a)(2))

**A.    INTRODUCTION**

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

**B.    FALSE REPORTING**

2.    On or about August 31, 2000, in the Houston Division of the Southern District of Texas, the defendant,

## MICHELLE M. VALENCIA,

13

commerce by telephone and other means of communication material false and misleading and knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas, a commodity in interstate commerce, that is, an email sent from El Paso in Houston, Texas, to *Inside FERC*, in Washington, D.C., that did not accurately describe El Paso's real trades of natural gas.

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code Section 2.

<u>**COUNT SEVEN**</u>
(False Reporting -- 7 U.S.C. § 13(a)(2))

**A.    <u>INTRODUCTION</u>**

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

**B.    <u>FALSE REPORTING</u>**

2.    On or about August 31, 2000, in the Houston Division of the Southern District of Texas, the defendant,

**MICHELLE M. VALENCIA,**

aided and abetted by others unknown to the grand jury, did knowingly deliver and cause to be delivered for transmission through interstate commerce by telephone and other means of communication material false and misleading and knowingly

15

inaccurate reports concerning market information that affected and tended to affect

the price of natural gas, a commodity in interstate commerce, that is, a fax sent from

West Coast LLC in Houston, Texas, to *Inside FERC*, in Washington, D.C., that did

not accurately describe West Coast LLC's real trades of natural gas.

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18,
United States Code Section 2.

### COUNT EIGHT
(False Reporting -- 7 U.S.C. § 13(a)(2))

**A.    INTRODUCTION**

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second

Superseding Indictment are adopted, realleged and incorporated as if set out fully

herein.

**B.    FALSE REPORTING**

2.    On or about August 31, 2000, in the Houston Division of the Southern

District of Texas, the defendant,

### MICHELLE M. VALENCIA,

aided and abetted by others unknown to the grand jury, did knowingly deliver and

cause to be delivered for transmission through interstate commerce by telephone and

other means of communication material false and misleading and knowingly

inaccurate reports concerning market information that affected and tended to affect

the price of natural gas, a commodity in interstate commerce, that is, a fax sent from

16

West Coast LLC in Houston, Texas, to *NGI*, in Virginia, that did not accurately describe West Coast LLC's real trades of natural gas.

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code Section 2.

**COUNT NINE**
(False Reporting -- 7 U.S.C. § 13(a)(2))

**A.    INTRODUCTION**

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

**B.    FALSE REPORTING**

2.    On or about August 31, 2000, in the Houston Division of the Southern District of Texas, the defendant,

**MICHELLE M. VALENCIA,**

aided and abetted by Greg Singleton and by others unknown to the grand jury, did knowingly deliver and cause to be delivered for transmission through interstate commerce by telephone and other means of communication material false and misleading and knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas, a commodity in interstate commerce, that is, an email sent from Dynegy in Houston, Texas, to *Inside FERC*, in Washington, D.C., that did not accurately describe Dynegy's real trades of natural

17

gas.

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code Section 2.

## COUNT TEN
### (False Reporting -- 7 U.S.C. § 13(a)(2))

**A.    INTRODUCTION**

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

**B.    FALSE REPORTING**

2.    On or about November 30, 2000, in the Houston Division of the Southern District of Texas, the defendant,

### MICHELLE M. VALENCIA,

did knowingly deliver and cause to be delivered for transmission through interstate commerce by telephone and other means of communication false and misleading and knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas, a commodity in interstate commerce, that is, defendant VALENCIA sent and caused Dynegy Marketing and Trade to send an email from Houston, Texas, to *Inside FERC*, in Washington, D.C., that included volume and price data for three trades of natural gas by Dynegy Marketing and Trade when VALENCIA knew that none of these reported three trades actually occurred.

18

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code Section 2.

## COUNT ELEVEN
(False Reporting -- 7 U.S.C. § 13(a)(2))

### A.    INTRODUCTION

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

### B.    FALSE REPORTING

2.    On or about January 31, 2001, in the Houston Division of the Southern District of Texas, the defendant,

### MICHELLE M. VALENCIA,

did knowingly deliver and cause to be delivered for transmission through interstate commerce by telephone and other means of communication false and misleading and knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas, a commodity in interstate commerce, that is, defendant VALENCIA sent and caused Dynegy Marketing and Trade to send an email from Houston, Texas, to *Inside FERC*, in Washington, D.C., that included volume and price data for thirty-three trades of natural gas by Dynegy Marketing and Trade when VALENCIA knew that none of these reported thirty-three trades actually occurred.

19

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code Section 2.

## COUNT TWELVE
(False Reporting -- 7 U.S.C. § 13(a)(2))

### A.    INTRODUCTION

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

### B.    FALSE REPORTING

2.    On or about February 28, 2001, in the Houston Division of the Southern District of Texas, the defendant,

### MICHELLE M. VALENCIA,

did knowingly deliver and cause to be delivered for transmission through interstate commerce by telephone and other means of communication false and misleading and knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas, a commodity in interstate commerce, that is, defendant VALENCIA sent and caused Dynegy Marketing and Trade to send an email from Houston, Texas, to *Inside FERC*, in Washington, D.C., that included volume and price data for seven trades of natural gas by Dynegy Marketing and Trade when VALENCIA knew that none of these seven reported trades actually occurred.

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18,

20

United States Code Section 2.

