# EXHIBIT 14

LAWYERS



Davis Wright Tremaine LLP

ANCHORAGE BELLEVUE LOS ANGELES NEW YORK PORTLAND SAN FRANCISCO SEATTLE SHANGHAI WASHINGTON, D.C.

CAROLYN K. FOLEY
DIRECT (212) 603-6472
carolynfoley@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

April 25, 2006

**CONFIDENTIAL TREATMENT REQUESTED BY THE McGRAW-HILL COMPANIES, INC. PURSUANT TO 17 CFR 145.9(d)(4)**

Anthony Mansfield, Esq.
Chief Trial Attorney
U.S. Commodity Futures Trading Commission
Enforcement Division
Three Lafayette Center
1155 21st Street NW
Washington, DC 20581
Re: *In re: Investigation of Energy Company*

Michael J. Otten, Esq.
Chief Trial Attorney
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW
Washington, D.C. 20581
Re: *CFTC v. Andrew Richmond*
Re: *CFTC v. Michael Whitney*

James A. Garcia, Esq.
U.S. Commodity Futures Trading Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581
Re: *CFTC v. Bradley and Martin*

David W. MacGregor, Esq.
U.S. Commodity Futures Trading Commission
140 Broadway
New York, NY 10005
Re: *CFTC v. Joseph P. Foley*

Kathleen M. Banar, Esq.
Chief Trial Attorney
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Re: *CFTC v. Paul Atha, et al.*

Dear Tony, Mike, James, David and Kathleen:

I write to each of you because The McGraw-Hill Companies, Inc. either has received or has been told to expect to receive subpoenas seeking documents in the captioned matters. In some of the captioned actions, McGraw-Hill has also received requests for depositions of certain present or former employees. I write here with three purposes in mind.



First, with regard to the requests for depositions of McGraw-Hill employees, please be advised that McGraw-Hill will assert, as applicable, the same privilege and trade secret objections which McGraw-Hill has asserted as to the document subpoenas. In making such objections at the depositions, we will take into consideration any waivers of privilege that may have been made, or will here after be made, by the specific defendants and energy companies involved in each case. In addition, in making its objections, McGraw-Hill will consider whether a protective order that preserves the confidentiality of McGraw-Hill's privileged material and its trade secrets is available.

Second, I write because we believe that, even setting aside the issues of privilege and protective order, it is highly burdensome and disruptive to McGraw-Hill's business to have its employees be subject to numerous deposition requests in the several cases listed above and, perhaps, more to come in the future. We believe that McGraw-Hill, as a third party, is entitled to some protection and some consideration and effort to minimize the burden on its employees and, in some cases, former employees. Accordingly, while McGraw-Hill will not object to making one witness available for deposition in each of the captioned cases, we will object to being required to provide more than one witness in any given case. To the extent the need for deposition stems from the need to authenticate documents or any other matter that can be covered by declaration, McGraw-Hill is willing to work with counsel to draft language for such declarations. In this regard, we agree to work with the CFTC and counsel for the defendants in each of the captioned cases to identify the appropriate witness for declaration and deposition.

Thirdly, and related to the second point, I write to ask that the CFTC consider implementing a procedure that would consolidate all issues relating to the depositions of McGraw-Hill employees that may be necessary in the various pending cases. The threatened expenses of time and cost to be incurred by McGraw-Hill in assisting in producing current and former employees has grown exponentially in just the last few weeks. To take the example of Thomas Haywood, a former Gas Daily employee, we have already received requests for his deposition in both the case pending in Oklahoma against Mr. Bradley and Mr. Martin and in the case pending in the Southern District of Texas against Mr. Whitney. Mr. Haywood is no longer employed by McGraw-Hill and to ask him to take the time to be prepared for and to sit for depositions on numerous occasions will place an unreasonable strain on him. Likewise, it is unreasonable to impose upon McGraw-Hill the costs and effort associated with requiring counsel supplied for Mr. Haywood by McGraw-Hill to travel to Houston several times in order to prepare Mr. Haywood for and defend numerous depositions. The situation is simply untenable. Since Mr. Haywood is the first to be subject to such requests, and since we have already agreed to make him available for deposition on May 15, I request that the CFTC consider notifying all defendants who may wish to depose Mr. Haywood that he will be made available for deposition on May 15, in Houston, at 1 p.m. We envision a procedure by which the counsel representing parties in each case appear and take his deposition consecutively (not at the same time). If there are more than two cases that need to depose Mr. Haywood, we would be willing, subject to Mr. Haywood's schedule, to carry over to the morning of May 16.



I hope that we can work together in these matters to facilitate production of documents and witnesses in a mutually acceptable manner and I look forward to a response.

Sincerely,

Carolyn K. Foley

CKF:AK

# EXHIBIT 15

LAWYERS



Davis Wright Tremaine LLP

ANCHORAGE BELLEVUE LOS ANGELES NEW YORK PORTLAND SAN FRANCISCO SEATTLE SHANGHAI WASHINGTON, D.C.

CAROLYN K. FOLEY
DIRECT (212) 603-6472
carolynfoley@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

May 8, 2006

**VIA FAX NO. (202) 418-5523**

Anthony Mansfield, Esq.
Chief Trial Attorney
U.S. Commodity Futures Trading Commission
Enforcement Division
Three Lafayette Center
1155 21st Street NW
Washington, DC 20581

Re: *CFTC v. Andrew Richmond* (D. Colo.)
Re: *CFTC v. Michael Whitney* (S.D.Tex.)
Re: *CFTC v. Bradley and Martin* (D. OK)
Re: *CFTC v. Joseph P. Foley* (S.D. Ohio)

Dear Tony:

As you know, McGraw-Hill has made overtures to the CFTC in an effort to coordinate a reasonable manner for producing documents under subpoena in the referenced actions and to agree upon a reasonable protective order. Indeed, McGraw-Hill proposed as early as my letter of March 15, 2006 a procedure for producing documents and repeatedly has expressed a willingness to consider any alternative proposals that the CFTC may offer. Accordingly, we were greatly disappointed to receive your call of Friday morning during which you indicated that the CFTC: (1) has rejected McGraw-Hill's proposed method of providing the information called for by the subpoenas; (2) will make no counterproposals of any kind; (3) will not agree to narrow the scope of the subpoenas in any manner; (4) will not agree to any form of a protective order; and (5) will move to compel production today if McGraw-Hill does not agree to produce all documents responsive to the subpoenas without any protective order. The absolute positions taken by the CFTC -- especially its absolute refusal to agree that any sort of a protective order can govern the production of the privileged, confidential and proprietary documents called for by the subpoenas -- make it impossible for McGraw-Hill to comply with the subpoenas at this time.



There can be no real dispute that the McGraw-Hill documents sought by the CFTC's subpoenas are highly proprietary, privileged and confidential. These documents contain information collected in confidence during the journalistic enterprise of price reporting. In addition, such proprietary, privileged and confidential documents sought by the subpoenas relate to numerous energy companies besides the employers of the individual defendants in the captioned actions. For that reason, McGraw-Hill had proposed to produce those documents needed to substantiate the CFTC's claims in these cases while minimizing disclosure of privileged, confidential and proprietary information concerning gas companies not at issue. At a minimum, McGraw-Hill sought to have its production covered by a protective order to avoid disclosure beyond what is required for these actions.

As the CFTC is aware, confidential, proprietary and privileged documents simliar (and in some instances the same) as those sought in the captioned actions have been produced by McGraw-Hill in other matters, including CFTC investigations, federal grand jury investigations and civil litigation. In all such cases, however, protective orders, grand jury secrecy rules, and other regulatory limitations have limited further disclosure of the produced documents. As the CFTC is also aware, many of the documents sought by the subpoenas issued in the captioned matters are indisputably protected by a journalist's privilege. While we do not dispute that the privilege is a qualified one that may be overcome in some circumstances, the question of whether the privilege has been overcome is a fact-specific determination that can only be made on a case by case basis. The fact that the privilege may be overcome in the circumstances of one case, does not mean that it will also be overcome in the circumstances of another case. McGraw-Hill seeks a protective order in order to ensure that disclosure and use of its privileged documents will be limited to those cases in which the privilege has not been overcome. It is critical that a protective order exist to maintain privilege and protect the documents from disclosure in other settings and to other persons. Not only would unprotected disclosure of these documents to the CFTC permit them to be disseminated in instances where the privilege may not be overcome, but such unrestricted disclosure would undermine the protective orders already obtained to protect some of these very same documents in other cases. Indeed, the protective order attached to my proposal of March 15 was specifically modeled after the protective orders that have been entered with regard to grand jury and criminal proceedings brought by the Department of Justice.

