UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| U.S. Commodity Futures Trading Commission, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Misc. No. 1:06MS00210 (RCL) |
| | ) | |
| Michael Whitney, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S REPLY TO MCGRAW-HILL'S OPPOSITION TO
THE MOTION TO COMPEL THIRD PARTY TO PRODUCE
DOCUMENTS IN RESPONSE TO SUBPOENAS *DUCES TECUM*
AND OPPOSITION TO CROSS-MOTION FOR PROTECTIVE ORDER**

### I.    Introduction

On May 26, 2006, third party The McGraw-Hill Companies, Inc. ("McGraw-Hill") submitted an opposition to the motion to compel McGraw-Hill to comply with four subpoenas *duces tecum* filed by the U.S. Commodity Futures Trading Commission ("Commission"). Contemporaneously, McGraw-Hill moved the Court for a protective order governing the scope and use of any documents it may be compelled to produce to the Commission. The Commission submits this reply to McGraw-Hill's opposition to the motion to compel, and opposition to McGraw-Hill's Cross-Motion for Protective Order.

Throughout its 41 page submission, McGraw-Hill repeats four themes: that the qualified reporter's privilege applies to the documents at issue; that the Commission does not need the information it seeks; that production of the documents without protection will harm McGraw-Hill; and that the Commission is dismissive of McGraw-Hill's concerns. McGraw-

**RECEIVED**

JUN - 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Hill's contentions, however, are unwarranted, and the points of disagreement that bring the parties before the Court are less stark.

The Commission demonstrated that the categories of information it seeks from McGraw-Hill go to the heart of the matter -- that is, the investigation and prosecution of false price reporting in the natural gas markets. In addition, having pursued the records from the entities and individuals who reported the trade data to Platts, first, the Commission exhausted the only alternatives available to obtain the information. Thus, the Commission approached its negotiations with McGraw-Hill, and now comes to this Court, from the perspective that the privilege is overcome. From this vantage point, the Commission suggests that the discussion is appropriately focused on whether McGraw-Hill has shown that production of its records absent a protective order will harm the company, and if so, striking a balance between the harm to McGraw-Hill of unlimited production and the burden to the Commission of limited production. The question of whether the Commission truly needs the information to prosecute these false reporting actions has already been answered in the affirmative.

In its negotiations with the Commission, and here, McGraw-Hill asserts that a protective order is necessary to preserve its confidential reporter/source relationships and to prevent disclosure of Platts' proprietary editorial process which, McGraw-Hill claims, is revealed in the spreadsheets the Commission seeks. Neither harm, however, even if real, is implicated by the requested records. The expectation of confidentiality that McGraw-Hill seeks to protect was predicated on sources' concern that their trade data not be disseminated to their competitors -- i.e. other natural gas traders. The assertion, then, that disclosure of four-year old trade data to a regulator will have a chilling effect on McGraw-Hill's relationships with its sources, rings hollow. *See U.S. v. Exxon Co.*, 94 F.R.D. 250, 251-52 (D.D.C. 1981) (finding that

2

the defendant failed to show the specific harm of producing stale data); *Deford v. Schmid Prod. Co.*, 120 F.R.D. 648 (D.Md. 1987) (citations omitted) ("While staleness of the information sought to be protected is not an absolute bar to issuance of an order, it is a factor which must be overcome by a specific showing of present harm. Speculative allegations of injury from the disclosure of years-old information are not sufficient to warrant issuance of a protective order").

The assertion of protected trade secrets fares no better. McGraw-Hill argues that disclosure of its spreadsheets, wherein it aggregates the trade data it solicits from market participants, will reveal its editorial process of creating its indices. However, as McGraw-Hill previously and publicly represented, the editorial process is not the accumulation of the data reflected in the spreadsheets, or even the results of the statistical analyses of that data (e.g. weighted average). Rather, the so called editorial process is the experience McGraw-Hill editors bring to bear to determine which number to choose as the index price. Nowhere is this process captured in the requested documents. McGraw-Hill further suggests that the spreadsheets are made up of data from confidential sources, and the sources' data itself (i.e. the trades and pricing assessments) reveals the publications editorial operations and mechanisms. The argument, however, is nothing more than a claim that McGraw-Hill's documents, which contain the sources' identities constitute customer lists. However, readily ascertainable customer lists based on publicly available information, like those at issue here, are not protected trade secrets.

## II.    Argument

### Reply to McGraw-Hill's Opposition to Motion to Compel

McGraw-Hill directs its first line of attack to what it describes as the Commission's overreaching, arguing to the Court that the information sought is cumulative,

peripheral and based on conjecture, and belies a fundamental misunderstanding of the qualified

reporter's privilege and what it takes to overcome the privilege. The Commission disagrees.

A.    **The Information the Commission Seeks Goes to the Heart of the Matters and the Commission Exhausted Reasonable Alternatives Available to Obtain it**

In support of the Commission's position that it overcomes the qualified reporter's

privilege with respect to the information sought in this action, the Commission cites, *inter alia*,

to the Court's finding that the Commission overcame the privilege in a separate action involving

a different energy company. *See CFTC v. The McGraw-Hill Companies, Inc.*, 390 F.Supp. 2d 27

(D.D.C. Oct. 4, 2005) ("Subpoena Enforcement Action"). The Commission, however, does not

cite to the Court's October Order for the proposition that the Court already determined that the

information the Commission now seeks goes to the heart of the specific matters filed in Texas,

Ohio, Oklahoma and Colorado. Rather, the Commission contends that the Court's prior

consideration of the importance of the same categories of information for use by the Commission

for the same purposes all but necessitates a finding that the privilege is overcome here.

The Commission's prosecution of the individual defendants at issue here is part of

a broader investigation the Commission undertook of price reporting in the natural gas markets.

As a result of that investigation, which to date has resulted in public settlements with more than

twenty energy marketing companies, the Commission uncovered evidence that natural gas

traders caused false information about natural gas transactions to be submitted to companies that

compile index prices in attempts to manipulate the price of natural gas. The conduct that the

Commission contends violates the Commodity Exchange Act is (i) the knowing delivery of false

trade data to index compilers, and/or (ii) the knowing delivery of false trade data to index

compilers for the purpose of causing the index prices to publish artificially high or low, thereby

benefiting positions tied to the index. Similarly, the manner in which the Commission has

proven, or intends to prove at trial, that a company or an individual's conduct violated the Act is largely uniform, i.e., (i) compare the actual trades with the trades reported to the index compiler and (ii) show that the trader knew what information the index compiler wanted and did not want, and, in the case of false reporting with an attempt to manipulate, (iii) show that the trader specifically intended to submit false information, and, for a perfected manipulation, (iv) show that the false information impacted the index price. Finally, the categories of information the Commission seeks, or sought, from McGraw-Hill for each company and/or individual is roughly the same; is sought for the same purpose; and is sought only after first exhausting efforts to secure the information from the companies and/or individuals.

Against this backdrop, the Court's finding that the categories of information sought by the Commission in the Subpoena Enforcement Action go to the heart of the matter against Energy Company necessitates a finding in this action that the same categories of information sought by the Commission from McGraw-Hill for the same purposes go to the heart of the matters in Texas, Ohio, Oklahoma and Colorado. Similarly, the Court's finding that the Commission exhausted all reasonable alternatives available to obtain the information about Energy Company's price reporting practices by first seeking the information from the company (through documents and testimony) similarly guides the outcome in this action.[1]

**B.    The Distinction McGraw-Hill Seeks to Draw between the Commission's Investigation and Prosecution of False Reporting is not Material here**

McGraw-Hill argues that "[t]he CFTC currently stands well beyond the investigatory stages of its proceedings against the energy companies and their employers who

---

[1]    The Commission's investigations of Duke, AEP, CMS and Western, the companies for whom the individual defendants were previously employed, was no less exhaustive than the investigation the Commission undertook of Energy Company. Furthermore, before reaching out to McGraw-Hill in the underlying actions, the Commission sought many of the documents at issue here directly from the individual defendants under Federal Rule of Civil Procedure 34.

allegedly submitted false price reports to Platts . . . [and thus] [t]he CFTC can on longer rely on

its investigatory mandate for the issuance of broad administrative subpoenas." Opposition and

Cross-Motion for Protective Order at p.28. The Commission is not unmindful of the distinction

generally between investigation and prosecution of allegedly wrongful conduct. Indeed, as the

Commission previously argued to this Court, the government's investigative authority is broad,

allowing an agency like the Commission to pursue information "merely on suspicion that the law

is being violated, or even just because it wants assurance that it is not." *United States v. Morton

Salt Co.*, 338 U.S. 632, 642-43 (1950). The distinction, however, is of no import here given the

record before the Court in the Subpoena Enforcement Action.

