# EXHIBIT 29

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: NATURAL GAS    )<br>COMMODITY LITIGATION   )<br>    ) | Master File No. 03 Civ. 6186 (VM) |

## JOINT MOTION FOR PROTECTIVE ORDER

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, Plaintiffs and Defendants (collectively, the "Parties") hereby move this Court for entry of the attached stipulated protective order.

WHEREFORE, the Parties respectfully request that this Court grant their joint motion for a protective order and issue an Order, in the form of the proposed order attached to this motion.

Respectfully submitted,

_Bernard Persky_

Bernard Persky
*Liaison Counsel for Plaintiffs*

_Peter J. Kadzik_

Peter J. Kadzik
*Liaison Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: NATURAL GAS COMMODITY LITIGATION | Master File No. 03 Civ. 6186 (VM) |

## STIPULATION AND (PROPOSED) PROTECTIVE ORDER

### STIPULATION

WHEREAS, the above-captioned case by the plaintiffs, Cornerstone Propane Partners, L.P., Roberto Calle Gracey, and Dominick Viola (collectively, "Plaintiffs"), against the defendants, Reliant Energy Services, Inc., Dynegy Marketing & Trade, West Coast Power, LLC, Aquila Merchant Services, Inc., Aquila Energy Marketing Corporation, AEP Energy Services, Inc., American Electric Power Company, Inc., El Paso Merchant Energy, L.P., El Paso Corporation, Williams Energy Marketing and Trading Company, Williams Companies, Inc., Duke Energy Trading and Marketing, L.L.C., Coral Energy Resources, L.P., Coral Energy Holding, L.P., CMS Marketing Services & Trading, CMS Field Services, Sempra Energy Trading, Enserco Energy, Inc., WD Energy Services, Inc., Encana Corporation, Entergy-Koch Trading, L.P., Cook Inlet Energy Supply, LLC., MidAmerican Energy Company, Meico, Inc., E-Prime, Inc., Oneok Energy Marketing and Trading Company, L.P., Oneok, Inc., and Calpine Energy Services, L.P. (collectively, "Defendants") concerns various claims relating to alleged violations of certain provisions of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("CEA");

WHEREAS, for purposes of this Stipulation and (Proposed) Protective Order, the term "Party" or "Parties" shall include any party to this case;

WHEREAS, this action will involve the production of documents, writings, drawings, graphs, charts, photographs, phonorecords, data, materials, depositions, electronic

1

or computerized compilations, or other testimony, deposition exhibits, interrogatory responses, responses to requests for admissions, and/or other information (collectively "Information") by the Plaintiffs, Defendants, and Third Parties (herein individually referred to as "Producing Party" or collectively referred to as "Producing Parties");

WHEREAS, it is anticipated that among the Information which will be produced by the Producing Parties, there will be confidential, proprietary, commercially sensitive, or trade secret information; and

WHEREAS, the Parties believe that the entry of an order limiting the use of confidential, proprietary, commercially sensitive, or trade-secret information will facilitate the production of Information from the Producing Parties.

IT IS THEREFORE STIPULATED, AGREED, AND JOINTLY REQUESTED by the Parties, by and through their respective counsel, that in accordance with Rule 26(c) of the Federal Rules of Civil Procedure, a protective order should be entered pursuant to the following terms and provisions:

1.     This Stipulation and (Proposed) Protective Order ("Stipulation and Protective Order") shall govern all Information produced by any Producing Party in connection with this case.

2.     Any Information that contains or comprises any trade secret or other confidential research, development or commercial information pursuant to Rule 26(c)(7) of the Federal Rules of Civil Procedure, and that is produced by a Producing Party in connection with this case, may be designated by the Producing Party as "Confidential" or "Restricted Confidential" by marking or designating the Information provided in paragraphs 3, 4, 5 and 6 of this Stipulation and Protective Order. Except as provided below, once Information has been

2

designated as "Confidential" or "Restricted Confidential" it shall be used only for purposes of this action, shall not be used for any business, proprietary, or commercial purpose, and shall not be disclosed to anyone except the following, for use in connection with this action only:

a. The Parties' outside counsel of record, including regular and temporary employees of such counsel, and employees of any firm retained to reproduce the Information for use in accordance with this Stipulation and Protective Order;

b. Members of the Parties' or their corporate parents' in-house legal counsel who are playing a role in connection with the case to which the portion of the Information disclosed is relevant or potentially relevant, and employees of the Parties' or their parents' in-house legal counsel who are similarly playing a role in connection with the case and have a similar need to have access to the Information;

c. Experts or consultants assisting counsel for the Parties in the conduct of this action;

d. The Parties (if natural persons), or officers, directors, and employees of the Parties (whether or not natural persons) who are assisting counsel in the conduct of this action and the portion of the Information disclosed is relevant or potentially relevant to that assistance (this subpart shall not apply if the Information is designated "Restricted Confidential");

3

e. The author of the Information and anyone shown on the Information as having received the Information in the ordinary course of business;

f. Court reporters and other stenographic or recording personnel in connection with this action;

g. Judicial or administrative employees in connection with this action; and,

h. Witnesses at a deposition or trial in this action who shall be bound by the provisions of this Stipulation and Protective Order.

3.    A Producing Party may designate Information as "Confidential" when the Producing Party's counsel in good faith believes: (1) secrecy as to the Information is consistent with the public interest; (2) the Producing Party designating the Information as "Confidential" has a cognizable interest in the material (*i.e.,* the material constitutes or reveals a trade secret, privileged information, other confidential research, development, or commercial information; or is otherwise protected by law from disclosure); and (3) the disclosure of the Information would cause harm. For purposes of this Stipulation and Protective Order, Information that is in the public domain or has been obtained by the Producing Party from non-confidential sources shall not be considered "Confidential." Any Confidential Information shall be designated by a Producing Party by so identifying each page of the material with the word "Confidential." Pages of deposition transcripts containing Confidential Information shall be identified in the same manner.