## COUNT THIRTEEN
### (False Reporting -- 7 U.S.C. § 13(a)(2))

**A.    INTRODUCTION**

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

**B.    FALSE REPORTING**

2.    On or about May 31, 2001, in the Houston Division of the Southern District of Texas, the defendant,

### MICHELLE M. VALENCIA,

aided and abetted by others unknown to the grand jury, did knowingly deliver and cause to be delivered for transmission through interstate commerce by telephone and other means of communication material false and misleading and knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas, a commodity in interstate commerce, that is, an email sent from Dynegy in Houston, Texas, to *Inside FERC*, in Washington, D.C., that did not accurately describe Dynegy's real trades of natural gas.

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code Section 2.

21

## COUNT FOURTEEN
(False Reporting -- 7 U.S.C. § 13(a)(2))

### A.   INTRODUCTION

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

### B.   FALSE REPORTING

2.    On or about May 31, 2001, in the Houston Division of the Southern District of Texas, the defendant,

### MICHELLE M. VALENCIA,

aided and abetted by others unknown to the grand jury, did knowingly deliver and cause to be delivered for transmission through interstate commerce by telephone and other means of communication material false and misleading and knowingly inaccurate reports concerning market information that affected and tended to affect the price of natural gas, a commodity in interstate commerce, that is, an email sent from Dynegy in Houston, Texas, to *NGI*, in Oregon, that did not accurately describe Dynegy's real trades of natural gas.

In violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code Section 2.

22

<u>**COUNTS FIFTEEN - TWENTY-TWO**</u>
(Wire Fraud -- 18 U.S.C. § 1343)

**A.    <u>INTRODUCTION</u>**

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

**B.    <u>THE SCHEME TO DEFRAUD</u>**

2.    From in or about July, 2000, through in or about June 2001, in the Houston Division of the Southern District of Texas, and elsewhere, the defendant,

**MICHELLE M. VALENCIA,**

aided and abetted by others unknown to the grand jury, did knowingly devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations and promises.

**C.    <u>THE MANNER AND MEANS OF THE SCHEME</u>**

3.    It was a part of the scheme that defendant **MICHELLE M. VALENCIA** would and did fabricate a list of fictitious gas trades of natural gas by Dynegy.

4.    It was a further part of said scheme that defendant **MICHELLE M. VALENCIA** would and did report and cause Dynegy to report fictitious gas trades to *Inside FERC* and *NGI* for use in calculating index prices.

23

5.    It was a further part of said scheme that defendant **MICHELLE M.**

**VALENCIA** would and did discuss fictitious gas trades over the telephone with an

editor of *Inside FERC.*

## D.    THE EXECUTION OF THE SCHEME

6.    On or about the dates set forth below, for the purpose of executing the

aforementioned scheme to defraud and intending to do so, defendant **MICHELLE**

**M. VALENCIA** did transmit and cause to be transmitted in interstate and foreign

commerce writings, signals and sounds, that is, the defendant sent and caused to be

sent the following emails and faxes from Houston, Texas, that reported fictitious

natural gas trades and did not accurately describe real natural gas trades:

| COUNT | DATE | WRITING | FROM | TO |
|-------|------|---------|------|-----|
| 15 | July 31, 2000 | Email | West Coast LLC Houston, Texas | *Inside FERC* Washington D.C. |
| 16 | July 31, 2000 | Email | Dynegy Houston, Texas | *Inside FERC* Washington D.C. |
| 17 | August 31, 2000 | Fax | West Coast LLC Houston, Texas | *NGI* Virginia |
| 18 | August 31, 2000 | Fax | West Coast LLC Houston, Texas | *Inside FERC* Washington D.C. |
| 19 | August 31, 2000 | Email | Dynegy Houston, Texas | *Inside FERC* Washington D.C. |
| 20 | November 30, 2000 | Email | Dynegy Houston, Texas | *Inside FERC* Washington D.C. |

| 21 | January 31, 2001 | Email | Dynegy Houston, Texas | *Inside FERC* Washington D.C. |
| 22 | February 28, 2001 | Email | Dynegy Houston, Texas | *Inside FERC* Washington D.C. |

In violation of Title 18, United States Code, Section 1343 and Title 18, United States Code Section 2.

## COUNT TWENTY-THREE
(Wire Fraud -- 18 U.S.C. § 1343)

### A.    INTRODUCTION

1.    The allegations in paragraphs 1 - 19 of the Introduction of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

### B.    THE SCHEME TO DEFRAUD

2.    The allegations in Section B of Counts Fifteen through Twenty-Two of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

### C.    THE MANNER AND MEANS OF THE SCHEME

3.    The allegations in Section C of Counts Fifteen through Twenty-Two of this Second Superseding Indictment are adopted, realleged and incorporated as if set out fully herein.

### D.    THE EXECUTION OF THE SCHEME

4.    On or about February 28, 2001, for the purpose of executing the

aforementioned scheme to defraud and intending to do so, defendant **MICHELLE**

**M. VALENCIA** did transmit and cause to be transmitted in interstate and foreign

commerce writings, signals and sounds, that is, the defendant, in Houston, Texas,

spoke over the telephone with an editor of *Inside FERC* in Washington, D.C.

In violation of Title 18, United States Code, Section 1343 and Title 18, United
States Code Section 2.

A TRUE BILL:


_____

FOREPERSON OF THE GRAND JURY

CHUCK ROSENBERG
UNITED STATES ATTORNEY


By:    _____

John R. Lewis
Assistant United States Attorney


_____

Belinda Beek
Assistant United States Attorney

26