Insofar as the CFTC might at some point wish to use the documents produced in these actions for other legitimate government ends, we believe that such events can be addressed in a suitable protective order. I would point out, however, that a motion seeking to compel the production of many of these same documents from McGraw-Hill recently was dismissed with prejudice by Judge Hughes in the Southern District of Texas. Accordingly, we assume that the CFTC would not attempt to utilize documents obtained in these cases for the matters dismissed by Judge Hughes and that the CFTC's refusal to enter into a protective order here does not constitute an attempt to subvert that decision.

McGraw-Hill appreciates the CFTC's diligent pursuit of the captioned actions. By the same token, McGraw-Hill hopes that the CFTC can appreciate and respect why McGraw-Hill



needs to protect its proprietary, privileged and confidential information from unwarranted disclosure. Instead of burdening the courts with additional motion practice, I ask, once again, that the CFTC reconsider its position and, *at the very minimum*, propose a protective order that will afford McGraw-Hill the minimal protections it has consistently received in similar matters and I emphasize that McGraw-Hill remains open to considering any counter-proposals that the CFTC may have to offer in response to my proposal of March 15, 2006.

Sincerely,

Carolyn

Carolyn K. Foley

CKF:AK

James A. Garcia, Esq.
David W. MacGregor, Esq.
Michael J. Otten, Esq.

# EXHIBIT 16

LAWYERS



Davis Wright Tremaine LLP

ANCHORAGE BELLEVUE LOS ANGELES NEW YORK PORTLAND SAN FRANCISCO SEATTLE SHANGHAI WASHINGTON, D.C.

CAROLYN K. FOLEY
DIRECT (212) 603-6472
carolynfoley@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

April 19, 2006

**CONFIDENTIAL COMMUNICATION MADE FOR PURPOSES OF SETTLEMENT ONLY**
**CONFIDENTIAL TREAMENT REQUESTED BY THE McGRAW-HILL COMPANIES, INC. PURUSANT TO 17 CFR 145.9(d)(4)**

**(VIA FACSIMILE: 202-418-5523)**

James A. Garcia, Esq.
U.S. Commodity Futures Trading Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581

**Re: <u>CFTC v. Bradley and Martin (4:05-cv-00062-JHP-FHM)</u>**

Dear James:

This letter responds to certain issues raised in our telephone conversation of Thursday, April 13, 2006 concerning my letter to you of March 15, 2006.

With regard to Request No. 1, given your representation that the charges of false reporting in the case against Messers. Bradley and Martin do involve charges of false reporting to both *Gas Daily* and *Inside FERC Gas Market Report*, we will agree to amend our response to Request No. 1. Accordingly, in response to Request No. 1, McGraw-Hill will provide the CFTC with a list of the trade data associated with CMS as considered in the determination of the natural gas index prices published in *Inside FERC Gas Market Report*. The CFTC can compare this list to the records of CMS's actual trading activity (which we assume the CFTC has obtained from CMS). For those dates and pricing points as to which the CFTC certifies that discrepancies are found, McGraw-Hill will undertake a reasonable search of its records for the document(s) that reflect the data submitted by CMS for the affected pricing point on the identified date and will produce any such document still in its possession.

Similarly, based on your representation that charges of misreporting concern *Inside FERC Gas Market Report*, McGraw-Hill will produce, in response to Request No. 4, redacted copies of the spreadsheets that reflect the data considered in the determination of the natural gas



index prices, as published in *Inside FERC Gas Market Report*, for the specific pricing points and dates on which the CFTC certifies that it has a good faith belief that CMS submitted false trade data to *Inside FERC Gas Market Report*. (It is anticipated that after receiving the information provided pursuant to Request 1, the CFTC will be able to compare the trade data submitted by CMS to the records of CMS's actual trading records and thereby identify which submissions contained false information.) The spreadsheets produced pursuant to this request will be redacted to protect the continued confidentiality of the sources who are not the subject of the underlying Action.

Also based on your representation that the allegations of misreporting involved *Inside FERC Gas Market Report*, we will agree to produce, in response to Request No. 6, published price indices for the relevant time period as published in *Gas Daily* and *Inside FERC Gas Market Report* and, in response to Request No. 9, we will produce the methodologies for *Inside FERC Gas Market Report*.

Turning to the observations that Request Nos. 3, 5 and 7 have a broader scope than Request Nos. 1 and 4, I respectfully submit that the proposed production laid out in my March 15, 2006 letter, as modified above, provides the CFTC with the information that is highly material and necessary and critical to its case. To the extent that the information sought by Requests 3, 5 and 7 exceed requests 1 and 4, they seek peripheral information that is simply not necessary for to prosecute or defend the case. For example, whether or not anyone complained about CMS's submissions (as would be called for by Requests 3 and 7, which do seem duplicative) is beside the point: McGraw-Hill's proposed production will provide the CFTC with all the information necessary to determine whether or not the information submitted was false and whether or not that false information was considered in the course of determining any given index price. Similarly, documents that might reflect the thoughts and impressions of Platts' reporters or editors are similarly ancillary, at best, to the direct evidence of whether or not a submission was false. As Judge Lamberth noted in his decision directing compliance with a CFTC administrative subpoena, even in the context of an investigatory subpoena, McGraw-Hill should not be required to "cull its files for data submitted by other energy companies" and that the CFTC's subpoena should be limited to documents "received from Energy Company" under investigation. *See U.S. Commodity Futures Trading Com'n v. McGraw-Hill Companies, Inc.*, 390 F.Supp.2d 27, 36 (D.D.C. 2005).

I hope that this addresses the concerns that you have raised and I look forward to your response about modifications that the CFTC would propose to the protective order.

Sincerely,

Carolyn K. Foley

cc: David W. MacGregor, Esq.
Michael J. Otten, Esq.
Anthony Mansfield, Esq.

# EXHIBIT 17

LAWYERS



Davis Wright Tremaine LLP

ANCHORAGE BELLEVUE LOS ANGELES NEW YORK PORTLAND SAN FRANCISCO SEATTLE SHANGHAI WASHINGTON, D.C.

CAROLYN K. FOLEY
DIRECT (212) 603-6472
carolynfoley@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

April 19, 2006

**CONFIDENTIAL OFFER MADE FOR PURPOSES OF SETTLEMENT ONLY CONFIDENTIAL TREAMENT REQUESTED BY THE McGRAW-HILL COMPANIES, INC. PURUSANT TO 17 CFR 145.9(d)(4)**

David W. MacGregor, Esq.
United States Commodity Futures Trading Commission
140 Broadway
New York, NY 10005

Re: *CFTC v. Joseph P. Foley* (S.D. Ohio 2:05-cv-849)

Dear David:

This letter addresses the issues raised in our April 13, 2006 telephone conversation held to discuss my letter to you of March 15, 2006. I propose to address your concern that our proposed method of responding to **Request 1** won't provide you with all the submissions made by AEP traders in the following manner. First, our proposed production will provide the CFTC with all of the data associated with AEP that was considered as part of the process of determining any of *Inside FERC's* published index prices. This will allow the CFTC to compare the data received from AEP with AEP's trading records to identify instances of false reporting. Once the days and hubs for which false information was submitted -- if any -- are identified, McGraw-Hill will undertake a reasonable search for the actual submissions received from AEP for the hubs and dates involved. If, in the course of making this determination, you either have reason to believe that you are missing major instances of mis-reporting or you have trading data from AEP that does not appear to have been transmitted to *Inside FERC Gas Market Report*, we can perform a similar search for submissions for such dates/hubs for which you think information is missing.