On October 19, 2005, McGraw-Hill asked the Court to reconsider its October 4,

2005 order, arguing that "the Court's findings about what the CFTC *needs* for its investigation

do not justify enforcement of *all* of the wide-ranging requests for information laid out in the

Subpoena . . ." *See Memorandum of Points and Authorities in Support of Respondent's Motion

to Clarify this Court's October 4, 2005 Order*, p.2, Misc. No. 05-235 (RCL) (Docket 16). The

Commission opposed the motion, pointing out that McGraw-Hill's demand for reconsideration

ignored the fact that

> the information the Commission seeks from McGraw-Hill, and which the Court ordered
> the company to produce, is necessary not only to determine whether Energy Company's
> false submissions resulted in an artificial price, but also potentially to prove as a matter of
> law that the submissions were the proximate cause of an artificial price. These are not
> the same inquiries and they periodically require different information to prove.

*See Applicant U.S. Commodity Futures Trading Commission's Opposition to Respondent's

Motion to Clarify this Court's October 4, 2005 Order*, p.2, Misc. No. 05-235 (RCL) (Docket 17)

(October 31, 2005). The Commission then articulated how it intended to use the requested

information to litigate false reporting cases, *i.e.*, like those filed in Texas, Ohio, Oklahoma and

Colorado. On December 2, 2005, the Court denied McGraw-Hill's motion finding,

> the Opinion's discussion of the CFTC's investigatory needs did not purport to be
> exhaustive or exclusive. This Court considered the CFTC's need for the information
> to the extent that the parties then litigated it. Neither the parties nor the Court engaged in
> the kind of detailed discussion that McGraw-Hill now seeks to initiate. The CFTC's
> expanded discussion of its needs in the Opposition to the Motion to Clarify reveals the
> complex nature of the investigation and further buttresses the reasonableness of the
> subpoena.

*CFTC v. The McGraw-Hill Companies, Inc.*, 403 F.Supp. 2d 34, 38 (D.D.C. Dec. 2, 2005).

In sum, the Commission did not come to the Court in the Subpoena Enforcement

Action seeking information from McGraw-Hill based on a mere suspicion that natural gas traders

were violating the Commodity Exchange Act. Nor did the Court find that the Commission

overcame the reporter's privilege based simply on deference to the government's broad

investigatory powers. As such, McGraw-Hill's attempt to distinguish the Court's ruling in the

Subpoena Enforcement Action as applying only to the investigative context is misplaced.

## C.    McGraw-Hill is not the Gatekeeper of the Information The Commission Requires to Prosecute these False Reporting Actions

Mindful that the Court previously "encourage[d] the parties to continue to work

together in good faith toward the common goal of protecting the public interest in truthful news

reporting," 403 F.Supp. 2d at 38, McGraw-Hill devotes much of its opposition to chastising the

Commission for "utterly refusing to negotiate with McGraw-Hill" despite the company's efforts

to craft a proposal "designed to assist the CFTC in making its way through the hurdles" the

Commission identifies. Contrary to McGraw-Hill's depiction, the Commission is not dismissive

of McGraw-Hill's efforts. Rather, it objects to McGraw-Hill's continued insistence that the

Commission demonstrate to McGraw-Hill's satisfaction that its need for information is real.

To illustrate this point, during the negotiations, McGraw-Hill indicated that it would only provide the Commission with information pertaining to price reporting to Platts' *Gas Daily* in the context of the Oklahoma action. In support, McGraw-Hill noted that the Commission's complaint did not reference false reporting to Platts' monthly publication, *Inside FERC's Gas Market Report*. *See* Oklahoma Complaint attached as <u>Exhibit 1</u> to Supplemental Declaration of Anthony M. Mansfield ("Supp. Mansfield Declaration"). Counsel for the Commission pointed out that McGraw-Hill's reading of the complaint was inaccurate and confirmed that the Commission's evidence in the Oklahoma action included false reporting to *Inside FERC*.[2] *See, e.g.*, Complaint at ¶ 6; Supp. Mansfield Declaration, <u>Exhibit 1</u> ("On numerous occasions during the relevant period, Bradley knowingly submitted false, misleading or knowingly inaccurate transaction information regarding hundreds of natural gas transactions to multiple natural gas reporting firms, including but not limited to Gas Daily, Btu Daily, NGI and Natural Gas Week . . ."). Thereafter, McGraw-Hill represented that it would produce information pertaining to *Inside FERC* pursuant to its proposed process for production. *See* Supp. Mansfield Declaration, <u>Exhibit 2</u>. However, despite the above exchange, McGraw-Hill now argues that

> The complaint against Bradley and Martin is similarly focused only on *Gas Daily*, although counsel for the CFTC in that case insists upon discovery of all submissions made by CMS (defendants' former employer) to *Inside FERC* as well, even though he has no reason to believe that these defendants submitted any trades, never mind false trades, to *Inside FERC*.

Opposition and Cross-Motion for Protective Order (D.C. action), p.25.

During the hearing in the Subpoena Enforcement Action, the Commission argued that McGraw-Hill is not appropriately cast as the gatekeeper of the information at issue. That

---

[2]    The Commission will provide the Court with examples of the false reports defendant Bradley caused to be submitted to *Inside FERC* upon request.

8

role is for the court and the court alone. Nevertheless, McGraw-Hill insists on filling this role, challenging not only the Commission's need for the information and the thoroughness of its efforts to secure the information elsewhere, but even the credibility of the Commission's representations to McGraw-Hill. Under these circumstances, negotiations were bound to fail.

### D.    The Wording of the Specific Document Requests is Appropriate

As it has done previously, McGraw-Hill seeks to find fault with the subpoenas "vague and overbroad language." As one example, McGraw-Hill points to the fact that the subpoenas do not just ask for the trade data submitted by the defendants, but rather "all documents received by McGraw-Hill . . . from any employee or agent of [energy company]." This language is intended to insure that the Commission secures the trade data the defendants directly or indirectly submitted or caused to be submitted to Platts.

By way of example, Joseph Foley, the defendant named in the Ohio action, supervised other natural gas traders as the head of the Gulf Desk at AEP Energy Services, Inc. In the Commission's complaint, it alleges that Foley "engaged in a pervasive and widespread scheme to violate the Act by (i) directing those he supervised to deliver to firms such as Platts . . . false or misleading or knowingly inaccurate reports . . ." *See* Ohio Complaint, ¶ 23, Supp. Mansfield Declaration, Exhibit 3. Foley, however, did not himself forward the reports to Platts, but rather instructed others to do so. Given this fact, Request No. 1 of the Commission's subpoena in the Ohio action, of necessity, seeks the documents McGraw-Hill received "from any employee or agent of AEP."

As another example, in the Texas action, the Commission alleges that defendant, Michael Whitney "knowingly submitted, or caused to have submitted, to the reporting firms, among other things, fixed price, physical natural gas trades he had executed on behalf of DETM

9

but with the prices and/or volumes altered." Complaint, ¶ 5 attached as <u>Exhibit 1</u> to

Supplemental Declaration of Michael J. Otten ("Supp. Otten Declaration") submitted herewith.

However, on most occasions, Mr. Whitney's false reports were submitted to companies that

compile natural gas index prices, like Platts, by other employees of DETM -- *e.g.*, support staff.

*See* Supp. Otten Declaration, ¶ 2. Thus, Request No. 1 of the subpoena the Commission caused

to be served on McGraw-Hill in the Texas action seeks "[a]ll documents received by McGraw-

Hill during the relevant time period from any employee or agent of Duke, including but not

limited to Michael Whitney . . ." *Id.* at ¶ 3.

Thus, far from being vague and overbroad, the Commission's requests allow for

the very real possibility that simply asking for documents relating to the defendants may not

capture the information that is relevant to the Commission's prosecution of the defendants.

### E.      The Scope of the Information Sought is Warranted

In a similar vein, McGraw-Hill argues that many of the Commission's requests

are unduly burdensome because the scope of the requests is "truly vast." McGraw-Hill grossly

oversells the burden. Request No. 1, which is largely uniform across the four subpoenas, offers a

good example. According to McGraw-Hill,

> The burden imposed by this request inheres in the fact that McGraw-Hill does not keep
> "all documents" containing trade data in one place, organized by company submitting the
> information. Thus finding all such documents could require extensive searches of many
> employee email accounts and paper files . . .

Opposition and Cross-Motion for Protective Order (D.C. action), p.35. McGraw-Hill, however,

fails to note that it raised this concern during the negotiations that preceded this action, and the

Commission addressed it (or so it thought) to McGraw-Hill's satisfaction.