4.    A Producing Party may designate Information as "Restricted Confidential" if the Producing Party believes in good faith that the Information is so commercially sensitive or confidential that disclosure to employees of the Parties, even for the purposes permitted with respect to materials designated "Confidential," will not provide adequate protection to the interests of the Producing Party.  Any Restricted Confidential Information shall be designated "Restricted Confidential" by the Producing Party by so identifying each page of the material with the words "Restricted Confidential."  Each page of a deposition transcript that contains testimony designated "Restricted Confidential" and/or relates to Information that has been designated "Restricted Confidential" shall be identified "Restricted Confidential" and any testimony or exhibits so designated shall be bound separately from the remainder of the deposition transcript in a volume with a cover page identified "Restricted Confidential." Except as provided in the next sentence, Information designated as "Restricted Confidential" shall not be disclosed to anyone except the individuals described in paragraph 2(a), (c), (e), (f), (g), and (h) of this Stipulation and Protective Order regarding "Confidential Information." Information designated as "Restricted Confidential" may be disclosed to in-house counsel who are playing a role in connection with the case to which the portion of the Information disclosed is relevant or potentially relevant, and the paralegals, stenographic and clerical staff of such inside counsel who are working on this case and under the direction of such inside counsel.

5.    Information used during or in connection with a deposition may be designated as "Confidential" or "Restricted Confidential" by a Producing Party on the record during the deposition.  No person shall attend portions of depositions during which

Information designated as "Confidential" or Restricted Confidential" is disclosed unless such person is an authorized recipient of such Information under this Stipulation and Protective Order. If, during a deposition, the response to a question would require the disclosure of "Confidential" or "Restricted Confidential" Information, the witness may refuse to answer or complete his or her answer, or any party that designated the Information as "Confidential" or "Restricted Confidential" Information may instruct the witness not to answer or complete his or her answer, until any persons not authorized to receive that Information have left the room.

6.    In designating any Information as "Confidential" or "Restricted Confidential" a Producing Party and its counsel are obligated to act in good faith and consistent with Rule 26 (c) of the Federal Rules of Civil Procedure. Any designation of Information as "Confidential" or "Restricted Confidential" may be withdrawn by a Producing Party by providing written notice to the Parties.

7.    Every person described in paragraphs 2(a-e, and h) who is given access to Confidential or Restricted Confidential Information shall be provided with a copy of this Stipulation and Protective Order prior to receipt of the Information and advised that the Information is being disclosed pursuant and subject to the terms of this Stipulation and Protective Order and may not be disclosed or used other than in accordance with this Stipulation and Protective Order. Any person or entity to whom Confidential or Restricted Confidential Information has been made available ("the Information Holder") shall not provide any Information to any person described in paragraph 2 (a-e, and h) until the

DSMDB 1830147 v.1

6

Information Holder has obtained from such person a signed written acknowledgement substantially in the form of Exhibit A, that such person has received a copy of this Stipulation and Protective Order, will comply with its terms in all respects, and will submit to the jurisdiction of this Court for adjudication of any dispute about whether such person has complied with the terms of this Stipulation and Protective Order. In the event that a dispute arises concerning a possible violation of confidentiality, the relevant signed written acknowledgements will be provided to the Court for *in camera* inspection. Persons who come into contact with any Information designated as "Confidential" or "Restricted Confidential" in connection with clerical or administrative duties, and who do not retain copies or extracts thereof, are not required to execute acknowledgments.

8.    If the person signing the Agreement ("Signatory") cannot attest that the scope of his or her employment "does not currently include the marketing of natural gas, or the direct supervision of any employee or employees whose duties include the marketing of natural gas," a modified attestation must be delivered to the Producing Party at least five (5) days before the Signatory views the Confidential or Restricted Confidential Information in question. If the Producing Party objects in writing within five (5) days to the Signatory's viewing the Confidential or Restricted Confidential Information, the discovering party will not disclose the Confidential or Restricted Confidential Information to the Signatory unless and until the issue is resolved. The Parties shall meet and confer regarding the dispute within ten (10) days of the written objection. If the issue cannot be resolved by the Parties, the Party requesting the Signatory's viewing the Confidential or Restricted Confidential Information

DSMDB 1830147 v.1

7

may apply to the Court for relief, within ten (10) days of the meet and confer between the Parties. The burden is on the discovering party to establish that the signatory should be permitted to view Confidential or Restricted Confidential Information. Until the dispute is resolved, the Signatory will not view Confidential or Restricted Confidential Information.

9.     Any Producing Party who wishes to file with the Court any Information designated as "Confidential" or "Restricted Confidential" pursuant to the Stipulation and Protective Order must file such Information under seal pursuant to Rule 26(c)(8) of the Federal Rules of Civil Procedure. Any Party who files with the Court Confidential or Restricted Information under seal pursuant to Rule 26(c)(8) of the Federal Rules of Civil Procedure will also file redacted versions of the pleadings or materials containing Confidential or Restricted Information with the Court which shall be placed in the public file.

10.     Until seven (7) days after receipt, the Information Holder shall treat all Information received from a Producing Party as being "Restricted Confidential," regardless of how such Information is marked. After that seven-day period, however, Information shall be treated in accordance with how the Information is actually designated, either originally or pursuant to Paragraph 13 below.

11.     Any Producing Party may redact from the Information it produces (a) Information not relevant to the subject matter of this litigation, and (b) Information that the Producing Party claims is subject to the attorney-client privilege, work-product immunity, a legal prohibition against disclosure, or other privilege or immunity. The Producing Party shall

mark the Information which has been redacted with a legend stating "REDACTED FOR RELEVANCE" or "REDACTED FOR PRIVILEGE," as appropriate, or a comparable notice. Where Information consists of more than one page, at least the first page and each page on which Information has been redacted shall be so marked. The Producing Party shall preserve an unredacted version of the Information. This provision shall not affect any obligation to provide a log of Information redacted or otherwise withheld on the basis of attorney-client privilege, work-product immunity, a legal prohibition against disclosure, or other privilege or immunity.

12.    Except with the prior written consent of a Producing Party or prior order of the Court obtained upon noticed motion, Information designated as "Confidential" or "Restricted Confidential" shall be used solely for the purpose of litigating the above-captioned case. Confidential Information or Restricted Confidential Information shall not be communicated in any manner, directly or indirectly, to anyone other than a person qualified to receive such Information under the terms of this Stipulation and Protective Order.