Turning to the observations made by your colleague, James Garcia, that Request Nos. 3, 5 and 7 have a broader scope than Request Nos. 1 and 4, I respectfully submit that the proposed production laid out in my March 15, 2006 letter, as modified above, provides the CFTC with the



information that is highly material and necessary and critical to its case. To the extent that the information sought by Requests 3, 5 and 7 exceed requests 1 and 4, they seek peripheral information that is simply not necessary for to prosecute or defend the case. For example, whether or not anyone complained about CMS's submissions (as would be called for by Requests 3 and 7, which do seem duplicative) is beside the point: McGraw-Hill's proposed production will provide the CFTC with all the information necessary to determine whether or not the information submitted was false and whether or not that false information was considered in the course of determining any given index price. Similarly, documents that might reflect the thoughts and impressions of Platts' reporters or editors are similarly ancillary, at best, to the direct evidence of whether or not a submission was false. As Judge Lamberth noted in his decision directing compliance with a CFTC administrative subpoena, even in the context of an investigatory subpoena, McGraw-Hill should not be required to "cull its files for data submitted by other energy companies" and that the CFTC's subpoena should be limited to documents "received from Energy Company" under investigation. *See U.S. Commodity Futures Trading Com'n v. McGraw-Hill Companies, Inc.*, 390 F.Supp.2d 27, 36 (D.D.C. 2005).

I hope that this addresses the concerns that you have raised and I look forward receiving a response from you or Mr. Garcia, about modifications that the CFTC would propose.

Sincerely,

Carolyn

Carolyn K. Foley

cc: James A. Garcia, Esq.
Michael J. Otten, Esq.
Anthony Mansfield, Esq.

# EXHIBIT 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

U.S. COMMODITY FUTURES TRADING COMMISSION,

Applicant,

- against -

THE McGRAW-HILL COMPANIES, INC.,

Respondent.

Miscellaneous Action H-03-187

**AFFIDAVIT**

DISTRICT OF COLUMBIA )
: s.s.:
CITY OF WASHINGTON )

LARRY FOSTER, being duly sworn, deposes and says:

1. I am the Editorial Director for Platts' U.S. Natural Gas publications, a position I have held since 1995. I am also Platts' Washington Bureau Manager. I have worked for McGraw-Hill in various capacities (including working as a reporter) since 1980, always for publications covering the natural gas and electricity markets. I received my B.A. in journalism from the University of Rhode Island in 1974, after which I worked as a reporter for various publications before obtaining an M.A. in journalism from the University of Wisconsin in 1980.

2. In my capacity as Editorial Director for U.S. Natural Gas, I oversee various Platts publications, including *Inside FERC's Gas Market Report ("Inside FERC")* and *Gas Daily*. *Gas Daily* is, as the name suggests, a daily publication that publishes news and analysis regarding the natural gas market, including daily price information. *Inside FERC* is a biweekly publication that also publishes news and analysis of the natural gas market, including monthly price indices and assessments for the natural gas market. *Gas Daily* was formerly published by a separate

company, FT Energy, until it was acquired by Platts in September 2001. Both publications are sold via subscription and are available to any member of the public who wishes to purchase them.

3. Platts' price indices and other news and analysis are prepared by Platts' reporters, virtually all of whom have a background in journalism. Platts generally does not hire former traders or others with an energy industry background to do news or price reporting.

4. In compiling their publications' price indices, *Inside FERC* and *Gas Daily* reporters obtain information firsthand from buyers and sellers in the marketplace. Only original data is used – Platts does not use data from other publicly available price surveys. Platts reporters obtain information from their sources via fax, phone, and electronic transmissions. Platts obtains this information with the intent to disseminate it to the public by aggregating it into its indices.

5. Once the data has been collected, Platts reporters and editors use their experience and judgment to identify and question outlying data, and in some cases follow up with telephone calls to their sources to seek confirmation or explanation of the data in question. Reported prices that deviate significantly from others reported for that location and time period may be excluded from the indices.

6. The published indices are determined through a combination of statistical calculations and editors' knowledge of dealmaking for the pricing point and time period reported. In creating the published indices, Platts editors follow publicly available methodologies, copies of which are annexed at Exhibit A.

7. Platts' sources provide price and volume information with the understanding that the data they provide will be aggregated with other prices for the creation of the indices and that

the data will not be attributed to a particular company or trader. Maintaining confidentiality is extremely important to Platts' sources in part because, absent confidentiality, companies and traders fear that their competitors or potential counter-parties will know the specific price at which the particular trader is willing to buy or sell, giving an unfair advantage in future transactions.

8. *Inside FERC* was launched in 1985 under my direction. At that time, price discovery in the U.S. natural gas spot market did not exist. *Inside FERC* and other publications, including *Gas Daily*, created gas price survey techniques from the ground up in the late 1980s. Based on my experience, I believe that Platts would be unable to obtain a broad range of price and volume information from industry participants without the ability to promise confidentiality, which has always been the foundation of our surveys. Indeed, in the wake of the various governmental investigations of energy market participants, some sources have already informed Platts that they will no longer provide price and volume information or have sought additional assurances of confidentiality.

9. Even in those instances where certain companies have, at the CFTC's request, retroactively waived confidentiality, for Platts to turn over the requested information to the CFTC would still have a severe chilling effect on Platts' ability to obtain price information in the future. This is because sources would know that, regardless of any promise of confidentiality by Platts, the government could in the future simply ask the source to waive confidentiality in the context of an investigation, at which point Platts would turn over the requested information.

10. Since approximately October of 2002, my staff and I have spent a great deal of time responding to subpoenas and other requests for information from the CFTC, the FERC, the United States Attorney in Houston, the California Senate Select Committee to Investigate Price

Manipulation of the Wholesale Energy Market, the California Attorney General, and other government agencies and investigators. We also have met in person with CFTC enforcement and market oversight staff. This burden has fallen especially heavily on Kelley Doolan, the Chief Editor of *Inside FERC*, whom I supervise. As part of his regular duties as Chief Editor, Mr. Doolan is the "point man" for the monthly price indices. All information collected for the monthly indices is either furnished directly to Mr. Doolan by Platts' sources or is ultimately forwarded to him by Platts' reporters. Mr. Doolan also is directly involved in placing follow-up calls to sources and otherwise confirming or checking information provided to Platts for the monthly indices. While he has the lead role in producing the *Inside FERC* monthly indices, his work is corroborated by other Platts staff.

11. Since October of 2002, I conservatively estimate that Mr. Doolan has spent 400 to 500 hours of his time responding in one way or another to the demands of various government agencies and investigators, including the CFTC. In particular, Mr. Doolan has worked intensively responding to subpoenas from the United States Attorney's office in Houston in the criminal prosecution of two energy company traders charged with providing false information to Platts, and Mr. Doolan anticipates that further extensive demands on his time will be made by the prosecutors as the two cases proceed to trial.

12. The amount of time that Mr. Doolan has been forced to devote to these matters has directly interfered with his ability to carry out his various responsibilities at *Inside FERC*. In fact, while he continues to supervise the monthly price indices, Mr. Doolan has been forced to temporarily give up many of his other duties as Chief Editor because he is spending so much time preparing to testify, reviewing documents, and otherwise responding to government demands for his time. Indeed, Platts has been forced to hire an additional staff member to

temporarily assume some of Mr. Doolan's other responsibilities. We also have had to reassign the duties of other staff members to accommodate the demands on Mr. Doolan's time and to temporarily locate him in an office separate from the rest of our staff's newsroom to give him the necessary privacy to deal with these confidential matters. All of this has been extremely disruptive to the business operations of *Inside FERC*.

13. In my view, compliance with the CFTC subpoenas as currently written would add a vast additional burden on Mr. Doolan and others and would directly interfere with the newsgathering, reporting, and business functions of *Inside FERC* and *Gas Daily*. For example, the CFTC subpoenas seek "all documents relating to submissions by the Energy Companies received by or used by McGraw-Hill to gather, calculate and publish price and volume information" over a period of more than four years. This request calls for literally thousands of documents. Since information from the Energy Companies was gathered via facsimile, email, and phone interviews, complying with this request would require Mr. Doolan and several other Platts reporters to spend hundreds of hours combing through document files, email files, phone records, reporter's notebooks, and other files.

14. Similarly, the subpoenas seek all documents concerning any price and volume data known or suspected to be inaccurate, and all documents reflecting any complaints received by any person regarding allegedly inaccurate price and volume information. Platts does not maintain separate files labeled "inaccurate data" or "complaints." Rather, to the extent that any responsive documents exist, they would be scattered through the voluminous document files and email files of Mr. Doolan and other reporters and staff. Again, the task of finding responsive documents would require Platts personnel to spend an enormous amount of time sifting through these various files, and indeed could take months.