During those discussions, McGraw-Hill pointed out that in order to "certify" that

it had complied with the request, the company would literally have to comb through every

computer hard drive and every file cabinet in Platts' offices, an undertaking that would require

tremendous time, effort and expense. In response, Commission staff assured McGraw-Hill that it

did not expect the company to engage in a search of this magnitude, that no such certification

was required, and that reasonable efforts to locate the reports submitted to Platts would suffice.

*See* Declaration of David W. MacGregor submitted herewith.

        With regard to issues such as these, the Commission has always been, and will

continue to be, prepared to work with McGraw-Hill in an effort to mitigate the burden of any

production on the company.[3]

### F.    McGraw-Hill's Documents are not Cumulative and Peripheral Simply Because the Commission May Prove or Rebut Claims by Different Means

        In response to Commission's stated need for records to rebut what McGraw-Hill

now blithely characterizes as the "I didn't understand defense," McGraw-Hill argues that there

are numerous ways to debunk such a defense. Thus, McGraw-Hill offers, the records the

Commission seeks are cumulative and peripheral. The vagaries of trial practice, however, do not

lend themselves to this conclusion.

        According to McGraw-Hill, the Commission may demonstrate that the defendants

knew what information Platts required "through testimony of what the defendants' colleagues

understood was called for, as well as the methodologies published by McGraw-Hill and the

---

[3]     McGraw-Hill made essentially the same argument in the Subpoena Enforcement Action. *See* Affidavit of Larry Foster, ¶ 13 attached as Exhibit A to the Amended Declaration of Victor A. Kovner (filed 7/19/05) (Doc. 7) ("Since information from the Energy Companies was gathered via facsimile, email, and phone interviews, complying with this request would require Mr. Doolan and several other Platts reporters to spend hundreds of hours combing through document files, email files, phone records, reporter's notebooks, and other files."). In the Court's October 4, 2005 order, it held, "[w]hile this Court is unpersuaded that McGraw-Hill's general complaints of the tediousness of compliance meet the undue burden standard, this Court does agree that some of the Requests are excessively broad on their face and technically call for a larger volume of data than may have been intended by the CFTC. To the extent that these Requests are unduly burdensome, this Court will modify them as explained *infra* Section, II.C and in the accompanying Order. As modified, the Subpoena does not impose an impermissible burden on McGraw-Hill." *The McGraw-Hill Companies, Inc.*, 390 F.Supp. 2d at 35 (emphasis supplied). The four subpoenas now before this Court are drafted so as to track the Court's modifications.

monthly email reminders sent by McGraw-Hill, both of which indicate what was called for."

Opposition and Cross-Motion for Protective Order (D.C. action), p.29. The Commission shares

McGraw-Hill's view that each avenue is a potentially relevant source of evidence to prove

knowledge. However, the Commission rejects the notion that any one source, alone, will

inevitably be sufficient for the Commission to meet its burden. To the contrary, in prosecuting

its cases, the Commission is entitled to demonstrate that the weight supports a finding that the

defendants' conduct was knowing. Taking each in turn, while the defendants' colleagues would

appear to be a fruitful source of evidence, experience in the natural gas investigations teaches

that traders are loath to testify against one another. Any inquiry, then, directed to a trader's

understanding about what Platts wanted is typically met with "I don't recall." Referring to the

email reminders, these documents offer a clear and compelling recitation of the information

Platts did, and did not, want. However, as McGraw-Hill points out, they do not identify the

recipients. Rather, individual traders were listed as "blind carbon copies." Finally, while the

published methodologies thoroughly explain the information Platts required, traders inevitably

profess never to have seen them.

In short, while the email reminders and published methodologies provide

important building blocks in the Commission's cases, they are not necessarily the only building

blocks. Their production, therefore, cannot serve as a basis to preclude Commission access to

other relevant information sought here, particularly where, as a litigant, the Commission needs to

show a finder of fact that the weight of the evidence is in its favor.

### G.     The Commission's Need for the Documents is not Based on Conjecture

Seizing upon the Commission's reference to use of McGraw-Hill's documents to

rebut "anticipated" defenses, McGraw-Hill accuses the Commission of "conjur[ing] several

12

intended uses that clearly fall outside of the matters that can be said to go to the heart of the matters raised in the underlying actions." Opposition and Cross-Motion for Protective Order (D.C. action), p.29. Through other litigation, McGraw-Hill well knows that the documents sought here are relevant to claims of false reporting and false reporting in an attempt to manipulate the price of natural gas.

Separate from McGraw-Hill's efforts to evade the government's requests for information pertaining to price reporting in the natural as markets, the company has worked diligently to fend off attempts by the parties to a class action lawsuit filed in the Southern District of New York to secure similar information. The plaintiffs in the action are traders on the New York Mercantile Exchange who claim to have been injured by artificial natural gas prices. The defendants are a laundry list of energy companies (including the defendants' former employers), who reported trade data to, *inter alia*, Platts. As part of that action, the defendants subpoenaed McGraw-Hill for records. McGraw-Hill moved to quash the subpoena. In opposition to McGraw-Hill's motion, the defendants argued,

> Whether any alleged false reporting by any of the Defendants to the Publications during the Class Period had any impact on the published indices of natural gas spot prices at trading hubs through the country – a predicate to an assessment of whether the published indices in turn had an impact on NYMEX prices – is a central issue in this case. It is impossible to determine the effect of a Defendant's submissions to the Publications on a single one of the published index prices <u>without knowing the other prices and volumes submitted and included by the Publications in the calculation of the index.</u>

*Memorandum of Law in Opposition to the Motion of McGraw-Hill Companies, Inc. and the Motion of Intelligence Press, Inc. to Quash Defendants' Subpoena Duces Tecum*, p.7, *In Re: Natural Gas Commodity Litig.*, 03 Civ. 6186 (S.D.N.Y. Jan. 12, 2005) (emphasis supplied).[4]

---

[4]    *See also*, letter from Stephanie Goldstein (on behalf of the defendants) to Magistrate Judge Andrew J. Peck dated September 2, 2005, Civil Action No. 03-CV-6186, pp. 4-5 ("It is thus likely that reports to the Publications during the Class Period, other than those of Defendants, were 'false' as defined by Plaintiffs. *See infra* at p.6. Without identifying the names of all reporting entities, Defendants will be unable to ascertain which other reporting

A defense predicated on the lack of any impact of a given defendant's false reporting on the index prices, thus, has been squarely raised in other actions, and the Commission's need for information to rebut such "anticipated" defenses, should it conclude that it is appropriate to allege perfected manipulation, is inappropriately characterized as conjecture.[5]

## H.   The Absence of Claims for Perfected Manipulation are the Result of McGraw-Hill's Unwillingness to Produce the Requested Information

In the Subpoena Enforcement Action, McGraw-Hill argued that its records did not go to the heart of the matter because the Commission had not put forward evidence of a perfected manipulation.  The Commission responded that evidence of a perfected manipulation, if any, resided solely with McGraw-Hill in the form of the spreadsheets Platts used to aggregate the trade data it solicited from survey participants and calculate its index prices.  In response, this Court ordered McGraw-Hill to produce the spreadsheets, finding that "Platts' formulas are crucial for determining whether Energy Company's false reporting did, or could have, had an effect on prices." *The McGraw-Hill Companies, Inc.*, 390 F.Supp. 2d at 34.

Nevertheless, McGraw-Hill incredibly features as "notable" the fact that none of the defendants in the underlying cases are charged with having actually succeeded in manipulating either a McGraw-Hill index or the price of natural gas in general.  Far from notable, it is consistent with the Commission's earlier position that it cannot determine whether a given defendant successfully manipulated the price of natural gas without first reviewing the spreadsheets Platts used to compile its index prices.

---

entities provided 'false' information to the Publications during the putative Class Period (and which information would also not be reliable in any reconstructed indices), what effect that 'false' information may have had on the relevant indices, and which of those entities are putative class members who would be barred from recovery by an unclean hands or other equitable defense.").

[5]     Addressing the other "anticipated defense" the Commission identifies, i.e. "editorial discretion," McGraw-Hill notes that the US Attorneys' Office downgraded from 90% to 75% its estimate of the percentage of time the Platts index price was the weighted average price.  Again, this goes to the weight, and not the relevance, of the evidence the Commissions seeks from McGraw-Hill.

As the Commission noted in its original motion, in order to allege a count for perfected manipulation against any of the defendants, the Commission must have a good faith basis to believe that the false information a defendant submitted or caused to be submitted to Platts was used by Platts and resulted in an artificial price. Only Platts can confirm whether it used the false information, and only the Platts' spreadsheets will show the impact of the false trade data on the Platts index prices. Acknowledging the Commission's predicament, the district courts in the Southern District of Texas and the Northern District of Oklahoma have stayed and/or extended the discovery deadlines to allow the Commission, *inter alia*, an opportunity to secure and analyze the information it requires to determine whether claims for perfected manipulation exist. *See* Supp. Mansfield Declaration, <u>Exhibits 4</u> and <u>5</u>.