13.    The failure of a Party to designate any Information as "Confidential" or "Restricted Confidential" prior to production shall not waive the protections of this Stipulation and Protective Order, or otherwise limit or forego any rights of the Party to preserve the confidentiality of the Information produced. Upon discovering that "Confidential" or "Restricted Confidential" material was inadvertently produced without being so-designated, the Producing Party shall notify all Parties in writing. The Parties shall return the un-

designated materials immediately, wherein the Producing Party shall designate the material and return it to the Parties, and the Information so designated shall be treated as Confidential or Restricted Confidential from and after the date of receipt of the written notification, unless and until the designation changes, pursuant to Paragraph 15 herein.

14.    All Confidential Information and Restricted Confidential Information shall be maintained by the Parties and any Information Holder in possession of such Information in a secure place.

15.    A Party may object to the treatment of Information or portion of a transcript as "Confidential" as defined in paragraph 3 herein, or the treatment of Information or portion of a transcript as "Restricted Confidential" as defined in paragraph 4 herein. Whenever a Party objects to the treatment of Information or portion of a transcript as "Confidential" or "Restricted Confidential" it shall inform the Producing Party of its objection, and its reasons for such objection in writing. Such writing shall be delivered by hand delivery, courier or facsimile transmission. If an agreement as to the designation has not been reached with ten (10) days, the Party and Producing Party may thereafter jointly apply to the Court by motion for a ruling as to whether the Information or transcript should be treated as "Confidential" or "Restricted Confidential." The Producing Party bears the burden of establishing the appropriateness of the protection sought. Until the Court enters an order, if any, changing the designation of any Information or transcript which is the subject of the joint motion, the

Information or transcript shall be afforded "Confidential" or "Restricted Confidential" treatment, in accordance with its designation.

16.     If the Court finds at any time in the course of the litigation that all or part of the materials designated as "Confidential" or "Restricted Confidential" need not be protected, those materials shall, nevertheless, be subject to the protection afforded by this Stipulation and Protective Order for ten (10) business days from the date of the Court's decision or ruling. In no event does the Party seeking protection waive or release its right to seek additional judicial remedies after the Court's decision respecting "Confidential" or "Restricted Confidential" Information.

17.     Producing or receiving materials or otherwise complying with the terms of this Stipulation and Protective Order shall not:

a.  Prejudice in any way the rights of any Producing Party to object to the production of Information it considers not subject to discovery; or

b.  Prejudice in any way the rights of any Party to object to the authenticity or admissibility into evidence of any Information, testimony or evidence subject to this Stipulation or Protective Order; or

c.  Prevent any Party from seeking a further order of this Court pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.

18.     This Stipulation and Protective Order has no effect upon, and its scope shall not extend to:

a.  any Party's use of its own Confidential Information or Restricted Confidential Information; or

b.  any Party's use of Information obtained from a source other than any of the Producing Parties in this case.

19.     Within 45 days after termination and notice of termination of this litigation, including any appeals therefrom the originals and all copies of Information designated as "Confidential" or "Restricted Confidential" in the possession of any person shall be destroyed or turned over to the Producing Party or its counsel.  However, each Party may keep copies of all pleadings and correspondence files in this action and any internal work product, memoranda, letters or electronic mail.

20.     Sealed records which have been filed with the clerk shall be removed by the party submitting them (1) within ninety (90) days after a final decision is rendered if no appeal is taken, or (2) if an appeal is taken, within thirty (30) days after final disposition of the appeal. Parties failing to comply with this order shall be notified by the clerk that, should they fail to remove the sealed records within thirty (30) days, the clerk may dispose of them.

21.    The Parties agree that a violation or threatened violation of these terms shall constitute irreparable harm and qualify as valid grounds for seeking injunctive relief to prevent said violation.

22.    In the event of a proven violation of this Protective Order by any of the Parties in this action or others designated in paragraph 2 hereof, the Parties acknowledge that the offending Party or persons may be subject to sanctions determined in the discretion of the Court.

23.    This Stipulation and Protective Order shall be binding upon the Parties upon entry.


DATED:  October 12, 2004

By: /s/ Bernard Persky

      BERNARD PERSKY

      CRAIG L. BRISKIN

      Goodkind Labaton Rudoff & Sucharow LLP


      DOUGLAS G. THOMPSON, JR.

      RICHARD M. VOLIN

      ALI OROMCHIAN

      Finklestein, Thompson & Loughran

DSMDB 1830147 v.1

STEPHEN LOWEY

RICHARD W. COHEN

GEOFFREY M. HORN

PETER ST. PHILLIP, JR.

Lowey Dannenberg Bemporad & Selinger, P.C.


CHRISTOPHER LOVELL

GARY S. JACOBSON

CHRISTOPHER J. GRAY

Lovell Stewart Halebian, LLP

Counsel for Plaintiffs


By: /s/ Paul A. Ragusa

PAUL A. RAGUSA

J. GREG COPELAND

J. MICHAEL BALDWIN

Baker Botts LLP

TERRY J. HOULIHAN

NORA CREGAN

Bingham McCutchen, LLP

Counsel for Defendant Reliant Energy, Inc.

By: /s/ Michael J. Kass

MICHAEL J. KASS

DOUGLAS R. TRIBBLE

Pillsbury Winthrop LLP

Counsel for Defendants Dynegy Marketing & Trade and
West Coast Power, LLC

By: /s/ Diana L. Weiss

DIANA L. WEISS

JAY K. MUSOFF

Orrick, Herrington & Sutcliffe LLP

Counsel for Defendants Aquila Energy Marketing Corp.
and Aquila Merchant Services, Inc.

By: /s/ Jonathan L. Abram

JONATHAN L. ABRAM

STEVEN J. ROUTH

Hogan & Hartson LLP

Counsel for Defendants American Electric Power
Company, Inc. and AEP Energy Services, Inc.

By: /s/ Stephanie J. Goldstein

STEPHANIE J. GOLDSTEIN

MICHAEL RAUCH

Fried Frank Harris Shriver & Jacobson

Counsel for Defendants El Paso Merchant Energy, L.P.,
and El Paso Corp.

By: /s/ Jeffrey M. Shohet

JEFFREY M. SHOHET

MARK H. HAMER

Gray Cary Ware & Freidenrich LLP

Counsel for Defendants Williams Power Company, Inc.
and The Williams Companies, Inc.