Larry Foster

Larry Foster

Sworn to before me this
16th day of June, 2003

M Ramiro

Notary Public

MIRNA J. ROMERO
NOTARY PUBLIC, DISTRICT OF COLUMBIA
My Commission Expires 8/31/07

A

# Platts US Natural Gas Methodology

## Daily prices

Platts polls scores of respondents from every sector of the industry, from the wellhead to the burner-tip, for the daily price survey. Prices are obtained primarily via phone and fax.

The daily price survey, which currently covers more than 100 pricing points, has three components. The daily midpoint is the average of the low and high of the common range, commonly called the GDA (*Gas Daily* average), which is always within a half-cent of the volume-weighted average of all the deals reported to Platts for each point. The absolute range shows the absolute low and high of deals reported on the previous trading day.

A formula is used to calculate the common range. In most markets, the formula establishes the common range at 50% of the absolute range and builds the range around the volume-weighted average price. This formula assumes a standard bell curve-shaped distribution of data, common to stable markets. A volume-weighted price located more toward either end of the range, however, may narrow the range further. The common range represents the same ranges published in the daily price survey prior to adoption of the current format July 1, 1996. If volume is heavily weighted toward one end of the curve or if volume is very thin, alternate methodologies are used to reflect the most common range.

All prices gathered are for deliveries into the pipeline, except as noted. The postings, expressed on a US$/MMBtu dry basis, include any gathering and transportation fees incurred to get to the mainline grid points listed in the tables. Prices for three Canadian locations are in C$/gigajoule.

Transaction and flow dates are specified in the daily price survey. As of Jan. 1, 2001, prices for points for which no new data is received are not carried over from the previous day; when no data is received, the survey shows only dashes in the columns for midpoint, absolute and common ranges.

Prices collected are for deals done on the transaction date and prior to the NAESB nomination deadline (11:30 a.m. Central time) for gas flowing the following day. Transactions done on Friday usually are for flow on Saturday, Sunday and Monday.

In assessing markets, Platts editors rely on both mathematical calculations as well as their experience and knowledge in dealing with the same sources on a regular basis. If a trade or report is judged to be out of the market, the source of the information is contacted and asked to confirm and explain the transaction. Platts editors reserves the right to delete reported data based on such reviews.

For more information on the daily price survey, contact Markets Editor Tom Haywood at 713-939-5846 or tom_haywood@platts.com.

## Monthly prices

The current reporting format for the monthly survey has been in place since March 1986. The survey sample is composed of large and small gas producers, marketers, brokers, distributors, electric utilities and other end-users. Almost all of the sources provide multiple price reports.

First-of-the-month prices are reported at the beginning of each month for gas that will flow throughout that month. Like daily prices, monthly prices are obtained firsthand in surveys of actual buyers and sellers by Platts market reporters. Price assessments are based only on original reporting and do not incorporate publicly available price surveys. Prices are collected from participants only for transactions with which they are directly involved. Prices reported are for actual spot gas sales agreements, not for offers or bids.

A price range and an index price assessment are reported for each of more than 70 monthly pricing points. The index is determined by considering the results of a number of statistical calculations on the transactional data -- including the volume-weighted average, the median, the simple average, the mode and other measures of frequency of occurrence -- and editors' knowledge of dealmaking for the period in the market reported. Platts does not report a price index if it cannot obtain a satisfactory number of individual prices for a particular location.

Most monthly prices are reported to Platts electronically in a database form, although prices also are obtained via phone and fax. In a typical monthly survey, thousands of transactions are considered. In the monthly survey, a price, an associated volume, a transaction date, in some cases counterparties and other information are collected for each deal a price source reports. Platts does not solicit prices derived from basis deals, exchanges of futures for physicals (EFPs) or other transactions in which the price is derived from something other than negotiation during bidweek.

With few exceptions, prices are reported delivered to mainline. Prices are reported on a US$/MMBtu dry basis (except for one Canadian location, reported in C$/gigajoule) and are collected for a wide range of package volume sizes; there is not a standard size unit. Delivered-to-pipeline prices include any charges for processing, gathering and transportation that may be incurred in moving the gas from the wellhead to the pipeline system.

Bidweek typically is considered to be the last five business days of the month. However, the exact bidweek period can differ by region and by month. In the West, for instance, first-of-the-month dealmaking often starts earlier than along the Gulf Coast. To determine the start of bidweek for each pricing point reported, the dated spot transactions are sorted and the day when the surge of dealmaking begins is identified.

To ensure that Platts collects prices for all dealmaking during bidweek -- particularly for late deals done on the final business day of the month -- the monthly surveying isn't concluded until after nominations are completed on the last business day of the month.

In an effort to verify the accuracy of assessments, which reflect Platts' editors' subjective judgment, editors do not include a reported price they determine deviates significantly from others reported for that location and time period unless they are able to conclude that it is for a deal comparable to the others being reported.

For the monthly survey, a statistical approach and database tools are used to identify outliers, which are generally considered to be a price more than two standard deviations outside the price series. In cases of outliers, editors contact the source to try to verify the circumstances of the trade. Additional details sought might include counterparties, time stamps, or other forms of confirmation. If editors do not trust the answers they receive about suspect deals, they have the option of not including the prices in the survey. Reported deals with verifiable counterparty information are treated as more reliable than trades lacking that information and may be given greater weight in formulating price assessments.

In both the daily and monthly surveys, veteran editors use their experience and editorial judgment to identify and question invalid information. The goal is to make the survey as broad and deep as possible, to maximize the amount of data collected and to get data from all parts of the market, regardless of the size or type of entity, the number of trades done by the entity, or how the trade was transacted.

For more information on the monthly price survey, contact Chief Editor Kelley Doolan at 202-383-2145 or kelley_doolan@platts.com.

## Platts editorial standards

Platts has in place a Code of Ethics with which all of its employees, including its editorial staff, must comply. In addition, all Platts employees are subject to and must adhere to The McGraw-Hill Companies' Code of Business Ethics. Editors must re-sign each code annually. Company policies, among other things, prohibit editorial personnel and their spouses from trading in commodities or stocks, bonds or options of companies in the industry covered by their publication(s) and from dealing with outside parties in a manner that creates even an appearance of a conflict of interest. The McGraw-Hill Companies' Code of Business Ethics reflects McGraw-Hill's commitment to integrity, honesty and acting in good faith in all its dealings. The Platts Code of Ethics is designed to ensure that Platts information is the product of honest, fair and open reporting.

# EXHIBIT 19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---------------------------------------------------------- x
U.S. Commodity Futures Trading Commission, :
Plaintiff, :
- against - :
Michael Whitney, et al. :
Defendants. :
---------------------------------------------------------- x

**Case No. 1:06-mc-00210 (RCL)**

**NOTICE OF FILING UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

Third Party The McGraw-Hill Companies, Inc. ("McGraw-Hill"), by and through undersigned counsel, herewith file the following document under seal:

AFFIDAVIT OF KELLEY DOOLAN

This document is subject to the pending Order Sealing the Affidavit of Kelley Doolan in the above-captioned case. A copy of that proposed Order is attached hereto.

Dated this 26th day of May, 2006, New York, New York.

Respectfully submitted,

s/ Richard L. Cys
Richard L. Cys
D.C. Bar No. 087536
DAVIS WRIGHT TREMAINE LLP
1500 K Street, N.W.
Suite 450
Washington, D.C. 20005-1272
(202) 508-6600 (phone)
(202) 508-6699 (fax)
*Counsel for Third Party The McGraw-Hill Companies, Inc.*

Of Counsel:
Victor A. Kovner (*pro hac vice* admission pending)
Carolyn K. Foley (*pro hac vice* admission pending)
Kevan D. Choset (*pro hac vice* admission pending)
DAVIS WRIGHT TREMAINE LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 489-8230
Facsimile: (212) 489-8340
Email: carolynfoley@dwt.com

Of Counsel:
William Farley, Esq.
Adam Schuman, Esq.
The McGraw-Hill Companies, Inc.
1221 Avenue of the Americas
New York, New York 10020

# EXHIBIT 20

MAY-12-2006 11:55 JUDGE ANDREW J PECK, SDNY 212 805 7933 P.02/08



MEMO ENDORSED

IT IS ORDERED that counsel to whom this Memo Endorsement is sent is responsible for faxing a copy to all counsel and retaining verification of such in counsel's case file. Do not fax or mail such verification to Chambers.