I.    **The Commission's Notice of Dismissal of the Subpoena Enforcement Action in the Southern District of Texas does not Impact this Action**

Finally, McGraw-Hill refers the Court to a recent order by the United States District Court for the Southern District of Texas dismissing *with prejudice* an action the Commission filed against McGraw-Hill to enforce an investigatory subpoena in which the Commission sought, *inter alia*, documents pertaining to Duke, AEP, CMS and Western. *See* Dismissal Order, *CFTC v. The McGraw-Hill Companies, Inc.*, Misc. Action No. H-03-187 (S.D. TX March 30, 2006) (Doc. 35). McGraw-Hill questions whether the Texas court's order precludes the Commission from pursuing documents from McGraw-Hill in this action. The answer is no.

The subpoena which the Commission sought to enforce in Texas was an investigatory subpoena, which sought information pertaining to false reporting by a number of energy companies. In contrast to the subpoena at issue in this action, the Commission's request pertained to the price reporting practices of all natural gas traders employed by the underlying

energy companies. Further, the request covered a broader time period (January 1, 1999 to February 7, 2003). Finally, the request sought broader and different categories of information.[6]

Furthermore, although the Texas court's order of dismissal was *with prejudice*, it was done so in response to the Commission's *Notice of Dismissal* rather than on the merits. Pursuant to Federal Rule of Civil Procedure 41(a)(1), an action may be dismissed "(i) by filing a notice of dismissal at any time before service by the adverse party of an answer . . ." Fed.R.Civ.P. 41(a)(1)(i). "Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice . . ." *Id.* No answer was filed in the Texas Subpoena Enforcement Action. Thus, the Commission's Notice of Dismissal was *without prejudice*. *See D.C. Electronics, Inc. v. Narton Corp.*, 511 F.2d 294 (6th Cir. 1975) (the provision of Rule 41 allowing dismissal by the plaintiff prior to service by the adverse party of an answer or of a motion for summary judgment is clear and unambiguous on its face and admits no exceptions; the court has no function under this provision other than to determine, should the question arise, whether the answer or motion for summary judgment in fact has been filed prior to the filing of the notice of dismissal); *Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters*, 506 F.2d 914, *cert. denied*, 95 S.Ct. 2665, 422 U.S. 1048, 45 L.Ed.2d 700 (1975) (allowing plaintiff to dismiss case by notice even though plaintiff had argued and lost motion for preliminary injunction); *Foss v. Federal Intermediate Credit Bank of St. Paul*, 808 F.2d 657, 659-60 (8th Cir. 1986) (citation omitted) ("Obviously, Rule 41(a)(1)(i) dismissals will no longer be self executing, as intended, if there is

---

[6]     *See, e.g., Request No. 1* ("All documents relating to Michelle Markey, a former McGraw-Hill employee, concerning price and volume information reporting to energy industry publications"); *Request No. 2* ("All documents relating to Michelle Markey, a former McGraw-Hill employee, concerning communications regarding the gathering and the verification of price and volume information provided to energy industry publications"); *Request No. 3* ("All documents relating to David Behrman, a former McGraw-Hill employee, concerning price and volume information reporting to energy industry trade publications"); *Request No. 12* ("All documents relating to any internal audit or investigation conducted by, or on behalf of, McGraw-Hill or its Board of Directors or any other agent or employee of McGraw-Hill concerning the transmission and receipt of price and volume information").

16

to be frequent judicial intervention for the purpose of determining whether the 'equivalent' of an answer or a motion for summary judgment has been served or for the purpose of weighing whether the merits have been sufficiently considered by the court to warrant terminating the plaintiff's right to dismiss the proceedings.").[7]

## The Commission's Opposition to Cross-Motion for Protective Order

On May 19, 2006, McGraw-Hill notified this Court that it intended to file a motion for protective order, governing documents the Court may compel McGraw-Hill to produce pursuant to subpoenas served by the Commission in the Texas, Ohio, Oklahoma, and Colorado actions. On the same day, McGraw-Hill filed a motion for protective order in the Northern District of Oklahoma, governing documents this Court may compel McGraw-Hill to produce to the Commission in the Oklahoma action.

On May 26, 2006, McGraw-Hill filed its motion for protective order in this Court, as represented. On May 31, 2006, the Oklahoma court (McCarthy, MJ) held a hearing on McGraw-Hill's motion. Before proceeding to the merits of McGraw-Hill's request, the Oklahoma court invited McGraw-Hill to withdraw its motion in deference to the same request pending before this Court (given McGraw-Hill's stated preference that the issues be consolidated in one court and its concern about the possibility of inconsistent rulings). McGraw-Hill declined and the Oklahoma court proceeded with oral argument. The Oklahoma court has taken McGraw-Hill's request under advisement. Despite the proceedings in Oklahoma, McGraw-Hill presses its request for the same relief in this Court. The Commission responds accordingly.

---

[7]    Even if the Texas court had the authority to dismiss the action with prejudice, it was required to give the Commission notice of its intention to do so and a chance to withdraw the request and proceed with the litigation. *See Choice Hotels Int'l, Inc. v. Goodwin & Boone*, 11 F.3d 469, 471, n.1 (4th Cir. 1993) ("When a plaintiff requests dismissal without prejudice and the district court intends to dismiss with prejudice, however, the district court must give the plaintiff notice of its intention and a chance to withdraw the request and proceed with litigation."); *Jaramillo v. Burkhart*, 59 F.3d 78 (8th Cir. 1995) (same).

Rule 26 of the Federal Rules of Civil Procedure, pursuant to which McGraw-Hill ostensibly moves for protective orders, provides that "for good cause shown" the court "may make any order which justice requires to protect a party or person from . . . undue burden . . ." Fed.R.Civ.P. 26(c). "[I]t is the movant's burden to articulate specific facts showing 'clearly defined and serious injury' resulting from the discovery sought." *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 226 F.R.D. 56, 57 (D.D.C. Jan. 21, 2004) (citation omitted). McGraw-Hill fails in this regard.

### A.    The Requested Orders are not Necessary to Protect the Confidentiality of McGraw-Hill's Relationships with its Sources

Citing to the Court's finding that the journalist's privilege applies to the categories of documents at issue here, *see The McGraw-Hill Companies, Inc.*, 390 F.Supp. 2d 27, McGraw-Hill seeks a protective order intended to balance the Commission's need for McGraw-Hill's documents and McGraw-Hill's "confidential" reporter/source relationships. The balance, however, has already been struck.

The reporter's privilege, by definition, is qualified. Thus, the privilege "does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Branzburg v. Hayes*, 408 U.S. 665, 682-83 (1972) (citation omitted). Recognizing, then, that competing interests are at play, a court in deciding whether the privilege is overcome must balance the fundamental principle that the public has a "right to everyman's evidence" with the also important principle of "unfettered communication of information by the journalist to the public." *von Bulow v. von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed. 498 (1987). Therefore, an entity seeking to overcome the privilege must demonstrate that the information sought "goes to the heart of the matter" and that it has "exhausted every reasonable alternative source of

18

information." *Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981). In other words, a court

considering whether the privilege is overcome, in effect, engages in the same balancing of harms

that a court undertakes in determining whether a protective order should issue. *Cf. In re*

*Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 1980 U.S. Dist. LEXIS

17088 *3-4 (W.D. Okl. 1980) ("Rule 26(c)(2), *Federal Rules of Civil Procedure*, provides in part

that for good cause shown and to protect a party or person from 'undue burden or expense,' the

federal district courts may order that discovery be had only on specified terms and conditions . . .

Such determination must also include a consideration of relative hardship to the non-moving

party should the protective order be granted.").

       In the Subpoena Enforcement Action, this Court was called upon to consider the

Commission's petition to compel McGraw-Hill to produce roughly the same categories of

information for use by the Commission for the same purposes. Balancing the Commission's

need for the requested information to prosecute wrongful conduct in the natural gas markets, and

McGraw-Hill's interest in preserving its confidential relationships, the Court concluded that

McGraw-Hill must produce records to the Commission, but a more limited universe of

information than requested in the underlying subpoena -- i.e. "that discovery be had only on

specified terms and conditions." *The McGraw-Hill Companies, Inc.*, 390 F.Supp. 2d at 35-36.

Asked by McGraw-Hill to revisit its finding, the Court subsequently held that "[t]he CFTC's

expanded discussion of its needs [] reveals the complex nature of the investigation and further

buttresses the reasonableness of the subpoena." *The McGraw-Hill Companies, Inc.*, 403 F.Supp.