By: /s/ Peter J. Kadzik

    PETER J. KADZIK

    JOEL B. KLEINMAN

    Dickstein Shapiro Morin & Oshinsky LLP

Counsel for Defendant Duke Energy Trading and Marketing, L.L.C.

By: /s/ Robert D. Owen

    ROBERT D. OWEN

    FELICE B. GALANT

    Fulbright & Jaworski, L.L.P.

Counsel for Defendants Coral Energy Resources, L.P. and Coral Energy Holding, L.P.

By: /s/ Banks Brown

    BANKS BROWN

    DANIEL A. MULLEN

    McDermott Will & Emery LLP

Counsel for Defendant CMS Marketing Services & Trading and CMS Field Services

By: /s/ Melvin A. Brosterman

    MELVIN A. BROSTERMAN

    ALAN Z. YUDKOWSKY

    Stroock & Stroock & Lavan LLP

Counsel for Defendant Sempra Energy Trading Corp.

DSMDB 1830147 v.1

By: /s/ Richard P. Swanson

    RICHARD P. SWANSON

    VERONICA E. RENDON

    Thelen Reid & Priest LLP

Counsel for Defendant Enserco Energy, Inc.


By: /s/ Robert A. Sacks

    ROBERT A. SACKS

    BRENDAN P. CULLEN

    Sullivan & Cromwell LLP

Counsel for Defendants Encana Corporation and WD
Energy Services Inc.

By: /s/ Kenneth M. Raisler

    KENNETH M. RAISLER

    JILL D. FAIRBROTHER

    Sullivan & Cromwell LLP

Counsel for Defendant Entergy-Koch Trading, LP


By: /s/ Mary Anne Sullivan

    MARY ANNE SULLIVAN

    WILLIAM H. JOHNSON

    Hogan & Hartson LLP

Counsel for Defendant Cook Inlet Energy Supply LLC

By: /s/ Robert A. Jaffe

ROBERT A. JAFFE

BARTHOLOMEW L. MCLEAY

SUZANNE M. SHEHAN

Kutak Rock LLP

Counsel for Defendant MidAmerican Energy Co.


By: /s/ Richard T. Marooney, Jr.

RICHARD T. MAROONEY, JR.

King & Spalding LLP

Counsel for Defendant Mieco Inc.


By: /s/ Jayant W. Tambe

ROBERT C. MICHELETTO

JAYANT W. TAMBE

KELLY A. CARRERO

Jones Day

Counsel for Defendant E Prime, Inc.


By: /s/ Kent A. Yalowitz

KENT A. YALOWITZ

Arnold & Porter LLP

GEOFFREY F. ARONOW

Heller Ehrman White & McAuliffe, LLP

Counsel for Defendant Oneok Energy Marketing and
Trading Company, L.P. and Oneok, Inc.

By: /s/ Richard P. Swanson

RICHARD P. SWANSON

VERONICA E. RENDON

Thelen Reid & Priest LLP

Counsel for Calpine Energy Services, L.P.

## **ORDER**

IT IS SO ORDERED.

Dated: _____

_____

The Honorable Andrew J. Peck

United States District Court

**EXHIBIT A**

**AGREEMENT TO BE BOUND BY STIPULATION AND PROTECTIVE ORDER**

1.    My name is _____. I am employed as

_____ [position] by _____ {name

and address of employer].

2.    I have received and read a copy of the Stipulation and Protective Order filed in *In*

*Re: Natural Gas Commodity Litigation* (Master File No. 3 Civ. 6186 (VM)). I understand the

provisions of the Stipulation and Protective Order, and agree to comply with, and to be bound

by its provisions. I attest that the scope of my employment does not currently include the

marketing of natural gas, or the direct supervision of any employee or employees whose

duties include the marketing of natural gas. I hereby agree to not use any "Confidential" or

"Restricted Confidential" Information obtained through this proceeding to give any other

Party or any competitor or customer of any Party a commercial advantage or to otherwise

disclose any such Information to anyone not authorized to receive it. I further agree that my

use of any "Confidential" or "Restricted Confidential" Information obtained through this

proceeding will be limited to my involvement in this proceeding. I agree to protect all

Confidential Information and Restricted Confidential Information in my possession and

maintain it in a secure place. I hereby agree to subject myself to the jurisdiction of the United

States District Court for the Southern District of New York and understand that the Court may

impose sanctions on me personally and/or on my employer for any violation of the Stipulation

and Protective Order. I further agree that upon termination of this action, or sooner if so requested, I shall return all Confidential and Restricted Confidential Information provided to me, including all copies and excerpts thereof, pursuant to the terms of the Stipulation and Protective Order.

Date_____    _____

                                 Name (type of printed)

                                 _____

                                 Signature

# EXHIBIT 30

## HEARING MINUTES AND ORDER

Cause Numbers:__CR-04-514___&___CR-06-080_____

Style:__United States of America v. Valencia & United States v. Singleton_____

### Appearances:
Counsel:                                          Representing:

| | |
|---|---|
| John Lewis/Belinda Beek | Government |
| Charles Flood/Chris Flood | Defendant Michelle Valencia |
| Paul Nugent | Defendant Singleton |
| Kent Schaffer/Duffy Carolyn | The McGraw-Hill Companies Inc. |
| Christopher Downey | Intelligence Press Inc./NGI, Inc. |

Date:__May 31, 2006_____          ERO: B. Laswell_____
Time:__1:33 p.m. - 7:45 p.m.__          Interpreter:_____

### At the hearing the Court made the following rulings:

Court made findings and conclusions of law that the courtroom should be CLOSED to the
public during the hearing because of the apparently highly sensitive nature of the information
to be discussed in argument and testimony in McGraw-Hill's and NGI's motions in these
cases.  The Court required that NGI representatives not be present during the McGraw-Hill
argument and evidence and excluded McGraw-Hill representatives during the NGI portion
of the hearing.

Oral argument and testimony heard.  Affidavits previously submitted all were received as the
direct testimony of McGraw-Hill's witnesses.

Defendant Singleton's Motions to Strike [Doc. # 25, 27, 28 in 4:06-CR-080] concerning
evidence of obstruction are DENIED.