Davis Wright Tremaine LLP

ANCHORAGE BELLEVUE LOS ANGELES NEW YORK PORTLAND SAN FRANCISCO SEATTLE SHANGHAI WASHINGTON, D.C.

VICTOR A. KOVNER
DIRECT (212) 603-6451
victorkovner@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

03 Civ. 6186 (VM) (AJP)

MEMO ENDORSED 5/12/06

May 11, 2006

**VIA FACSIMILE: 212-805-7933**

Hon. Andrew J. Peck
United States Magistrate Judge
Southern District of New York
500 Pearl Street – Room 1370
New York, New York 10007

BY FAX

SO ORDERED:

Hon. Andrew Jay Peck
United States Magistrate Judge

Dear Judge Peck:

Pursuant to this Court's Order of April 24, 2006, counsel for McGraw-Hill, Intelligence Press, Inc. (collectively, "the Publications"), Plaintiffs, non-settling defendants El Paso, Coral, AEP and Aquila ("Non-Settling Defendants") met, in person and by teleconference, on April 27, 2006 and on May 9, 2006 and on May 10, 2006 to discuss the procedures for producing data to the plaintiffs as required by Judge Marrero's April 18, 2006 Decision and Order and this Court's November 14, 2005 Opinion and Order.[1] Interested parties have held numerous additional discussions in a quest for common ground. The Publications and plaintiffs have reached an agreement as to the method of production and set it forth below. The respective positions of the the non-settling and the settling-defendants are also set forth below.

## I. Method of Production Agreed Upon Between The Publications and Plaintiffs

The Publications and plaintiffs have agreed to a two-phase production, which will allow the plaintiffs to identify which hubs and months they believe contain false trades by the non-settling defendants so that the Publications can then produce the complete set of considered prices for those months at those hubs. The production would specifically operate as follows:

1 Certain of the settling defendants listened in on those discussions *via* telephone to ensure that their rights were not being compromised. Settling defendants include CMS Field Services (now known as Cantera Gas Company LLC), CMS Marketing Services & Trading Company (now known as CMS Energy Resource Management Company), Cook Inlet Energy Supply, LLC, Cinergy Marketing and Trading, L.P., Duke Energy Trading and Marketing, L.L.C., Dynegy Marketing and Trade, West Coast Power LLC, e prime, Inc., Enserco Energy, Inc., Entergy-Koch Trading, LP, MidAmerican Energy Company, Mieco, Inc., ONEOK, Inc., ONEOK Energy Services Company, L.P. (formerly ONEOK Energy & Marketing Company, L.P.) (collectively, the "Settling Defendants").

- McGraw-Hill will produce the trade data associated with the non-settling defendants that were considered in the determination of any index price for any hubs, for the entire 36-month class period.

- With regard to (1) bidweek data for the entire 36-month class period and (2) daily index data covering roughly the last six months of the class period, Intelligence Press will likewise produce the trade data it has retained, associated with the non-settling defendants, that were considered in the determination of any index price for any hubs.

- Plaintiffs will compare that data with the actual trade data of the non-settling defendants in order to identify the specific instances in which any of the non-settling defendants appear to have submitted false trade data.

- The plaintiffs will then provide the Publications with a list of the hubs and dates for which they certify that they have identified, based on the above analysis, that false trade data was submitted by one or more of the non-settling defendants.[2]

- The Publications will produce the universe of data considered for the determination of the index prices for the identified hubs and months. The names of all sources other than the non-settling defendants will be redacted and replaced by codes that will allow identification of the sources as Source X, Source Y, Source Z, etc.[3] If it develops – whether by way of a ruling that may be made by the Court or because of objections that may be made by the non-settling defendants – that the absence of the names of the settling defendants becomes a highly material problem for plaintiffs, plaintiffs reserve the right to request that either Judge Marrero or Judge Peck compel the Publications to identify the codes referring to the settling defendants; the Publications and the Settling Defendants reserve the right to oppose any such request.

- In addition, for the period roughly comprising November 14, 2001-June 2002, Intelligence Press will produce the data in its possession used to calculate daily price indices. To the extent Intelligence Press has retained information about any

2 If after conducting the 30(b)(6) deposition of El Paso, plaintiffs determine that they have insufficient information to perform an accurate comparison, the Publications agree to confer in good faith with plaintiffs about the issue.

3 To clarify the method of redacting, the names of both settling defendants and sources who were never defendants will be redacted. McGraw-Hill will use redaction codes that will allow: i) the distinction between one source and another; and ii) the distinction between sources that are settling defendants and sources that were never defendants at all. *E.g.*, the settling defendants might be labeled as Sources A-1 through A-10, while the sources who were never defendants would be labeled as Sources B-1 through B-10. Plaintiffs will provide McGraw-Hill with a list of the names of the settling defendants.

source of any data point, other than the non-settling defendants, the name of the source will be redacted and replaced by codes that will allow identification of the sources as Source X, Source Y, Source Z, etc. For the portion of the class period prior to November 2001, Intelligence Press has conducted a search of a sample of its old hard drives and have found virtually no data responsive to Plaintiffs' subpoena. As a result, plaintiffs and Intelligence Press have agreed that they need not continue to search for, and will not be obligated to produce, any data prior to November 2001.

- After the data is provided to the parties as described above – *and in lieu of serving the Publications with any notice for any other form of deposition, whether under Federal Rule of Civil Procedure 30(b)(6) or otherwise* – the plaintiffs can serve one notice of deposition pursuant to Federal Rule of Civil Procedure 31 on each of McGraw-Hill and one on Intelligence Press. While reserving the right to assert objections, as appropriate, the Publications will designate a witness to answer the questions. After receiving the Publications' answers, the parties will have the option of serving a short set of follow-up questions, limited to seeking clarification of the answers provided by the Publications.

- The Publications' production of documents shall be made subject to the protective order currently operative in this case (a copy of which is attached). The plaintiffs and the Publications have also agreed, however, that for purposes of the production of documents by the Publications as contemplated herein, the defendants who have entered into settlement agreements are explicitly excluded from the definition of "Parties" to whom the documents may be made available pursuant to paragraph to the protective order. In addition, the Publications and plaintiffs have agreed to add the following additional provision designed to protect the confidentiality of the documents to be produced by the Publications as outlined above:

> If any party determines that it is likely to present, introduce as evidence or otherwise discuss before this Court documents produced by the Publications that are marked "Confidential" or "Restricted Confidential" during a trial of this action, that party shall provide the Publications with at least 10 business days prior written notice of such determination. The Publications must move within 5 business days of such notice for a protective order limiting public disclosure of said documents. The parties shall not disclose in open court proceedings said documents until resolution of the Publications' motion for a protective order.

- Finally, no further requests for documents or information will be served on either of the Publications in advance of any trial of this action. The Publications reserve the right to object to and oppose any trial subpoenas that may be served.

McGraw-Hill will need approximately three weeks to provide the first wave of data as outlined above. Intelligence Press, which has a substantially larger amount of information to produce, will need approximately six weeks to complete its initial round of production in full. Intelligence Press will endeavor to produce its bidweek data first, within approximately the same time period as McGraw-Hill. Once plaintiffs provide the Publications with the list of hubs and dates for which they have identified false trade submissions were made by non-settling defendants, McGraw-Hill will be able to produce the universe of data considered for each such hub, in redacted form, in approximately one week and Intelligence Press in approximately two weeks.

Since Judge Marrero's decision and this Court's earlier decision address only the question of enforcement of plaintiffs' subpoenas, it is not clear to Plaintiffs and the Publicatins that any of the defendants have standing or authority to object to this agreement.[4] There is no provision in Rule 45 that allows a non-party to a subpoena to object that a lesser amount of production will prejudice its rights, as Defendants assert here. *See* F.R.C.P. 45(c)(3)(A) (bases for motion to quash or modify subpoena). Indeed, such non-parties may only have standing in situations where the production of information touches upon some privacy or privilege of the objecting party. *See, e.g., Nova Prods., Inc. v. Kisma Video, Inc.*, 220 F.R.D. 238, 241 (S.D.N.Y. 2004) ("a party ordinarily lacks standing to quash a subpoena directed at a nonparty unless the party is seeking to protect a personal privilege or right"). Here, Defendants do not want *less* information produced, but *more*. There is no support for the standing of Non-Settling Defendants here, either in the Federal Rules or in the case law.