2d at 38. McGraw-Hill's motion for a protective order is, thus, like a request for a "do-over."[8]

---

[8]     Again, the four subpoenas before this Court were drafted so as to track the modifications the Court ordered
in the Subpoena Enforcement Action.

Even if this were not the case, the "confidential" relationships McGraw-Hill enjoys with its "sources" will not be chilled by production of the requested information absent the protections McGraw-Hill requests. In an affidavit McGraw-Hill previously submitted to the Court, Kelley Doolan, Chief Editor of Inside FERC's Gas Market Report ("*Inside FERC*") described the nature of the confidential relationships at issue here. He stated,

> With the emergence of a spot market in natural gas in the 1980's, *Inside FERC* first undertook efforts to report on prices in that market. Because spot transactions took place between private parties in the gas industry, *Inside FERC* faced substantial hurdles in its efforts to obtain prices and other information to include in its reporting. This difficulty arose in large part because the parties who entered into spot transactions had concerns that, if the details of their transactions were revealed, the parties would be at a competitive disadvantage in the market. Sources and potential sources repeatedly expressed such concern to *Inside FERC*.

*See Declaration of Kelley Doolan* ("Doolan Declaration"), ¶ 4 (emphasis supplied); Supp. Mansfield Declaration, Exhibit 6.[9] In other words, McGraw-Hill's sources cared about their trading strategies getting into the hands of the sources' competitors. Given this fact, McGraw-Hill's contention that disclosure of information to a regulator will chill Platts' relationships with its sources is without support.[10] This conclusion is further buttressed by the fact that the information the Commission seeks, from the source's perspective, is stale -- a fact that McGraw-Hill does not even attempt to address generally no less with regard to the specific documents at issue as it is required to do. *See Exxon*, 94 F.R.D. at 252 ("Exxon asserts that 'even Exxon documents which are over four years old contain important financial facts and data pertinent to

---

[9] McGraw-Hill submitted the Doolan Declaration under seal in this Court. On September 20, 2005, the Court ordered that only a discrete group of documents would remain under seal, the Doolan Declaration not among them, and that any document submitted under seal pending the court's ruling on a motion to seal would not be under seal. *See* Supp. Mansfield Declaration, Exhibit 7.

[10] It bears noting that, to date, the Commission has received one request for the data this Court ordered McGraw-Hill to produce to the Commission in the Subpoena Enforcement Action, *i.e.* a document request served by the defendants in the Oklahoma action. In response, and as a courtesy, the Commission notified McGraw-Hill of its obligation to produce the documents and ultimately deferred production for fourteen days to allow McGraw-Hill an opportunity to address the issue as McGraw-Hill saw fit.

Exxon's ongoing business practices . . . But once again, Exxon fails to isolate particular documents in the relevant age bracket which will reveal ongoing business practices.  In Re Halkin precludes this court form simply accepting as true the vague and conclusory generalizations furnished in Exxon's pleadings and supporting affidavits."); *United States v. Int'l Bus. Mach. Co.*, 67 F.R.D. 40 (S.D.N.Y. 1975) (information three to fifteen years old was held not entitled to protection because, in the court's view, it revealed little, if anything, about the contemporary operations of the party resisting disclosure).[11]

## B.    McGraw-Hill's Documents do not Constitute Protected Trade Secrets

The second prong of McGraw-Hill's request for protective orders rests on the theory that McGraw-Hill's documents constitute trade secrets.  However, like McGraw-Hill's claim of confidentially, the argument falters upon review of the specific documents for which McGraw-Hill demands protection.[12]

In September 2005, McGraw-Hill sought similar protection for similar categories of documents vis-à-vis a criminal prosecution by the U.S. Attorneys' Office against a natural gas trader, arising out of the trader's alleged false reporting to compilers of natural gas index prices, like Platts.  *See United States of America v. Phillips*, Criminal No. H-04-512 (S.D. TX filed Nov. 17, 2004).  The district court noted that the analysis is twofold: first, a court must determine whether the information at issue fits the definition of a trade secret -- i.e. a compilation of information used in one's business.  Second, a court must analyze whether the documents qualify

---

[11]    To the extent that McGraw-Hill seeks to recast the issue as one of the importance of the trade data to McGraw-Hill and McGraw-Hill's competitors, such an argument would be misplaced.  The issue is whether McGraw-Hill's sources care about production of years-old trade data and whether the sources' relationships with McGraw-Hill will be chilled by production of such data to the Commission.

[12]    McGraw-Hill does not articulate the specific records that it claims constitute trade secrets.  Therefore, for purposes of this response, and consistent with McGraw-Hill's previous claims of trade secret protection with regard to the categories of information at issue here, the Commission focuses solely on the Platts' spreadsheets.

as protected trade secrets.[13]  Applying this two-part test, the Commission does not dispute that Platts' spreadsheets constitute a compilation of information used in one's business.  It does, however, reject the notion that the spreadsheets qualify as protected.

### 1.    The spreadsheets do not reveal Platts' editorial process

In support of trade secret protection, McGraw-Hill argues that the content of the documents themselves dictate whether they should be protected, and that McGraw-Hill's documents should protected because they "reveal the internal mechanisms developed by McGraw-Hill's publication over several years - editorial operations and considerations that lie at the heart of their indices - namely their ability to quickly and efficiently assimilate and process large amounts of information in the short period of time available for creating the indices." Cross-Motion for Protective Order (Oklahoma action) at 7.  However, even if this process occurs within Platts, it is not revealed in the documents the Commission seeks.  Attached as Exhibit 3 to the Mansfield Declaration is a copy of the *Platts' Methodology and Specifications Guide, North American Natural Gas*, which is publicly available on Platts' website.  In the document, Platts includes an exemplar of the spreadsheet Platts' editors use to aggregate trade data solicited from survey participants and to compile its index prices -- i.e. the spreadsheet that McGraw-Hill now asserts is a protected trade secret.  *Id*. at p.8 ("Bidweek Example 2").[14]  As the document makes plain, the only information reflected in the spreadsheet is raw data and the results of various

---

[13]    A similar analysis is appropriate here.  *See Catalyst & Chemical Services, Inc. v. Global Ground Support*, 350 F.Supp. 2d 1 (D.D.C. 2004).

[14]    McGraw-Hill previously produced to the Commission the actual spreadsheets Platts used for certain time periods and trading locations.  Those spreadsheets do not include the following categories of information referenced in the example spreadsheet McGraw-Hill publishes on its website: (a) discarded trades, (b) analysis, and (c) daily trading summary.  Attached as Exhibit 8 to the Supp. Mansfield Declaration are example of the spreadsheets McGraw-Hill produced to the Commission.  Given McGraw-Hill's pending request for a protective order, the documents are submitted to this Court under seal.

statistical calculations (e.g. simple average, weighted average, median, mode and midpoint).[15]

The spreadsheet does not disclose, according to McGraw-Hill, how Platts' editors convert this

data into the published index price. Indeed, as Mr. Doolan states,

> Once all available data was collected for a given month's bid week, *Inside FERC*
> evaluated the data by price hub. At this juncture, *Inside FERC* performed an extensive
> review of the submitted data. Among other things, *Inside FERC* performed a variety of
> statistical calculations.

> Importantly, *Inside FERC* further considered the submitted data in light of numerous
> other factors that are not susceptible to any precise calculation. During the Time Period,
> *Inside FERC* may have considered, for example, a given month's activity in comparison
> to prior months, changes in activity during the bid week at issue, which market
> participants were active at which hubs, current and forecasted weather conditions, gas
> storage inventories or the lack thereof, activity in electricity and industrial sectors that
> affected supply and demand of natural gas, natural gas pipeline capacity, and, of course,
> *Inside FERC* also considered market trends and other market information . . .

Doolan Declaration, ¶¶ 17-18, pp. 5-6; Supp. Mansfield Declaration, <u>Exhibit 6</u>.[16]  None of this

experience and judgment, even if it was brought to bear, is contained in the spreadsheets.

Rather, as Mr. Doolan states, "many material facts that affected each price assessment were not

documented anywhere." *Id.* at ¶ 18, p.6. Thus, production of the spreadsheets the Commission

seeks will not reveal Platts' alleged editorial process, and the spreadsheets are not worthy of

protection. *See Peckarsky v. American Broadcasting Co.*, 603 F.Supp. 688, 697 (D.D.C. 1984)

(contention that article, or the information contained therein, constituted a trade secret was

frivolous where the compilation of facts was not used by the plaintiff as a means for conducting

his business as an investigative reporter, but rather was the product of his efforts as a reporter).