Government's Motion to Strike [Doc. #133 in 4:04-CR-514] regarding McGraw-Hill's latest
submissions for untimeliness is DENIED in accordance with the record in open court.

Government to respond to all Defendants' pending Motions by Monday, June 5, 2006.

The McGraw-Hill Companies Inc.'s Motion to Intervene and Motion for Limited Protective
Order [Doc. # 119 in 4:04-CR-514] ("McGraw-Hill's Motion") is DENIED IN PART.

GRANTED IN PART, AND TAKEN UNDER ADVISEMENT IN PART.

− As to McGraw-Hill's requested intervention in this criminal case, the Motion is DENIED. There is no need for intervention at this time.

− The Motion is DENIED AS MOOT to the extent the parties and the Court have agreed that electronic versions (and, if necessary, hard copies) of the trial exhibits identified by the Government as of today and other similar documents produced to the grand jury by McGraw-Hill or generated during trial from McGraw-Hill's electronic database (*i.e.*, hard copies of (i) spreadsheets created by McGraw-Hill showing putative trade data submitted and created by McGraw-Hill in connection with the Platt's monthly surveys of gas prices and (ii) emails and other submissions by third party sources who contributed to the surveys (collectively, "McGraw-Hill Documents")) may be used freely by the parties at trial, so long as the copies are displayed during trial only as discussed at the hearing. The jury will be given for purposes of deliberation or at trial, hard copies of McGraw-Hill Documents (or similar documents generated electronically during trial) that are received in evidence. While deliberating, the jury will not have access to McGraw-Hill Documents in any electronic format.

− The parties and Court further AGREE in this case that no electronic versions of the McGraw-Hill Documents will be publicly filed.

− The Court TAKES UNDER ADVISEMENT the remaining issues in McGraw-Hill's Motion, specifically, whether hard copies of McGraw-Hill Documents received in evidence will be filed in the public record with or without redactions, will be retained by the Court under seal, or retained by the Government.

The NGI Motion for Limited Protective Order [Doc. # 129 in 4:04-CR-514] ("NGI's Motion") is DENIED IN PART, GRANTED IN PART, AND TAKEN UNDER ADVISEMENT IN PART.

− The Motion is DENIED AS MOOT to the extent the parties and the Court have agreed that electronic versions (and, if necessary, hard copies) of the trial exhibits identified by the Government as of today and other similar documents produced to the grand jury by NGI or generated during trial from NGI's electronic database (*i.e.*, hard copies of (i) spreadsheets created by NGI showing putative trade data submitted and created by NGI in connection with NGI's monthly surveys of gas prices and (ii) emails and other submissions by third party sources who contributed to the surveys (collectively, "NGI Documents")) may be used freely by the parties at trial, so long as the copies are displayed during trial only as discussed at the hearing. The jury will be given for purposes of deliberation or at trial, hard copies of NGI Documents (or similar documents generated electronically during trial) that are received in evidence. While deliberating, the jury will not have access to NGI Documents in any electronic format.

− The parties and Court further agree in this case that no electronic versions of the NGI

Documents will be publicly filed.

— The Court TAKES UNDER ADVISEMENT the remaining issues in NGI's Motion, specifically, whether hard copies of NGI Documents received in evidence will be filed in the public record with or without redactions, will be retained by the Court under seal, or retained the Government.

SIGNED at Houston, Texas this **31st day of May, 2006.**

P:\CTS\MINUTES\1-2004\04-05\14.6.wpd  060602.1613

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS

**MICHAEL N. MILBY**
CLERK OF COURT
P.O. Box 61010
HOUSTON, TEXAS 77208

www.txs.uscourts.gov



Duffy Carolan
Davis Wright et al
One Embarcadero Ctr
Ste 600
San Francisco  CA  94111-3611

Case: 4:04-cr-00514   Instrument: 135   (3 pages)  aty
Date: Jun 2, 2006
Control: 06063654
FAX number: 415-276-6599   (4 Total pages including cover sheet)
Notice: The attached order has been entered.

You could have received this notice faster by e-mail,
                 and
You can serve other parties through the court's electronic filing system.

Electronic Noticing and Filing is authorized in Civil, Criminal and Bankruptcy Cases.

Read more about it at www.txs.uscourts.gov under CM/ECF – Electronic Filing,
                 and
Register on-line for a training class to receive your user privileges.


If we are unable to sucessfully send this fax, we will print this notice and mail it to you. We will
continue to attempt to fax all subsequent notices.  For questions, please call (713) 250-5768.

# EXHIBIT 31

District of Columbia )
         ss.:
City of Washington )

## AFFIDAVIT OF KELLEY DOOLAN

I, Kelley Doolan, declare:

1. I am the Chief Editor of *Inside FERC's Gas Market Report* ("*Inside FERC*"), a publication of The McGraw-Hill Companies, Inc. ("McGraw-Hill"). I began working for McGraw-Hill in November 1986 as an associate editor of *Inside FERC*, which had been in existence since 1985. Prior to joining McGraw-Hill, I was a reporter for the Springfield Daily News in Springfield, Massachusetts for approximately five years. I have personal knowledge of the matters stated herein, unless otherwise stated, and could and would competently testify to them if called as a witness.

2. *Inside FERC* is a leading energy publication of Platts, a division of McGraw-Hill which publishes news about the natural gas industry, including natural gas prices assessments covering 70 pricing locations (often called "hubs") throughout the United States where natural case is traded. Its coverage of natural gas prices in the monthly market is based on information obtained firsthand from actual buyers and sellers in the marketplace by the same Platts reporters responsible for *Inside FERC*'s other market commentary. *Inside FERC*'s price assessments are based only on original reporting and do not incorporate other publicly available price surveys.

3. I understand that in response to subpoenas issued by the grand jury here and in the Northern District of California, McGraw-Hill produced

correspondence relating to trade data reported to *Inside FERC* by various natural gas companies, the company submissions of trade data and the internal Excel spreadsheets used by *Inside FERC* in the process of publishing its monthly natural gas price assessments.

4.    In addition to these productions, I appeared and testified for three full days before the grand jury of the Northern District of California on July 22, 2004, October 13, 2002 and November 10, 2004. During these appearances I was asked questions about McGraw-Hill's produced materials. Additionally, the Excel spreadsheets, as well as certain emails, were introduced and used by the prosecutor before the grand jury.