Defendants have, however, participated in some of the negotiations regarding this issue and submit the following statements of their position:

## II. Statement of the Non-Settling Defendants

The Non-Settling Defendants have a number of concerns with the agreement between the Publications and the Plaintiffs. As an initial matter, the suggestion that the Non-Settling Defendants are not entitled to voice their objections to the agreement are unfounded. Surely, the Non-Settling Defendants must have the opportunity to ensure they are not unduly prejudiced by the agreement. In addition, as this court recalls, the Defendants (including the Non-Settling Defendants) served their own subpoenas on Mc-Graw Hill seeking data that the Plaintiffs might agree not to take, but which is essential to any sound analysis.5 The Non-Settling Defendants

4 Intelligence Press further notes that none of the Defendants served a subpoena on it.

5 The exposition of Non-Settling Defendants' position herein does not mean that they agree that Plaintiffs can





represented at the hearing before this Court that they were not withdrawing those supboenas unless plaintiffs' motion was quashed in its entirety. In any event, parties always have a right to object to third-party subpoenas, and to ensure their interests are protected.

Non-Settling Defendants raise the following concerns with the current agreement between Plaintiffs and the Publications:

1. The Non-Settling Defendants do not consent to be limited to conducting their deposition of each publication pursuant to Federal Rule of Civil procedure 31. At the hearing on December 1, 2005, this Court made it abundantly clear that the Publications would be required to submit to a Rule 30(b)(6) deposition following a production of documents. Tr. at 38. A written deposition procedure unfairly skews efforts at uncovering the truth, given that the format makes it nearly impossible to meaningfully follow-up on questions. Moreover, the deposition will likely serve as trial testimony given the Publications promise to resist a trial subpoena, the need for a live witness to answer questions from all parties is all the more important because a jury will ultimately have to judge the witness' credibility. Watching a witness read deposition answers prepared in advance does not serve that purpose. The Non-Settling Defendants are prepared to serve a Rule 30(b)(6) deposition notice for a video deposition, if this Court agrees as to the appropriateness of it.

2. The agreement between Plaintiffs and the Publications is susceptible to manipulation by the Plaintiffs to claim that it found reports it claimed were false only on dates and in locations where such reports fit their theory of the case. In order to avoid this possibility, Plaintiffs should be required to disclose to the Non-Settling Defendants which of the trades it claims are false,[6] and should specify how they are making that determination. Plaintiffs will have to make this determination in any event, and it will certainly simplify the rest of the case if the parties are operating on the same playing field in addressing possible false reports. Plaintiffs should also be required to stipulate that they are not contesting the accuracy of any trades that they do not identify as false.

3. To the extent Plaintiffs claim they have identified false reports from hubs that are not liquid or not highly correlated to the Henry Hub and not from liquid hubs or hubs that are correlated to the Henry Hub, the Non-Settling Defendants should be entitled to obtain data from this later group of hubs. The Publications can not object to producing this as they have now essentially agreed to produce to Plaintiffs as much information as they want (conceivably all information in the Publications' possession), notwithstanding earlier claims of burden.

---

recreate the indices at this juncture in a way that is economically sound, particularly in that they have agreed not to consider the data obtained and rejected by the Publications, and they are not obtaining information regarding trading at hubs where any of the settling defendants, but not the Non-Settling Defendants, reported.

6 The Non-Settling Defendants reject the theory underlying the entire agreement between the Plaintiffs and the Publications that the Plaintiffs are able to identify trades that are false merely by comparing the information the Publications are providing to them with the trade data supplied by the Non-Settling Defendants. There are numerous reasons why the two may not match that are legitimate.

4. The Settling Defendants must be identified individually by name in the data that is ultimately produced because it is critical to both of Plaintiffs' claims. Plaintiffs here have asserted that false reporting was endemic in the industry, and that each of the false reporting Defendants (even those who have settled) reported false pricing information. However, without identification of the names of the Settling Defendants, it will be impossible to determine whether any alleged false reporting by any of the Settling Defendants impacted the reported index for purposes of an aiding and abetting claim or a direct manipulation claim. That is, if the identities of the Settling Defendants are not disclosed, it will appear as if their reporting was accurate because it will not be possible to compare reported prices to the actual trade data of the Settling Defendants. The possible prejudice to the Non-Settling Defendants could be extreme as it will then seem as if any false reporting by them was the only artificial influence on the indices. Moreover, in addressing Plaintiffs' claims, the Non-Settling Defendants may need to demonstrate how price reporting by the Non-Settling Defendants impacted particular hubs in addressing issues of causation. Given that the Settling Defendants previously agreed that their identities could be disclosed, they are in no position to now revoke their waiver.

5. Price reports for the Henry Hub should be provided for the entirety of the Class Period in that NYMEX natural gas futures contracts are for delivery of natural gas at the Henry Hub.

## III. Statement of Settling-Defendants

Because the proposed first phase of production by the Publications does not contemplate production of any of the data the Settling Defendants reported to the Publications, the Settling Defendants take no position at this time on the method of production agreed upon between the Publications and plaintiffs. All rights of the Settling Defendants with respect to the production of their reported data, however, are hereby reserved.

**Respectfully Submitted:**

**For The McGraw-Hill Companies, Inc.**

Victor A. Kovner,
Davis Wright Tremaine LLP

**For Intelligence Press, Inc.**

Nathan Siegel, by cff
Levine Sullivan Koch & Schulz, L.L.P.

Hon. Andrew J. Peck
May 11, 2006
Page 7

For Plaintiffs:

Bernard Persky, by CKF

Bernard Persky,
Labaton Sucharow & Rudoff LLP

For Non-Settling Defendants:

Stephanie J. Goldstein, by CKF

Stephanie J. Goldstein,
Fried Frank Harris Shriver & Jacobson

For Settling Defendants:

Robert C. Micheletto, by CKF

Robert C. Micheletto,
Jones Day

# EXHIBIT 21

**Release: 4840-03**
**For Release: September 17, 2003**

# DUKE ENERGY TRADING AND MARKETING, L.L.C., AN AFFILIATE OF DUKE ENERGY CORPORATION, PAYS $28 MILLION TO SETTLE U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES OF ATTEMPTED MANIPULATION

**Duke Energy Trading and Marketing, L.L.C. Charged With False Reporting and Attempted Manipulation in Violation of the Commodity Exchange Act**

WASHINGTON, D.C. - The U.S. Commodity Futures Trading Commission (CFTC) announced today the issuance of an administrative order (order) filing and simultaneously settling charges of false reporting and attempted manipulation by **Duke Energy Trading and Marketing, L.L.C. (DETM)**, an affiliate of Duke Energy Corporation.

In commenting on this matter, **CFTC Chairman James E. Newsome** said:

> **"The Commission has committed significant resources to seek out and prosecute such wrongdoing and, by doing so, is sending a clear message that such illegal conduct will not be tolerated. This case was a result of the collaborative efforts of the Commission and other members of the President's Corporate Fraud Task Force and demonstrates how government agencies can work together to ensure that America's energy markets are fair and competitive."**

CFTC Chairman Newsome added:

> **"The CFTC's ongoing energy investigations reflect its commitment to ensure the integrity of those markets over which the Commission has jurisdiction."**

The order finds that from at least January 2000 through August 2002, the Houston offices of DETM reported false information, including price and volume information, concerning natural gas cash transactions, to certain reporting firms. According to the order, price and volume information is used by the reporting firms in calculating published surveys or indexes (indexes) of natural gas prices for various hubs throughout the United States.

The order finds that DETM knowingly reported trades that did not occur and reported certain trades at false prices and/or volumes in an attempt to skew the indexes to benefit DETM's trading positions. According to the order, natural gas futures traders refer to the published indexes for price discovery and for assessing price risks. The CFTC found that DETM's false reporting conduct violated the Commodity Exchange Act (CEA).