---

[15]    One of the factors a court may consider to determine whether a trade secret is protected from disclosure is
the "ease or difficulty with which the information could be properly acquired or duplicated by others." *Gen.
Universal Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004) (citation omitted). Calculations such as weighted
averages, simple averages, midpoints, modes and means are basic math and thus are easily duplicated.

[16]    As the Commission previously pointed out, it believes that the majority of the time the index price Platts
disseminated were simply the volume weighted average, the very conclusion that the U.S. Attorneys' Office for the
Southern District of Texas drew based on its review of upwards of 1,000 Platts' spreadsheets.

Furthermore, even if the spreadsheets contained the "experience and judgment" of Platts' editors, it is debatable whether the information would constitute a protected trade secret. Indeed, the knowledge gained by McGraw-Hill's editorial staff through their constant exposure over several years of processing information to create Platts' indices, which would be common knowledge to anyone placed in an editorial position at Platts, arguably, does not amount to a trade secret. *See Cudahy Co. v. American Labs., Inc.*, 313 F.Supp. 1339 (D.Neb. 1970) (where an employee had a wealth of knowledge and expertise in the production and marketing of animal byproducts for pharmaceutical purposes and data on profits and costs of production, this would be common knowledge to anyone of his experience, would not be particular to the plaintiff and, therefore, did not constitute a protected trade secret).

Finally, to the extent that McGraw-Hill asserts that the inclusion of the sources' trade data and identities in the spreadsheets constitutes the protected trade secret, this argument is equally unsupportable. The identities of the entities who traded these markets are well known and readily ascertainable. Indeed, McGraw-Hill published the names of the largest natural gas traders (by volume) during the relevant time period. Moreover, these entities reported voluntarily and often to multiple index compilers.[17] Accordingly, it would not have been difficult for McGraw-Hill's competitors, at least, to duplicate McGraw-Hill's list of possible survey participants. *See John Does I-VI v. Yogi*, 110 F.R.D. 629, 633 (D.D.C. 1986) (citation omitted) ("The Court will not protect information that is 'not novel and probably already known, or could be reconstructed, by those familiar with the field.'"); *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F.Supp. 2d 1057, 1066 (D.Kan. 2001) (citation omitted) ("Customer lists containing merely public information that can easily be compiled by third

---

[17]    For example, in the complaint filed in the Oklahoma action, the Commission alleges that defendant Bradley submitted false reports to, among others, Platts, BTU Daily, Natural Gas Intelligence, and Natural Gas Week.

parties will not be protected as trade secrets; however, where the party 'compiling the customer
lists, while using public information as a source . . . expends a great deal of time, effort and
expense in developing the lists and treats the lists as confidential in its business, the lists may be
entitled to trade secret protection.'").[18]

### 2.     The structure, design, shape and size of the spreadsheets is not protected by McGraw-Hill

Separately, McGraw-Hill argues that the spreadsheets "contain proprietary
software that relates to, among other things, the structure, design, shape and size of the
spreadsheets." Opposition and Cross-Motion for Protective Order (D.C. action), at 17.
McGraw-Hill explains that the "software was designed to make the collection of information
gathered by various *Inside FERC* and *Gas Daily* reporters and provided by confidential sources
as well as the analysis of this information, as easy and seamless as possible." *Id.* at 17-18. This
"software", however, is not disclosed in the hard copies of the spreadsheets McGraw-Hill
proposes to produce.

Although Mr. Doolan (upon whose testimony McGraw-Hill relies) does not
identify the "software" to which he refers, given that Platts encourages survey participants to
submit their trade data electronically in Excel spreadsheets, he is likely describing "macros"
embedded in the electronic versions of the spreadsheets. As this Court may be aware, Microsoft
Excel is essentially an electronic spreadsheet, which allows the user to populate individual
"cells" with data and then to instruct the computer to perform various calculations using that data
(e.g. add the number in Cell A1 and the number in Cell A2).[19]  In addition, Excel allows the user
to create "macro" formulas.  A macro is simply a script (series of commands) that instructs the

---

[18]     As the Doolan Declaration demonstrates, the time, effort and expense Platts expended were not in
developing the lists of sources, but rather on developing relationships with the entities on those lists.

[19]     *See* example Microsoft Excel spreadsheet attached as <u>Exhibit 9</u> to Supp. Mansfield Declaration.

computer to perform a specific function(s), using the data contained in a specific group of cells, upon a triggering event (e.g., every time the user hits the "F5" key on the keyboard). Macros are particularly useful where the user requires that a complex formula be run repeatedly. Thus, for example, the "software" to which Mr. Doolan refers may be the macros that instruct the computer to extract the trade data contained in the individual spreadsheets submitted to Platts and to copy that data to specific locations on Platts' master spreadsheets.

However, to the extent that this is the "software" that McGraw-Hill now seeks to protect, the macros are nowhere revealed in the spreadsheets McGraw-Hill proposes to produce to the Commission. Indeed, in order for the Commission, or any of McGraw-Hill's competitors, to be able to review Platts' macros, it would need access to the spreadsheets in their native format -- i.e. electronic Microsoft Excel files, not the hard copies which McGraw-Hill has previously produced and ostensibly would produce, if the Commission's motion is granted.[20]

## C. The Proposed Protective Orders are Overbroad and will Improperly Impede Valid Law Enforcement Actions

Even if this Court is inclined to accept any of the reasons McGraw-Hill puts forward in support of its request for a protective order, the limitations McGraw-Hill proposes are overbroad and will inevitably and improperly impede the Commission's prosecution of the underlying actions; will undermine the expedited resolution of these cases; and will thwart the Commission's broader mandate to protect the integrity of the commodity markets.[21]

---

[20]    To illustrate this point, a user of Excel could write a macro in Cell A3 that instructs the computer to add the numbers included in Cells A1 and A2 every time the user hits "F5." See Supp. Mansfield Declaration, Exhibit 9. Thus, if Cell A1 contained the number "6" and Cell A2 contained the number "9", when the user hits F5, Cell A3 would show the number "15". However, if the user were to make a hard copy of the spreadsheet, the only information that would appear in Cell A3 would be the number "15", not the underlying formula from which the number 15 is derived.

[21]    Certain of the limitations included in McGraw-Hill's proposed protective orders, see, e.g., ¶¶ 9-11 to Proposed Order submitted by McGraw-Hill as Appendix B, have already been addressed by the Commission in its

26

1.    **Requiring that the Commission not disseminate McGraw-Hill's documents beyond the Commission does not promote the public interest and will result in wasting of taxpayer and judicial resources**

In the Proposed Orders, McGraw-Hill seeks to limit dissemination of the McGraw-Hill documents to the Commission and its staff. However, as McGraw-Hill is aware, the allegations of false reporting in the natural gas markets are within the jurisdiction of federal civil and criminal authorities. The work of these governmental entities is focused collectively and only on exposing and addressing improper conduct, restoring trust to the natural gas markets, and deterring future attempts to manipulate natural gas index prices. The ability to share information among these entities, as well as with Congress, is therefore important, and is in the public interest. Yet, despite this fact, McGraw-Hill's proposed order blocks and/or affords McGraw-Hill an opportunity to prevent the Commission's disclosure of information produced by McGraw-Hill to federal prosecutors and regulators and even Congress.[22]

The Commission, and separately the criminal authorities, have expended considerable time and resources -- ultimately at the taxpayer's expense -- to secure information from McGraw-Hill. McGraw-Hill has impeded those efforts at almost every turn. The Commission has already demonstrated in a court of law that it overcomes the qualified reporter's privilege in its pursuit of a valid law enforcement action. *See The McGraw-Hill Companies, Inc.*, 390 F.Supp. 2d at 35. Given these facts, along with this Court's finding that the public interest is fostered by restoration of truthful reporting in the natural gas markets, *see The*

---

original memorandum of points and authorities in support of its consolidated motion to compel. *See* Memorandum of Points and Authorities, Sections III.B.1-3.

[22]    Section 8(a)(2) of the Commodity Exchange Act, states, "In conducting investigations authorized under this subsection or any other provision of this Act, the Commission shall continue, as the Commission determines necessary, to request the assistance of and cooperate with the appropriate Federal agencies in the conduct of such investigations . . ." 7 U.S.C. § 12(a)(2). *See also*, Section 8(a)(1), 7 U.S.C. § 12(a)(1) ("For the efficient execution of the provisions of this Act, and in order to provide information for the use of Congress, the Commission may make such investigations as it deems necessary . . .").

*McGraw-Hill Companies, Inc.*, 390 F.Supp. 2d at 33, this Court should not allow McGraw-Hill to implement a procedure that will require every federal governmental entity -- all of whom seek the information for the ultimate purpose of protecting the integrity of the energy markets -- separately to petition a court before being given access to the same categories of information that this Court ourt required McGraw-Hill to produce to the Commission.