# REDACTED

### The Proprietary Nature of Confidential Source Information:

6.    With the emergence of a spot market in natural gas in the 1980s, *Inside FERC* first undertook efforts to report on prices in that market. Because spot transactions took place between private parties in the gas industry, *Inside FERC* faced substantial hurdles in its efforts to obtain prices and other information to include in its reporting. This difficulty arose in large part because the parties who entered into spot transactions had concerns that, if the details of their transactions were revealed, the parties would be at a competitive trading

2

disadvantage in the market. Sources and potential sources repeatedly expressed such concern to *Inside FERC*.

7.     Only with the passage of years and substantial efforts to develop sources of information within the gas industry did *Inside FERC* succeed in obtaining price and other information about the natural gas spot market. Importantly, *Inside FERC* had to engender trust in its sources that *Inside FERC* would not reveal their identities, their confidential trade information or otherwise take steps which would place them at a competitive disadvantage. It required years of effort before *Inside FERC* began collecting sufficient information from sources so that it could evaluate prices within the natural gas industry, and *Inside FERC* began publishing price indexes in the market in 1988. The expansion of *Inside FERC*'s price coverage to additional hubs not covered initially has required additional years of effort to develop further sources.

8.     *Inside FERC*'s ability to retain these sources – and acquire new ones – depends upon its ability to protect the confidentiality of its sources and the information they provided in the past.

9.     At no time have *Inside FERC*'s published price assessments revealed the identities of *Inside FERC*'s sources or the details of any individual transactions reported to *Inside FERC*. Rather, as is typical with journalists, *Inside FERC* has engendered trust with its sources over time by protecting their confidentiality and publishing only an aggregate price assessment.[1]

10.     Indeed, *Inside FERC* employees are required annually to sign a code of ethics that expressly forbids divulging confidential source information, which

---

[1] For example, *Inside FERC* currently publishes, on a monthly basis, its price assessment and the highest and lowest prices reported at each hub (without providing the date, volume or identity of source for any particular transaction).

3

includes but is not limited to the names of confidential sources, unless expressly authorized by the Editorial Vice President of Information and Trading Services.

### The Proprietary Nature Of The Methods By Which *Inside FERC* Assesses Prices:

11.    In a typical bid week during the time period covered by the subpoenas - "bid week" refers generally to the last five business days of each month - *Inside FERC* received in the range of a hundred e-mails and, to a lesser extent, faxes from its sources reporting natural gas trades.  Further, each price report often contains the details regarding several dozen trades at each hub, and each price report often reported about various hubs in one document.  The price reports include specific dates, prices, and volumes for each trade reported, and *Inside FERC* also has encouraged sources to include the trading counterparties on the reports during this time period.  In a typical bid week, *Inside FERC* considers thousands of transactions.

12.    This source data is compiled and maintained on Excel spreadsheets that took me years to develop.  Once all available data is collected for a given month's bid week and compiled on the Excel spreadsheets, *Inside FERC* evaluates the data by price hub.  At this juncture, *Inside FERC* performs an extensive review of the submitted data.  Among other things, *Inside FERC* performs a variety of statistical calculations utilizing the Excel spreadsheets discussed below.

13.    Importantly, *Inside FERC* further considers the submitted data in light of numerous other factors that are not susceptible to any precise calculation.  For example, *Inside FERC* may consider a given month's activity in comparison to prior months, changes in activity during the bid week at issue, which market participants are active at which hubs, current and forecasted weather conditions, gas storage inventories or the lack thereof, activity in electricity and industrial sectors that affect supply and demand of natural gas, natural gas pipeline capacity,

4

and, of course, *Inside FERC* also considers market trends and other market information provided by sources. Some portion of these considerations is reflected on internal spreadsheets utilized by *Inside FERC* in this process and discussed below.

14.    This in depth, focused editorial process lies at the heart of *Inside FERC's* publication of price assessments. Public disclosure of the editorial process engaged in by myself and others at *Inside FERC* in compiling the price indices would significantly disadvantage *Inside FERC* by making available commercially sensitive and valuable information to its competitors, in addition to causing irreparable harm to my newsgathering ability as a neutral and independent fact gatherer.

The Proprietary Nature Of The Documents At Issue:

# REDACTED

5

# REDACTED

# REDACTED

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this ___6___ day of December, 2004, in Washington, D.C.

*Kelley Doolan*

Kelley Doolan

Sworn to me this ___6___ day of December, 2004.

*MM Romero*

Notary Public

MIRNA J. ROMERO
NOTARY PUBLIC, DISTRICT OF COLUMBIA
My Commission Expires 8/31/07

7

# EXHIBIT 32

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

|  |  |  |
|---|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | Case No. 05-CV-62-JHP-FHM |
| Plaintiff, | ) ) ) |  |
| v. | ) ) ) |  |
| JEFFREY A. BRADLEY and ROBERT L. MARTIN, | ) ) ) |  |
| Defendants | ) ) ) ) ) | |

LARRY FOSTER, being duly sworn, deposes and says:

1.      I am the Global Editorial Director for Platts' Power publications, a position I have held since November 2003.  Prior to that date, I was Editorial Director for Platts' U.S. Natural Gas publications, a positioned I assumed in 1995.  The Power Group includes publications covering U.S. natural gas, U.S. electricity, European gas and electricity, global coal, global nuclear, emissions, and energy policy.  I submit this supplemental declaration to address certain issues raised with regard to the internal documents reflecting the editorial process by which the *Gas Daily* daily indices are derived and to explain why it is not possible for McGraw-Hill to produce a meaningful collection of such documents for use in this case.

2.      *Gas Daily* was acquired by Platts in September of 2001.  Every business day *Gas Daily* publishes daily price indices covering numerous pricing points across the United States as part of its extensive news coverage of the natural gas industry.   Until June 2002, *Gas Daily* also

published an index covering the monthly natural gas market, as well. In July 2002, *Gas Daily*'s monthly index was merged into *Inside FERC Gas Market Report*'s monthly index.

3.    During the 2001 to 2002 period, *Gas Daily* covered a range of pricing points of between approximately 102 and 116 pricing points. (Between January 2001 and September 2001, before Platts acquired it, *Gas Daily* covered approximately 116 pricing points; after the acquisition, that number dropped to approximately 102 as of July 1, 2002, and further reduced to approximately 85 in August 2004.)