The order further finds that DETM specifically intended to report false or misleading or knowingly inaccurate market information concerning, among other things, trade prices and volume of trading in an attempt to manipulate the price of natural gas in interstate commerce, and that DETM's false reports were overt acts that furthered the attempted manipulation. According to the order, DETM's conduct constituted an attempted manipulation in violation of the CEA, which, if successful, could have affected prices of New York Mercantile Exchange (NYMEX) natural gas futures contracts. In consenting to the entry of the order and the findings in the order, DETM neither admitted nor denied the findings in the order.

The CFTC order requires DETM to pay a civil monetary penalty of $28 million as well as cease and desist from further violations of the CEA and CFTC regulations. The CFTC order further requires DETM and Duke Energy Corporation to comply with an undertaking to cooperate with the CFTC in this and related matters. The order recognizes the cooperation of DETM and Duke Energy Corporation in the investigation of this matter.

Richard Wagner, Deputy Director of the Division of Enforcement, said:

> **"This is the sixth case filed by the Commission alleging false reporting and attempted manipulation of the energy markets, and we will continue to investigate and seek to sanction, as appropriate, others who engaged in this type of conduct."**

The Commission appreciates the cooperation of the President's Corporate FraudTask Force and the National Futures Association in this matter and in the Commission's ongoing energy investigations.

This case reflects the work of the following individuals: Stephen M. Humenik, Michael Otten, Kurt Windeler, James Garcia, Lacey Dingman, Kathleen M. Banar, Michael Solinsky, Gretchen L. Lowe, Richard B. Wagner, and Vincent A. McGonagle.

To see a copy of the settlement order, go to the following Internet web address http://www.cftc.gov/

**Media Case Contact, CFTC Division of Enforcement**
Vincent A. McGonagle, Senior Deputy Director
CFTC Division of Enforcement
(202) 418-5387

# # #

---

Updated February 03, 2006

# EXHIBIT 22

**Release: 4869-03**
**For Release: November 25, 2003**
To view Reliant Energy order, click here.
To view CMS Marketing Services order, click here.

**U.S. COMMODITY FUTURES TRADING COMMISSION IMPOSES A TOTAL OF $34 MILLION IN CIVIL PENALTIES ON THREE ENERGY TRADING FIRMS**

**Reliant Energy Services, Inc. To Pay $18 Million To Settle Charges of False Reporting and Attempted Manipulation, As Well As Charges of Wash Sales**

**CMS Marketing Services & Trading and CMS Field Services To Pay $16 Million to Settle Charges of False Reporting and Attempted Manipulation**

WASHINGTON D.C. - The U.S. Commodity Futures Trading Commission (CFTC) announced today the issuance of two administrative orders filing and simultaneously settling charges of wrongdoing against three energy firms.

The first order charged **Reliant Energy Services, Inc.** (RES), a wholly-owned subsidiary of Reliant Resources, Inc., with false reporting and attempted manipulation of natural gas prices, as well as engaging in wash sales and reporting of non-*bona fide* electricity prices.

The second order charged **CMS Marketing Services & Trading** (CMS MS&T) and **CMS Field Services,** respectively, current and former subsidiaries of CMS Energy Corporation (CMS Energy), with false reporting and attempted manipulation of natural gas prices.

CFTC Chairman James Newsome stated:

***Today's announcement is further demonstration of the aggressive work that continues to effectively serve notice that this conduct will not be tolerated by the Commission.***

In commenting on these matters, CFTC Director of Enforcement Gregory Mocek said:

***The Divsion of Enforcement continues to methodically investigate and prosecute misconduct in the energy trading arena. Over the past 11 months the Commission has imposed more than $130 million in civil penalties.***

**CFTC Finds that Reliant Energy Services, Inc. (RES) Engaged In Illegal False Reporting, Attempted Manipulation and Wash Sales**

The RES order finds that from at least February 1999 through May 2002, the Houston offices of RES reported false and/or misleading information, including price and volume information, concerning natural gas cash transactions to certain reporting firms. According to the order, price and volume information is used by the reporting firms in calculating published indexes of natural gas prices for various pipeline hubs throughout the United States. Natural gas futures traders refer to the published indexes for price discovery and for assessing price risks.

The order also finds that during the relevant period, RES knowingly reported, as RES trades, trades that did not occur at RES and reported certain trades at false and/or misleading prices and/or volumes in an attempt to benefit RES. By such conduct, the order finds that RES engaged in false reporting and attempted to manipulate the price of natural gas, in violation of the Commodity Exchange Act (CEA). If successful, RES's conduct could have affected prices of New York Mercantile Exchange (NYMEX) natural gas futures contracts.

The order further finds that on seven occasions, between April and November 2000, certain traders on

RES's west power trading desk executed non-competitive, prearranged wash sales during off-exchange trading of electricity contracts, in violation of the CEA. According to the order, the trades were for the same contract, delivery point, quantity and price, executed with the same counterparty companies and counterparty traders. The order also finds that the trades were prearranged and designed to produce a wash financial result, with neither party making nor taking, nor intending to make or take, delivery or a *bona fide* position in the market or market risk. Finally, the order finds that illegal trading resulted in the reporting of non-*bona fide* prices, in violation of the CEA.

The Commission's order requires RES to pay a civil monetary penalty of $18 million as well as cease and desist from further violations of the CEA. The CFTC order further requires RES and Reliant Resources, Inc. to comply with an undertaking to continue to cooperate with the CFTC.

The order recognizes the cooperation of RES and Reliant in the investigation of this matter.

In consenting to the entry of the order and the findings in the order, RES neither admitted nor denied the findings in the order.

**CMS Marketing Services & Trading and CMS Field Services Found to Have Engaged in False Reporting and Attempted Manipulation**

The CFTC order naming CMS MS&T and CMS Field Services finds that from at least November 2000 through September 2002, CMS MS&T, located in Houston, Texas, and CMS Field Services, located in Tulsa, Oklahoma, reported false information, including price and volume information concerning natural gas cash transactions, to certain reporting firms.

The order finds that during the relevant period, CMS MS&T and CMS Field Services knowingly reported trades that did not occur and reported certain trades at false prices and/or volumes to benefit the companies. The CFTC order finds that, by such conduct, CMS MS&T and CMS Field Services engaged in false reporting and attempted to manipulate natural gas prices, in violation of the CEA. If successful, the companies' conduct could have affected prices of NYMEX natural gas futures contracts.

The activity referred to in the Commission's order predates the sale of CMS Field Services to Cantera Natural Gas, Inc. in July 2003. CMS Field Services is now named Cantera Gas Company.

In consenting to the entry of the order and the findings in the order, CMS MS&T and CMS Field Services neither admitted nor denied the findings in the order.

The CFTC order requires CMS MS&T and CMS Field Services to pay a civil monetary penalty of $16 million as well as cease and desist from further violations of the CEA and CFTC regulations. The CFTC order further requires CMS MS&T, CMS Field Services, CMS Energy Corporation, and Cantera Natural Gas, Inc., the current owner of CMS Field Services, to comply with an undertaking to cooperate with the CFTC.

The order recognizes the cooperation of CMS MS&T, CMS Field Services and CMS Energy Corporation in the investigation of this matter.

The Commission appreciates the cooperation of the President's Corporate Fraud Task Force and the National Futures Association in these matters and in the Commission's ongoing energy investigations.

The CMS subsidiaries matter reflects the work of the following CFTC staff: James Garcia, Michael Otten, Judy Lee, Meredith Wade, Kurt Windeler, Michael Solinsky, Gretchen L. Lowe, and Richard B. Wagner.

Additionally, the following CFTC staff worked on the RES action: Laura Gardy, William O. Hoar, Kurt Windeler, Maura Viehmeyer, Kim Bruno, Michael Solinsky, Kathleen M. Banar, Gretchen L. Lowe, and Richard B. Wagner.