### 2. Limiting the Commission's use of McGraw-Hill's documents to this action is counterproductive and contrary to the public interest

In the Proposed Orders, McGraw-Hill seeks to limit the Commission's use of McGraw-Hill's documents to the underlying actions in Texas, Ohio, Oklahoma, and Colorado. This Court previously considered and rejected a similar demand. *See The McGraw-Hill Companies, Inc.*, 403 F.Supp. 2d at 38. The response should be no different here.[23] As this Court previously found, "[t]o the extent that Platts' publications were erroneous, the public interest in truthful news reporting – the very interest safeguarded by the privilege – is threatened." *The McGraw-Hill Companies, Inc.*, 390 F.Supp. 2d at 33. Consistent with this finding, the public has an interest in, and the Commission should pursue, any activities that resulted in the publication of erroneous index prices, and not solely the acts of false reporting engaged in by the defendants.

The Commission's subpoenas to McGraw-Hill that are now before this Court are focused on the defendants' false reporting to, among others, Platts. However, as the Commission's larger investigation and prosecution of false reporting in the natural gas markets

---

[23] McGraw-Hill argues that use of information obtained pursuant to a non-public investigation is different than use of information obtained pursuant to a subpoena issued under the federal rules of civil procedure. To the contrary, the federal rules contain no limitation on the use of discovery to the litigation in which it is provided. *See Zapata v. IBP, Inc.*, 160 F.R.D. 625, 628 (D.Kan. 1995) (the defendant "has not cited and the court otherwise knows of no rule or principle which restricts the use of discovery to the case in which it is provided . . . The drafter of the rules of civil procedure could easily have included a restriction that use of discovery is limited to the litigation in which it is provided, were such their intent. The court finds no such provision.").

demonstrates, the defendants' false reports were not the only submissions to Platts that may have caused the indices to be erroneous. Indeed, more than twenty companies have entered into public settlements with the Commission arising out of their submission of false trade data to Platts. Thus, if the documents McGraw-Hill produces to the Commission, and in particular the spreadsheets, evidence other violations of the CEA, (false reporting by individuals other than the defendants), the Commission is authorized by Congress, and should pursue such conduct.

It serves no legitimate purpose to require the Commission to return to the courts every time the Commission wishes to use McGraw-Hill's documents in furtherance of an investigation or legal action predicated on reporting of false information about natural gas prices to a compiler of natural gas index prices. McGraw-Hill wants the power to circumvent the Commission's pursuit of illegal acts in valuing energy indices that have been frequently abused by traders. Furthermore, McGraw-Hill's proposed protective orders would require the Commission to divulge information about otherwise non-public investigations to McGraw-Hill so that McGraw-Hill could assess whether to object to the proposed use. McGraw-Hill's continued insistence on acting as the gatekeeper of the information and how the information is used is among the very reasons the Commission has been repeatedly forced to compel production in the federal courts.

### 3.    Requiring that submissions to this Court that include or refer to McGraw-Hill documents be sealed is akin to exclusion of evidence

McGraw-Hill further proposes that any submissions to the courts overseeing the underlying actions "that include or refer to the McGraw-Hill Documents" be filed under seal pursuant to Federal Rule of Civil Procedure 26(c)(8). McGraw-Hill's request draws no distinction between discovery and dispositive filings. The point is critical.

As courts have repeatedly noted, the decision to seal the judicial record

contravenes the limitations imposed by the First Amendment and common law access to the

court system and specifically the principle that "[t]he public has a presumed right of access to

judicial proceedings and documents received by the court as part of the judicial decision-making

process." *In re Adobe Sys., Inc. Sec. Litig.*, 141 F.R.D. 155, 157 (N.D. Cal. 1992). To address

the competing concerns of, on the one hand, an entity's desire to protect the confidentiality of its

information and, on the other hand, the public's right to access, courts seek to strike a balance.

"Therefore, restraints placed on discovered, but not yet admitted information are not a restriction

on a traditionally public source of information." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33

(1984). However, as Wright and Miller note,

> when some of those materials are relied upon in a judicial decision, or form the basis for
> it, the justification for public access on both First Amendment and common law grounds
> increase. In extraordinary circumstances, there may be a justification for denying or
> curtailing access to evidence used at trial, but in general there should be a constitutional
> right to attend civil trials just as there is to attend criminal trials. Because of the
> importance of pre-trial decisions, similar constitutional interests, and related common law
> interests, need to be considered when sealed materials are used in connection with
> pretrial motions. Yet unlimited public access (e.g. to all materials considered on a
> motion for protective order) would eviscerate protections. The strongest arguments exist
> for access to materials used as the basis for a judicial decision on the merits of the case,
> as by summary judgment.

8 Wright, Miller & Marcus, *Federal Practice and Procedure*, § 2042, p.550-51 (1994 West

Publishing Co.).

Nowhere in the Proposed Orders does McGraw-Hill accommodate, let alone

acknowledge, this distinction -- this despite the fact that many of the issues likely to be presented

to the courts in Texas, Ohio, Oklahoma and Colorado will be dispositive in nature. Accordingly,

if bound by the proposed sealing requirement, the Commission would be faced with the very real

possibility of not being allowed to use McGraw-Hill's documents in furtherance of its

prosecution of the defendants.[24]

### 4. Providing McGraw-Hill notice and an opportunity to object to introduction of McGraw-Hill documents into evidence at trial threatens to bring the trial to a halt

Finally, in the protective order that McGraw-Hill seeks in the Oklahoma action,

which will govern any documents this Court may compel McGraw-Hill to produce to the

Commission, there is contained the following additional limitation:

> If one or more of the Defendants determine it is necessary to present, introduce as evidence or otherwise discuss before this Court the McGraw-Hill Documents, that Defendant shall provide McGraw-Hill with at least 10 business days prior written notice of such determination. McGraw-Hill must move within 5 business days of such notice for a protective order limiting public disclosure of said documents. Defendants shall not disclose in open court proceedings said documents until resolution of McGraw-Hill's motion for a protective order.

*See* Protective Order, ¶ 4, p.3; Supp. Mansfield Declaration, Exhibit 10.[25]

The Commission's prosecution of the defendants is a law enforcement action

undertaken for and in the public interest. The public has an obvious interest in the restoration of

transparent and accurate prices in the natural gas markets and the timely prosecution of those

alleged to have attempted to manipulate those prices. However, under paragraph 4, the

Commission, and the defendants, will be required to postpone the trial in this action, for at least

fifteen days, every time they seek to use a McGraw-Hill document. This provision likely will

prove unworkable. As but one example, documents currently in McGraw-Hill's possession may

---

[24]    McGraw-Hill may point to language in the Proposed Orders, which provides a mechanism for any party to challenge the sealed status of any materials filed with the Court. This provision, however, will adversely impact the Commission's ability to prosecute this action in a timely manner and this Court's stated desire to expedite the resolution of this case. *See* Section III.C.4.

[25]    For reasons unclear to the Commission, McGraw-Hill does not include this same limitation in the Proposed Orders submitted to this Court as Appendices A-D. However, to the extent that McGraw-Hill seeks a protective order including this limitation in its request to the Oklahoma court, the Commission addresses the proposed limitation here.

be useful for cross-examination of witnesses. This determination, however, will depend, in large part, on the scope of the direct examination. Under the process proposed by McGraw-Hill, upon completion of a direct examination, or even during the course of a cross-examination, the party seeking to use a McGraw-Hill document will have to suspend the examination to allow McGraw-Hill the opportunity to object and the presiding court to rule upon the objection. During this extended delay, the witness against whom the document is sought to be used will have an opportunity to digest the document, to consider how the document affects his/her testimony, and to prepare a response. Worse, this process will likely repeat itself through the course of the trial.

Even if the harm to the parties caused by this provision was not so glaring, the proposed procedure serves no useful purpose. Again, this Court, considering the Commission's need for the same categories of information for use by the Commission for the same purpose, and McGraw-Hill's objections to production of that information, already concluded that the documents the Commission seeks from McGraw-Hill go to the "heart of the matter." *See The McGraw-Hill Companies, Inc.*, 390 F.Supp. 2d at 34. Information goes to the heart of the matter if it is crucial to the case. *See Zerilli*, 656 F.2d at 713; *Hutira v. The Islamic Republic of Iran*, 211 F.Supp. 2d 115, 122 n.7 (D.D.C. 2002) (information goes to the heart of the matter when it is necessary to prove an element of the claim). *See also*, 7 U.S.C. § 13a1(d)(1) (civil penalty "for each violation" of the CEA). It is, therefore, hard to imagine what objections McGraw-Hill could possibly lodge that would cause any of the presiding courts to conclude that the Commission should not be allowed to use documents that otherwise go to the heart of the matter, other than on evidentiary grounds. However, McGraw-Hill is not a party to this action, and it thus has no interest in the admissibility of its documents.