4.    Before Platts acquired *Gas Daily* in September 2001, it is my understanding that the publication routinely discarded the information submitted by the energy company traders. And although after the acquisition, Platts informed *Gas Daily* reporters of Platts' preference for retaining the reports made by energy company traders, it is my understanding that, at least during a transition period that lasted well into 2002, *Gas Daily* reporters largely continued their previous practices of discarding the daily trade reports.

5.    The transaction data collected for purposes of creating the *Gas Daily* daily indices was not kept in Excel spreadsheet format, but rather in a database program. Because of the manner in which *Gas Daily* processed the transaction data received from its sources, there is no way of identifying which of the portions of the data-base contain data submitted by CMS or by Mr. Bradley or Mr. Martin. The reason for this is that until approximately November 2002, the computer system on which the database for the daily indices was kept was not set up to keep track of the source of each item of data considered in the creation of the daily indices. Moreover, the data recorded in the database does not include individual transaction detail. Thus, for all daily indices published before November 2002, *Gas Daily* simply does not have records that would enable the CFTC – or anyone else – to retroactively match the data considered for any given index assessment with any of the sources that provided it.

6.    I wish also to emphasize that McGraw-Hill has no way to even identify the portions of the database that *might* contain submissions by defendants, or their former employer, CMS. Accordingly, at minimum, the CFTC would have to identify the hubs for which defendants reported daily trade data and the dates on which that data was submitted before McGraw-Hill could even go about identifying which portions of the database might contain data submitted by CMS or defendants. Without that minimum amount of information, McGraw-Hill simply cannot identify which portions of the database would be relevant to the subpoenas issued to it by the parties in this case.

7.    I declare under penalty of perjury that the foregoing is true and correct.

June 7, 2006
Washington, DC

_____
Larry Foster

# EXHIBIT 33

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2
3    U.S. COMMODITY FUTURES TRADING :
     COMMISSION,                     :
4                                    :
                     Plaintiff,      : MISC. No. 05-235
5                                    :
         v.                          : Washington, D.C.
6                                    : Tuesday, September 27, 2005
     McGRAW HILL COMPANY, INC.,      :  10:02 a.m.
7                                    :
                     Defendant.      :
8                                    :
     . . . . . . . . . . . . . . . x
9
10                   TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE ROYCE C. LAMBERTH
11                 UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13
     For the Plaintiff:    ANTHONY M. MANSFIELD, ESQUIRE
14                         CHIEF TRIAL ATTORNEY
                           COMMODITY FUTURES TRADING COMMISSION
15                         Division of Enforcement
                           1155 21st Street, N.W.
16                         Washington, D.C.  20581
                           (202) 418-5686
17
                           MICHAEL SOLINSKY, ESQUIRE
18                         LEAD TRIAL ATTORNEY
                           COMMODITY FUTURES TRADING COMMISSION
19                         1155 21st Street, N.W.
                           Washington, D.C.  20581
20                         (202)  418-5384
21                         LAURA B. GARDY, ESQUIRE
                           TRIAL ATTORNEY
22                         COMMODITY FUTURES TRADING COMMISSION
                           1155 21st Street, N.W.
23                         Washington, D.C. 20581
                           (202)  418-5354
24
25

```
 1     APPEARANCES (Continued):
 2     For the Defendant:
 3                          VICTOR A. KOVNER, ESQUIRE
                            DAVIS WRIGHT TREMAINE, L.L.P.
 4                          Suite 450
                            1500 K Street, N.W.
 5                          Washington, D.C.  20005-1272
                            (202)  508-6617
 6
 7                          RICHARD L. CYS, ESQUIRE
                            CAROLYN K. FOLEY, ESQUIRE
 8                          DAVIS WRIGHT TREMAINE, L.L.P.
                            Suite 450
 9                          1500 K Street, N.W.
                            Washington, D.C.  20005-1272
10                          (202)  508-6617
11                          ADAM H. SCHUMAN, ESQUIRE
                            ASSOCIATE GENERAL COUNSEL
12                          THE McGRAW-HILL COMPANIES
                            1221 Avenue of the Americas
13                          New York, New York 10020-1095
                            (212)  512-4882
14
       COURT REPORTER:      THERESA M. SORENSEN, CVR-CM
15                          Official Court Reporter
                            U.S. Courthouse, Room 4800-H
16                          333 Constitution Avenue, N.W.
                            Washington, D.C.  20001
17                          202-273-0745
18
19
20
21
22
23
24
25
```

```
 1    privileged documents, notwithstanding this objection,
 2    McGraw-Hill responds that the responsive documents were
 3    previously produced in response to prior CFTC subpoenas, in
 4    the earlier subpoenas from 2003.  We gave them all those
 5    subpoenas, and it's -- and I -- you know, one of the things
 6    we were troubled by was when they -- you know, when they
 7    asked us in April of 2005 for a lot of information that we
 8    gave them in 2003, and also a lot of information that they
 9    already got from the energy companies.  We thought it was
10    appropriate, given the extent of our cooperation, our number
11    of meetings with them and providing them information, that
12    they should at least narrow their request to what they didn't
13    already have in their files from us.
14              THE COURT:  Okay.  Do you wanted to consult first?
15              MR. KOVNER:  If I may, Your Honor.  Thank you.
16              THE COURT:  Okay.
17         (Brief pause in proceedings.)
18              MR. KOVNER:  I think I've gotten it right, Your
19    Honor.  We pulled together whatever was public and provided
20    it, and it's not one of those objections where we just object
21    and didn't provide -- and didn't produce.
22              THE COURT:  Okay.
23              MR. KOVNER:  Thank you, Your Honor.
24              THE COURT:  Thank you very much.
25              All right, you get the last word since you've got
```

1    the burden.

2

3        MR. MANSFIELD:   I'll be very discrete.

4        The subpoena actually says -- the 2005 subpoena, any

5    information you've already provided to the Commission, please

6    just refer us to it and don't provide it again.  So that's

7    really not a point worth discussing much.