To see copies of the settlement orders, go to the following Internet web address http://www.cftc.gov/

Media Case Contact, CFTC Division of Enforcement
**Gretchen Lowe, Associate Director**
**Washington, DC**
**(202) 418-5379**

# # #

---

Updated February 03, 2006

# EXHIBIT 23



**Commodity Futures Trading Commission**
Office of External Affairs (202) 418-5080
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

**Release: 4948-04**
**For Release: July 1, 2004**

**U.S. COMMODITY FUTURES TRADING COMMISSION IMPOSES $7 MILLION CIVIL PENALTY ON ENERGY FIRM**

**Western Gas Resources, Inc. Charged With False Reporting and Attempted Manipulation in Violation of the Commodity Exchange Act**

WASHINGTON, D.C. - The Commodity Futures Trading Commission (CFTC) announced today the issuance of an administrative order instituting and simultaneously settling charges under the Commodity Exchange Act (CEA) of attempted manipulation and false reporting against **Western Gas Resources, Inc.** (Western), based in Denver, Colorado.

The order finds that, from June 1999 through February 2001, Western reported false information, including price and volume information, to Platt's *Gas Daily* concerning natural gas cash transactions in an attempt to manipulate the price of natural gas by skewing the published indexes in an attempt to increase the financial benefit Western derived from certain spread positions Western traded in the physical marketplace.

According to the order, price and volume information is used by *Gas Daily* to calculate published surveys or indexes of natural gas prices for various hubs throughout the United States. The order also states that natural gas futures traders refer to the published indexes for price discovery and for assessing price risks.

The order finds that Western specifically intended to manipulate the price of natural gas and that Western's false reports of transaction information were the overt acts designed to complete the attempted manipulation. According to the order, Western's conduct constituted an attempted manipulation under the CEA, which, if successful, could have affected prices of New York Mercantile Exchange natural gas futures contracts.

The order further finds that from March 2001 through December 2002, Western reported false or misleading information, including price and/or volume information, to *Gas Daily* concerning natural gas cash transactions.

The order requires Western to pay a civil monetary penalty of $7 million, to cease and desist from further violations of the CEA and its regulations, and to comply with various undertakings, including an undertaking to cooperate with the CFTC in this and related matters.

In consenting to the entry of the order, Western neither admitted nor denied the findings in the order. The CFTC recognizes the substantial cooperation of Western in the investigation of this matter, and afforded substantial weight to that cooperation in its decision to accept Western's settlement offer.

The CFTC appreciates the cooperation of the President's Corporate Fraud Task Force and the National Futures Association in this matter and in the Commission's ongoing energy investigations.

**Media Contacts**
Alan Sobba
(202) 418-5080
Dennis Holden
(202) 418-5088
Office of External Affairs

**Staff Contact**
Richard Glaser
Associate Director
CFTC Division of Enforcement
202-418-5358

**Related Document**
Order

This case reflects the work of the following individuals: Michael J. Otten, Judy T. Lee, Lacey Dingman, Ted Dowd, Kim Bruno, Michael Solinsky, Kathleen M. Banar, Richard Glaser, and Richard B. Wagner.

###

Updated July 1, 2004

# EXHIBIT 24






**Commodity Futures Trading Commission**
Office of External Affairs (202) 418-5080
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

**Release: 5041-05**
**For Release: January 26, 2005**

**U.S. COMMODITY FUTURES TRADING COMMISSION SETTLES LAWSUIT WITH AMERICAN ELECTRIC POWER COMPANY AND AEP ENERGY SERVICES, INC. FOR FALSE REPORTING AND ATTEMPTED MANIPULATION IN NATURAL GAS MARKETS**

**Federal Government Collects $81 Million: Defendants Ordered to Pay $30 Million Civil Monetary Penalty to CFTC; AEP Energy Services, Inc. to Pay an Additional $30 Million to U.S. Department of Justice to Avoid Federal Criminal Prosecution, and $21 Million to the Federal Energy Regulatory Commission**

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) announced today that it has entered into a Final Judgment and Consent Order (Judgment and Order) with defendants **American Electric Power Company, Inc. (AEP)** and **AEP Energy Services, Inc. (AEPES)**, a subsidiary of AEP. The Judgment and Order entered by the U.S. District Court for the Southern District of Ohio, requires the defendants to pay a $30 million civil monetary penalty in settlement of charges that defendants falsely reported natural gas trades and attempted to manipulate natural gas prices.

Today's Judgment and Order resolves the CFTC's lawsuit against the defendants, brought on September 30, 2003, in the U.S. District Court for the Southern District of Ohio (see CFTC Release 4846-03). The CFTC's complaint charged that from at least November 2000 through October 2002, AEP and AEPES repeatedly and deliberately reported false natural gas trading information, including price and volume information, to certain firms that compile natural gas price indexes. The complaint further alleged that AEP and AEPES knowingly delivered false information to price index compilers in an attempt to skew those indexes for their financial benefit.

**AEPES Acknowledges & Accepts Responsibility for Its Wrongdoing**

Under the terms of the Judgment and Order, AEPES acknowledges and accepts responsibility for submitting knowingly inaccurate data, including incorrect volumes and/or prices, fictitious trades, or incomplete reports of actual trades, relating to one or more of the 38 delivery points or hubs for which AEPES provided information during the period. AEPES specifically acknowledges that many of the spreadsheets submitted for its Gulf Natural Gas Trading Desk contained one of more instances of false data favoring the company's financial positions and that two other trading desks covering the Northeast and Mid-Continent regions submitted knowingly inaccurate data for at least one delivery point.

The Judgment and Order mandates that AEP and AEPES cooperate fully and expeditiously with the CFTC and its Enforcement Division concerning the reporting of trade prices and/or volumes to energy reporting services and price indexes.

**AEPES Pays Additional $30 Million Penalty to Avoid Criminal Prosecution by Federal Prosecutors**

In addition to settling charges brought by the CFTC, AEPES entered into a deferred

**Media Contacts**
Alan Sobba
(202) 418-5080
Dennis Holden
(202) 418-5088
Office of External Affairs

**Staff Contact**
Gregory Mocek
Director
CFTC Division of Enforcement
Washington, D.C.
(202) 418-5378

**Related Document**
Order

prosecution Agreement (Agreement) with the U.S. Department of Justice and the U.S. Attorney's Office for the Southern District of Ohio to avoid federal criminal charges. The Agreement requires AEPES to pay an additional $30 million dollar criminal penalty to resolve an investigation into AEPES' false reporting of natural gas trades. The Agreement provides that should AEPES commit any federal crime within a fifteen-month probationary period, federal prosecutors could charge AEPES for any federal crime it commits, including the false reporting and attempted manipulation alleged in the Commission's complaint.

**AEP to Pay a Further Civil Penalty of $21 Million to FERC**

Also today, the Office of Market Oversight and Investigations of the Federal Energy Regulatory Commission (FERC) announced that it has entered into a Stipulation and Consent Agreement with AEP, AEPES, and American Electric Power Service Corporation, another subsidiary of AEP, under which AEP will pay a further civil penalty of $21 million to settle claims that former AEP affiliates Jefferson Island Storage and Hub, LLC and Louisiana Intrastate Gas Company violated FERC regulations.

**Comment by CFTC Acting Chairman Sharon Brown-Hruska**

> "The derivatives markets play a significant role in our economy. Over the last three years, we aggressively pursued a large number of companies and individuals who committed illegal acts that either affected or could have affected natural gas markets. As of today, the Commission has assessed nearly $300 million in penalties against a number of those that we have investigated. Our enforcement actions send a clear signal that market abuses will not be tolerated," said Acting Chairman Sharon Brown-Hruska.

**CFTC Enforcement Director Gregory Mocek Comments**

Commenting on the settlement, CFTC Director of Enforcement Gregory Mocek stated:

> "The $81 million penalty assessed today reflects the gravity of the defendant's illegal conduct in the natural gas markets. I applaud the extensive efforts of our enforcement staff to expose the company's wrongdoing, as well as their efforts in assisting the Department of Justice and FERC. Over the last three years, corporate compliance departments have changed their controls and the way they report sensitive market information. It is obvious that our diligent enforcement actions in this area have had a positive impact on the veracity of traders."

The Commission would like to thank the Department of Justice and FERC for their ongoing cooperative efforts in pursuing illegal conduct in the energy markets. Additionally, the following CFTC Division of Enforcement staff were responsible for this case: Gregory Compa, Nancy Gogel, Michael McLaughlin, Armand Nakkab, Karin Roth, David W. MacGregor, Lenel Hickson, Jr., Stephen J. Obie, Richard Wagner, and Vincent McGonagle.

###