32

### III.   **Conclusion**

For the foregoing reasons, the Commission renews its request that the Court enter

an order compelling McGraw-Hill immediately to produce documents responsive to the four

subpoenas, and deny McGraw-Hill's request for protective orders.

Dated: June , 2006                          Respectfully submitted,
       Washington, D.C.

<br>

_____
Michael J. Otten (VA Bar 42371)
Anthony M. Mansfield (MA Bar 630216)
Laura Gardy (FL Bar 523909)
United States Commodity Futures
   Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
202.418.5000
202.418.5523 (facsimile)

## CERTIFICATE OF SERVICE

I, Anthony M. Mansfield, hereby certify that on June 7, 2006, I caused a copy of *Plaintiff's Reply to McGraw-Hill's Opposition to the Motion to Compel Third Party to Produce Documents in Response to Subpoenas Duces Tecum and Opposition to Cross-Motion for Protective Order* to be served by First Class Mail on the following individuals:

Victor Kovner, Esq.
Davis Wright Tremaine LLP
1633 Broadway
New York, New York 10019
*Counsel for The McGraw-Hill Companies, Inc.*
*First Class Mail and Electronic Mail*

Samuel F. Abernathy, Esq.
Menaker & Herrmann
10 East 40th Street
New York, NY 10016-0301
*Counsel for Michael Whitney*

Matthew L. Fornshell, Esq.
250 West Street
Columbus, OH 43215
*Counsel for Joseph Foley*

David R. Cordell, Esq.
Conner & Winters
4000 One Williams Center
Tulsa, OK 74172
*Counsel for Jeffrey Bradley*

Thomas M. Ladner, Esq.
Norman Wohlgemuth Chandler & Dowdell
401 South Boston Avenue
2900 Mid-Continent Tower
Tulsa, OK 74103-4023
*Counsel for Robert Martin*

Robert B. Christie, Esq.
Henderson & Lyman
175 West Jackson Blvd, Suite 240
Chicago, IL 60604
*Counsel for Andrew Richmond*

_____
Anthony M. Mansfield

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. Commodity Futures Trading Commission, )<br><br>Plaintiff, )<br><br>v. )<br><br>Michael Whitney, et al. )<br><br>Defendants. ) | Misc. No. 1:06MS00210 (RCL) |

## DECLARATION OF DAVID W. MACGREGOR

I, David W. MacGregor, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, the following:

1.    I am an attorney admitted to the bar of the State of New Jersey and the U.S. District Court for the District of New Jersey. I am employed as a Chief Trial Attorney in the Division of Enforcement of the U.S. Commodity Futures Trading Commission ("Commission").

2.    On September 14, 2005, the Commission filed a complaint in the U.S. District Court for the Southern District of Ohio against Defendant Joseph P. Foley ("Foley"), a former natural gas trader for American Electric Power Company, Inc. and AEP Energy Services, Inc. (collectively "AEP"), charging him with knowingly causing to be delivered false, misleading, or knowingly inaccurate reports concerning market information. *See CFTC v. Foley*, Civil Action No. 2:05-cv-849 (S.D. Oh.). The Complaint further charged Foley with attempted manipulation of natural gas prices. I am the attorney in charge of the litigation.

3.    Prior to the initiation of this action, I participated in discussions with counsel for McGraw-Hill regarding the scope and use of the information the Commission seeks pursuant to the subpoenas now at issue. I did so in an effort to narrow the areas of disagreement. During

1

those discussions, counsel for McGraw-Hill expressed a concern that before McGraw-Hill could "certify" full compliance with Request No. 1 of the subpoena in the Ohio action, the company would have to search every computer and every file cabinet in Platts' various offices.  Counsel noted that such an undertaking would require tremendous time, effort and expense.  I responded that I did not expect McGraw-Hill to engage in a search of this magnitude; that no such certification was required; and that reasonable efforts to locate the reports AEP traders submitted or caused to be submitted to Platts would suffice.  I did stress, however, that I required McGraw-Hill to produce all of the reports and not just the reports that were false.

Dated:  New York, NY
       June 6, 2006

David W. MacGregor

2

## CERTIFICATE OF SERVICE

I, Anthony M. Mansfield, hereby certify that on June 7, 2006, I caused a copy of the *Declaration of David W. MacGregor* to be served by First Class Mail on the following individuals:

Victor Kovner, Esq.
Davis Wright Tremaine LLP
1633 Broadway
New York, New York 10019
*Counsel for The McGraw-Hill Companies, Inc.*
*First Class Mail and Electronic Mail*

Samuel F. Abernathy, Esq.
Menaker & Herrmann
10 East 40th Street
New York, NY 10016-0301
*Counsel for Michael Whitney*

Matthew L. Fornshell, Esq.
250 West Street
Columbus, OH 43215
*Counsel for Joseph Foley*

David R. Cordell, Esq.
Conner & Winters
4000 One Williams Center
Tulsa, OK 74172
*Counsel for Jeffrey Bradley*

Thomas M. Ladner, Esq.
Norman Wohlgemuth Chandler & Dowdell
401 South Boston Avenue
2900 Mid-Continent Tower
Tulsa, OK 74103-4023
*Counsel for Robert Martin*

Robert B. Christie, Esq.
Henderson & Lyman
175 West Jackson Blvd, Suite 240
Chicago, IL 60604
*Counsel for Andrew Richmond*

Anthony M. Mansfield

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| U.S. Commodity Futures Trading Commission, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Misc. No. 1:06MS00210 (RCL) |
| | ) | |
| Michael Whitney, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SUPPLEMENTAL DECLARATION OF MICHAEL J. OTTEN

I, Michael J. Otten, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, the following:

1.    I am currently a Chief Trial Attorney in the Division of Enforcement of the Commodity Futures Trading Commission ("Commission"). I am the lead counsel in the cases *Commodity Futures Trading Commission v. Andrew Kennedy Richmond*, Civil Action No. 05-668 (D. Col.) and *Commodity Futures Trading Commission v. Michael Whitney*, Civil Action No. 05-333 (S.D. Tx.).

2.    In the Commission's complaint filed in the Southern District of Texas, it alleges, *inter alia*, that "[a]s part of his duties, Defendant [Whitney] provided, either directly or through other employees of DETM, market information concerning natural gas, physical trades to reporting firms, including but not limited to, *Gas Daily* and Enerdata." Complaint, ¶ 3, *CFTC v. Whitney*, Civil Action No. H-05-333 (S.D. TX Feb. 1, 2005), attached as Exhibit 1. The complaint is drafted to reflect the fact that on most occasions Mr. Whitney's false reports were

submitted to companies that compile natural gas index prices by other employees of DETM --
e.g., support staff.

     3.    Given this fact, Request No. 1 of the subpoena *duces tecum* the Commission
caused to be served on The McGraw-Hill Companies, Inc. in the Texas action seeks "[a]ll
documents received by McGraw-Hill during the relevant period from any employee or agent of
Duke, including but not limited to Michael Whitney . . ."

    Signed under the penalties of perjury on this 6th day of June, 2006.

Michael J. Otten

2

<u>CERTIFICATE OF SERVICE</u>

I, Anthony M. Mansfield, hereby certify that on June 7, 2006, I caused a copy of the *Supplemental Declaration of Michael J. Otten* to be served by First Class Mail on the following individuals:

Victor Kovner, Esq.
Davis Wright Tremaine LLP
1633 Broadway
New York, New York 10019
*Counsel for The McGraw-Hill Companies, Inc.*
*First Class Mail and Electronic Mail*

Samuel F. Abernathy, Esq.
Menaker & Herrmann
10 East 40th Street
New York, NY 10016-0301
*Counsel for Michael Whitney*

Matthew L. Fornshell, Esq.
250 West Street
Columbus, OH 43215
*Counsel for Joseph Foley*

David R. Cordell, Esq.
Conner & Winters
4000 One Williams Center
Tulsa, OK 74172
*Counsel for Jeffrey Bradley*

Thomas M. Ladner, Esq.
Norman Wohlgemuth Chandler & Dowdell
401 South Boston Avenue
2900 Mid-Continent Tower
Tulsa, OK 74103-4023
*Counsel for Robert Martin*

Robert B. Christie, Esq.
Henderson & Lyman
175 West Jackson Blvd, Suite 240
Chicago, IL 60604
*Counsel for Andrew Richmond*

Anthony M. Mansfield