8        On the issue of confidentiality, you once again hear

9    Mr. Kovner refer you back to the confidentiality of the

10   larger relationship, which is all of the entities with the

11   Platts' representatives, but let's be very clear about what

12   the traders cared about, and this is in Platts' papers.

13       They cared about the information getting in the

14   hands of their competitors.  Now, that concern is in no way

15   implicated by the production of this information to a

16   regulator, and I would put before this Court that, in fact,

17   any one of these traders expected and knew that if the

18   regulator ever wanted this information, it was going to be

19   produced.

20       And the last point is, if we're really talking about

21   the trader's concerns about a competitive disadvantage, this

22   information is stale.  If this information reflected

23   strategies, those strategies have long past.  And so any

24   suggestion that this would be a concern to these traders, I

25   think, is dated.

1          With regard to Mr. Kovner's suggestion, again, this

2     whole idea of one trader, it's very unclear, it's very vague,

3     the affidavit is actually very clear that it's several

4     traders.  But let me just be very clear.  Any reticence of

5     the Commission to discuss what it has found in it's

6     investigation is a function of nothing more than the fact

7     that this is a non-public investigation.  We have tried to

8     protect the integrity of the investigation, and, frankly, the

9     protection of the company and the individuals that work for

10    this company.  If at any point this Court had any concerns

11    about the information that backs up what we're saying, we

12    would make that information available to the Court in camera.

13    What we won't do is, we will not make this information

14    available to McGraw-Hill.

15          And on this point about, "Come to us, show us what

16    you've got, let us work with you," there are two problems

17    with that.  One is that actually what McGraw-Hill says to us

18    is, "Come to us.  Show us everything you've got, and then

19    we'll step back and we'll consider whether that's enough, or

20    to make you work further."

21          And the second point is, that any discussion that

22    we've had with McGraw-Hill stops at the reports.  There is no

23    circumstance under which they are willing to produce what

24    they describe as their work product, which is really just the

25    spread sheets.

1           A point on the spread sheets quickly.  The
2    information on the spread sheets would include information
3    about, in this case, the company we're talking about and
4    other companies.  These companies provide waivers to allows
5    us to get this information.  We have gone through the hoops
6    of getting waivers from these companies in this case.  How
7    can we know what companies to get waivers from when they
8    won't tell us who's on the spread sheet and who's information
9    they have to protect?  Of course we can get waivers from
10   these companies if that was an issue.  And, in fact, one of
11   the things that we understand that McGraw Hill did the first
12   time they were forced to produce this information in a grand
13   jury context is, they redacted all of the names of all of the
14   companies who weren't the subject of the grand jury subpoena.

15          When the Texas Court was asked the consider that,
16   the AUSA explained that that was a real problem.  In fact,
17   those spread sheets moved without any redaction.

18          Now, again, and on this point about the implications
19   of this information getting out, remember -- and we are very
20   aware of the fact that there is a way -- there are several
21   ways to deal with protecting this information.  One is that
22   our investigations are non-public.  Two, we have the ability
23   to make objections under FOIA to request for this
24   information, and we don't discuss our investigations
25   publicly, and the most obvious is that there is an ability

1    within this Court to issue protective orders defining and

2    describing how we can use this information.  So that really

3    is something I think that has got to be considered.

4           And, obviously, just the last point is that, again,

5    any attempt by Mr. Kovner to parse out the words of my

6    affidavit describing in the context of a non-public

7    investigation what we know, again, our reticence is only

8    about the fact that it's non-public, and we are more than

9    willing to discuss with this Court, in camera, whatever it

10   needs to know to satisfy itself, although we take the

11   position that we don't have to show that we have a proven

12   case to have access to this information.  We did this, we

13   went through these hoops because we take very seriously the

14   invocation of the privilege, and we wanted to satisfy for

15   this Court -- not because we think we have a legal obligation

16   to -- we wanted to satisfy for this Court that we have done

17   what we need to do to satisfy this Court that we are making

18   every effort to get this information in other means before we

19   go to Platts.

20          So, again, you know, the idea that one trader, that

21   that simply -- it's not true.  It's a simple word smithing of

22   the language in my affidavit.  The evidence is available

23   before this Court in camera any time it would like to see it.

24          Thank you, Your Honor.

25          MR. KOVNER:  Your Honor, may I say something?

1          THE COURT:  Sure.

2          MR. KOVNER:  In April of this year Judge Bates of

3    this court, in response to a subpoena from a private litigant

4    to documents of the CFTC that were provided by an energy

5    company, and the CFTC opposed the subpoena, saying that they

6    got that in confidence, and Judge Bates ruled that those

7    documents went out, and they are now public.  Those are

8    documents that they got in connection with one of the

9    settlements.

10          Two, in terms of what they would submit, they filed

11   this affidavit under seal, Mr. Mansfield's affidavit under

12   seal.  We're bound by the sealing provisions.  For them to

13   say, well, we'll show the Court without our opportunity to

14   see what information they've done, what exhaustion of

15   sources, I -- I know the Court can evaluate it and we give

16   great weight to it, but there are some technical questions

17   that may well occur.  It seems to me that we ought to have

18   the opportunity to see what they have done under seal and

19   respond, and that have not done that after three years.

20          Thank you, Your Honor.

21          THE COURT:  What's the citation there the Judge

22   Bates.

23          MR. KOVNER:  It's in re:  Subpoena issued to

24   Commodity Futures Trading Commission, 370 F.Supp 2d, 201.

25          THE COURT:  Thank you.

1          All right, you still get the last word if you want

2     to say anything else.

3          MR. MANSFIELD:  Thank you for taking the time to

4     hear us today, Your Honor.

5          THE COURT:  I will say to counsel it's a nice job.

6     It's a great pleasure to have a civil case like this instead

7     of guns and drugs which is how I spend my life.  So thank you

8     for a nice argument today.

9          MR. KOVNER:  Thank you, Your Honor.

10          THE COURT:  The matter is submitted.

11          (Whereupon, the proceedings in the above-entitled matter

12     were concluded at 11:06 a.m.)

13

14

15

16                    CERTIFICATE OF REPORTER

17          I hereby certify that the foregoing is a correct

18     transcript from the records of proceedings in the

19     above-entitled case.

20

21

22                    _____

23                         Theresa M. Sorensen, CVR-CM

24                         Official Court Reporter

25